**IN THE CHANCERY COURT FOR THE STATE OF TENNESSEE**
**TWENTIETH JUDICIAL DISTRICT, DAVIDSON COUNTY**

| | |
|---|---|
| TENNESSEE IMMIGRANT AND REFUGEE RIGHTS COALITION; PAUL ADAMS; JOHANNA KEOHANE; JONI LANEY; DAVID MORALES; MARIA OCEJA; BILLY VAUGHN; and TERRY VO. <br><br> Plaintiffs, <br><br> v. <br><br> TENNESSEE HIGHWAY PATROL; TENNESSEE DEPARTMENT OF SAFETY AND HOMELAND SECURITY; JEFF LONG, Commissioner of the Department of Safety and Homeland Security, in his official capacity; COL. MATT PERRY, Deputy Commissioner of the Department of Safety and Homeland Security, in his official capacity, <br><br> Defendants. | Case No. _____ |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### Introduction

1. For the past year, the Tennessee Highway Patrol (THP) has been operating in tandem with the U.S. Immigration & Customs Enforcement (ICE) with the shared goal of detaining motorists to investigate their immigration status.

2. These agencies have operated in tandem because the officers of each agency have powers that the officers of the other lack. THP troopers can detain motorists for traffic violations; ICE agents generally cannot. Meanwhile, ICE agents can detain people for violating civil immigration laws; THP troopers cannot. So these agencies have operated in tandem on

1

Tennessee roadways: THP troopers stop vehicles for putative traffic violations when they suspect the motorists are noncitizens, and ICE agents—who either ride along with the troopers or are on standby nearby—then arrest the detained motorists if they develop probable cause of an immigration violation. Simply put, THP troopers exercise their traffic stop powers in service of ICE's arrest objectives.[1]

3. These joint THP-ICE operations cause great harm to Tennesseans. THP troopers choose to detain, and to prolong the detention of, motorists based on perceived race or ethnicity. They also repeatedly detain motorists who, absent the THP's subservience to ICE's objectives, otherwise would not have been detained. And when THP troopers encounter motorists who obviously have U.S. citizenship, the troopers choose *not* to enforce traffic laws against them, even for serious violations. The THP's subservience to ICE turns our highways into ad hoc immigration check points, and it also deprives taxpayers of the THP's protection against dangerous misconduct on the state highways.

4. In sum, the THP is engaging in a subterfuge by programmatically using its traffic-stop powers to serve ICE's immigration arrest objectives. This programmatic subterfuge is illegal. First, when engaging in it, the THP acts outside its statutory mandate; its actions are *ultra*

---

[1]This Complaint assumes traffic stops are made only when there actually is probable cause of a traffic violation and that immigration arrests are made only when there actually is probable cause of an immigration violation. That assumption is generous. Law-enforcement officers who make pretextual traffic stops often overreach by stopping vehicles even absent probable cause of a violation. *See, e.g., State v. Binette*, 33 S.W.3d 215, 219 (Tenn. 2000); *United States v. Freeman,* 209 F.3d 464, 466 (6th Cir. 2000); *United States v. Gross*, 550 F.3d 578, 582 (6th Cir. 2008). And ICE agents, especially under the current Administration, often abuse their arrest powers. Nicole Foy, ProPublica, *We Found That More than 170 U.S. Citizens Have Been Held by Immigration Agents. They've Been Kicked, Dragged and Detained for Days,"* ProPublica (Oct. 16, 2025, 12:00 PM) https://www.propublica.org/article/immigration-dhs-american-citizens-arrested-detained-against-will. But those types of abuses are not the focus of this Complaint.

*vires*. Second, its warrantless detentions of motorists violate the Fourth Amendment of the U.S. Constitution and Article I, Section 7 of the Tennessee Constitution because repeatedly detaining motorists based on a programmatic subterfuge is unreasonable. Third, the THP's track record during such operations shows that it detains motorists in violation of the Equal Protection Clause of the Fourteenth Amendments of the U.S. Constitution and Article I, Section 8 and Article XI, Section 8 of the Tennessee Constitution because its troopers stop motorists based primarily on their perceived race or ethnicity.

5. The Tennessee Immigrant and Refugee Rights Coalition (TIRRC), along with Tennessee taxpayers, Paul Adams, Johanna Keohane, Joni Laney, David Morales, Maria Oceja, Billy Vaughn, and Terry Vo, bring this action to seek declaratory and injunctive relief prohibiting the THP from engaging with immigration agents in joint operations whose purpose is the enforcement of civil immigration law. TIRRC and these Tennessee taxpayers do so in order to limit the THP to its proper role in law enforcement and to thereby stop its misuse and diversion of taxpayer funds for these illegal operations.

**Jurisdiction and Venue**

6. This Court has jurisdiction under Tenn. Code Ann. §§ 4-5-225, 16-11-101 *et seq*., 29-14-102, and 29-14-103.

7. This Court has authority to enter a declaratory judgment and to provide injunctive relief under Tenn. Code Ann. §§ 4-5-225, 16-11-101 *et seq*., 29-1-101 *et seq.*, 29-14-102, and 29-14-103 and Tenn. R. Civ. P. 65.01 *et seq.*

8. Venue is proper under Tenn. Code Ann. §§ 4-4-104, 4-5-225, and 20-4-101.

**Parties**

9.      Plaintiffs Paul Adams, Johanna Keohane, Joni Laney, David Morales, Maria Oceja, Billy Vaughn and Terry Vo pay sales, gasoline, and motor-vehicle taxes to the State of Tennessee, including the annual privilege tax on the operation of motor vehicles that is levied under Tenn. Code Ann. §§ 55-4-101, 55-4-105, and 55-4-111, as well as driver's license fees. They object to the Defendants' use of their tax payments to fund the THP operations described in this Complaint because they believe that those operations are not statutorily authorized, that they systematically violate the constitutional rights of motorists, and that they divert taxpayer funds away from the THP's statutorily authorized operations in order to engage in these illegitimate operations. It violates the Plaintiffs' consciences to contribute tax dollars towards the support of unlawful and discriminatory practices. They sue to prevent the Defendants from using public funds illegally and from using funds to act outside their publicly funded authority. *See Badgett v. Rogers*, 436 S.W.2d 292, 293–94 (1968) (allowing taxpayer standing where "public funds are misused or unlawfully diverted from stated purposes"); *Rutan-Ram v. Tenn. Dep't of Children's Services*, 698 S.W.3d 540, 566–67 (Tenn. App. 2023); *accord Langford v. Superior Court*, 729 P.2d 822 (Cal. 1987) ("[P]laintiffs may claim injury as taxpayers for the expenditure of funds by the [police department] to execute searches by unlawful methods.").[2]

10.      Plaintiff Paul Adams is a retired veteran of the U.S. Navy, in which he served as a Fleet Marine Force Corpsman. Presently, he is a Pastoral Care Assistant at a church in Rutherford County whose congregation is largely foreign-born. Through the church, he serves

---

[2] On May 5, 2026, Plaintiffs delivered a letter to the Defendants asking that they desist from the practices challenged in this Complaint. (Ex. 1, Letter of May 4, 2026.) Although undersigned counsel met with counsel for Defendants on May 11, no agreement to desist has been offered, and Plaintiffs gave subsequent notice of their intent to proceed by filing a lawsuit as soon as May 19.

4

congregants by, among other things, teaching English and naturalization classes. He has seen immigration-focused traffic stops impact congregants by making them scared to attend church and classes even when they have legal immigration status. He believes such traffic stops tear at the fabric of our society and tarnish America's reputation for decency and fairness. For these reasons, he wants the Tennessee Highway Patrol to stop misusing public funds to engage in such operations. He sues in his individual capacity as a taxpayer.

11. Plaintiff Johanna Keohane is a resident of Robertson County, Tennessee. As a motorist, she was subjected to a routine detention in the THP-ICE sobriety roadblock described in this Complaint. As a citizen, she is particularly concerned about the way the State uses public monies because she, a lifelong Republican, is fiscally conservative. On her own initiative, she has appeared at Tennessee legislative committees and testified regarding the merits or flaws in several pieces of legislation, ranging in topics from roadways to education to immigration. She firmly believes that THP-ICE joint operations are a waste of Tennessee tax revenues. She sues in her individual capacity as a taxpayer.

12. Plaintiff Joni Laney has resided in Memphis for more than four decades. Since last Fall, she has worked with groups who respond to traffic stops of immigrant motorists, both to witness the stops themselves and to help nondetained family members in the aftermath. She is aware that the Tennessee Highway Patrol is operating closely with federal immigration agents to seize immigrant motorists in Memphis. She is distressed to see how those operations cause acute harm by separating parents from their small children, depriving families of a crucial breadwinner, and taking hard-working people from their jobs. She believes that these operations are not only illegal, but also cruel. She sues in her individual capacity as a taxpayer.

5

13.     Plaintiff David Morales is a certified court interpreter who has lived in Tennessee for more than 26 years. He is also a motorcycle safety instructor. He has seen immigration-focused traffic stops such as Operation Flood the Zone in Nashville sow fear in local immigrant communities. He wants the Tennessee Highway Patrol to carry out its public safety functions, including promoting motorcycle safety and education and driver safety in general, and not divert resources to federal civil immigration enforcement operations that undermine immigrant community members' trust in state institutions, in particular law enforcement and the justice system. He sues in his individual capacity as a taxpayer.

14.     Plaintiff Maria Oceja, who has resided in Memphis since 1997, is a co-founder of the community collective, Vecindarios 901, which works to protect and support the immigrant community in Memphis. Volunteers within this collective, partly through the coordination of Plaintiff Oceja, have witnessed hundreds of traffic stops of immigrants since the Fall of 2026. Oceja is acutely aware that the Tennessee Highway Patrol has operated systematically with immigration agents to target Hispanic motorists for immigration investigations, and she has witnessed the devastating effect of those operations on the community. She believes this systematic attack on Hispanic motorists is unlawful and that taxpayer money should not support it. She sues in her individual capacity as a taxpayer.

15.     Plaintiff Billy Vaughn is a fourth-generation Methodist pastor who has been on appointment in the Memphis Annual Conference since 1980 in a wide variety of ministry settings. He is aware that the ongoing Tennessee Highway Patrol operations in Memphis are intimidating the Hispanic community, including deterring many from attending church in Memphis, and that churches are carrying a heavy burden of trying to repair the harm that these random immigration arrests cause. He believes that the THP should adhere to its role of

6

protecting the safety of those traveling on state roadways, rather than making foreign-born Memphians afraid to use those roadways. He sues in his individual capacity as a taxpayer.

16. Plaintiff Terry Vo is a Council Member of the Metropolitan Council of Nashville and Davidson County, representing District 17. District 17 is filled with businesses that rely on immigrant workers. During Operation Flood the Zone, Council Member Vo heard from numerous constituents that workers were not showing up for work and students were not going to school due to fear of THP traffic stops. She believes the THP's actions have prompted the community to distrust local government officials. Plus, in District 17, two constituents were struck and killed on U.S. Highway 41 in recent weeks. Council Member Vo believes the THP should focus on traffic enforcement rather than doing the work of federal immigration authorities at the expense of her constituents' welfare. She sues in her individual capacity as a taxpayer.

17. Plaintiff Tennessee Immigrant & Refugee Rights Coalition (TIRRC) is a statewide membership-based coalition of immigrants, refugees, and allies working to lift up fundamental American freedoms and human rights and build a strong, welcoming, and inclusive Tennessee. TIRRC's members include immigrants and naturalized citizens who have been and/or have a fear being subjected to pretextual traffic stops by THP troopers operating at the behest of ICE. TIRRC brings this suit on behalf of its members who have experienced previous injury and are subject to imminent future injury due to the defendants' unlawful collaboration with ICE. It may bring such a claim because "(1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted, nor the relief requested, requires the participation of individual members in the lawsuit." *ACLU v. Darnell*, 195 S.W.3d 612, 626 (Tenn. 2006) (citing *Citizens for Collierville, Inc. v. Town of Collierville*, 977 S.W.2d 321, 323 (Tenn. Ct. App. 1998) *perm.*

7

*app. denied* (Tenn. Sept. 14, 1998); *Curve Elementary Sch. Parent & Teacher's Org. v. Lauderdale County Sch. Bd.*, 608 S.W.2d 855, 858 (Tenn. Ct. App. 1980) *perm. app. denied* (Tenn. June 30, 1980)).

18.     First, TIRRC's members have suffered a clear, constitutional injury—unlawful stops and seizures resulting from racial profiling—and face an imminent risk of experiencing that injury again at the hands of the defendants. That injury was caused by the defendants' ongoing unlawful collaboration with ICE, and it is redressable through a court order enjoining the defendants from engaging in such unlawful conduct. *See Case v. Wilmington Tr.*, N.A., 703 S.W.3d 274, 290 (Tenn. 2024) (quoting *City of Memphis*, 414 S.W.3d at 98)[3]; *Floyd v. City of N.Y.*, 283 F.R.D. 153, 169–71 (S.D.N.Y. 2012) (finding plaintiff previously subjected to random racial profiling stop who feared being stopped again had standing to seek injunctive relief on Fourth and Fourteenth Amendment claims). For example, TIRRC member "Rosa" was stopped by a THP trooper near Memphis in January 2026. Rosa is a lawful permanent resident of the United States and a national of Mexico. The trooper who stopped Rosa told her he had stopped her because the tint in her car windows was too dark and the light beside her license plate was out. The trooper asked Rosa for her license and told her that he had, as he called it, an "alphabet

---

[3] Although *Wilmington Trust* clarified the distinction between what is required for plaintiffs alleging private rights versus public rights claims, that decision had no impact on the Court's taxpayer standing or associational standing jurisprudence. *See id.* at 290 n.14 ("This is not a taxpayer standing case. Therefore, our analysis does not address taxpayer standing issues."); *Phillips v. Tennessee*, No. 23-1196-IV(I) (Tenn. Ch. October 16, 2025) (slip op. at 22) ("*Wilmington Trust* did not address, discuss, or purport to overrule any prior associational standing cases. 'The absence of any language in [*Wilmington Trust*] purporting to overrule precedent serves to indicate that [*Wilmington Trust*] should not be read to, in fact, overrule decades of clear Tennessee case law in this regard.'" (quoting *State v. Enix*, 653 S.W.3d 692, 700 (Tenn. 2022))).

8

soup" of federal agencies accompanying him, including ICE and Homeland Security Investigations (HSI) agents. He told her he needed to give her identification to those colleagues so they could run it in their systems. After a while, he returned and told her she could leave. Based on her knowledge that many THP traffic stops in Memphis led to ICE arrests, and the fact that she had never been told her car windows were too dark, Rosa believed that she had been subjected to a pretextual traffic stop for the purpose of investigating her immigration status. She experienced anxiety and a sense of powerlessness for the duration of the stop. She fears being stopped again by THP troopers. Her fear is well-founded, as hundreds of state troopers continue to participate in the Memphis Safe Task Force along with ICE and other federal agents, and THP is receiving additional funding to send even more troopers to Memphis.

19. Second, the interests that TIRRC seeks to protect—the rights of its members not to be racially profiled and not to be subjected to unlawful stops for the purpose of immigration enforcement—are directly related to the organization's core purpose. TIRRC's mission is to build power for immigrant communities and create a more inclusive Tennessee for people of all nationalities and races. Because THP's unlawful operations go to the heart of TIRRC's goal of building immigrant power and belonging, TIRRC has devoted significant resources over the past year to respond to the harm inflicted on its members by THP's unlawful operations. During Operation Flood the Zone in May 2025, TIRRC made and received more than 2,000 calls to respond to individuals seeking assistance locating friends and family members who were detained by ICE. Since October 2025, TIRRC has provided support, information, and referrals to hundreds of Memphis area residents who have been subjected, feared being subjected, or have loved ones who were subjected, to pretextual traffic stops for the purpose of an immigration

9

investigation. Protecting the rights of immigrant community members to not be subjected to unlawful stops and racial profiling is squarely within TIRRC's mission and mandate.

20. Finally, because the relief sought here is injunctive, individual members need not participate in the suit. *See Union Cnty. Educ. Ass'n v. Union Cnty. Bd. of Educ.*, No. E2013-2686-COA-R3-CV, 2014 Tenn. App. LEXIS 525, at \*22 (Tenn. App. Aug. 28, 2014) ("Where an association seeks only a prospective remedy, it is presumed that the relief to be gained from the litigation 'will inure to the benefit of those members of the association actually injured.' Accordingly, requests made by an association for prospective relief generally do not require the individual participation of the organization's members." (quoting *St. Louis Ass'n of Realtors v. City of Ferguson*, 354 S.W.3d 620, 624 (Mo. 2011))).

21. Defendant Tennessee Department of Safety and Homeland Security is a department of the Tennessee state government.

22. Defendant Tennessee Highway Patrol is a division of the Tennessee Department of Safety and Homeland Security.

23. Defendant Commissioner of the Department of Safety and Homeland Security, currently Jeff Long, is sued in his official capacity.

24. The Commissioner heads the Department and has broad authority over its operations. Tenn. Code Ann. § 4-7-101.

25. Defendant Deputy Commissioner director of the Tennessee Highway Patrol, currently Colonel Matt Perry, is sued in his official capacity.

26. The Deputy Commissioner has broad authority over the operations of the Tennessee Highway Patrol. Tenn. Code Ann. § 4-7-101.

10

27.     The Department, through the Commissioner, has statutory authority to receive, administer, allocate, disburse, state funds derived from taxes.

28.     As relevant here, the Tennessee Highway Patrol receives and administers funds generated by sales taxes, motor vehicle taxes, and driver's license fees. *See* Tenn. Code Ann. §§ 4-7-107(a), 4-7-111(e), 4-7-112(b), 55-50-324.

28.     Tax payments made by the plaintiffs to the State of Tennessee flow into the State's general fund.

29.     The General Assembly appropriates funds from the State's general fund to the Tennessee Highway Patrol for general operating expenses and trooper salaries. Tenn. Code Ann. § 4-7-107(a).

30.     Appropriations from the General Assembly to the THP have grown rapidly in the past five years. For example, the General Assembly appropriated more than $300 million from the State's general fund to THP for fiscal year 2027, representing a 154% increase from the fiscal year 2021.[4]

31.     Those appropriated funds support the THP's unlawful pretextual traffic stop operations described herein, to which Plaintiffs object.

### General Allegations

#### *Legal Background*

32.     Enforcement of immigration law is generally the task of immigration agents, not Tennessee law enforcement agencies or officers. That is so because, except in unusual circumstances, being present in the State of Tennessee without legal immigration status is not a

---

[4] Mandy Spears & Robin Yeh, *The Budget in Brief: Summary of Gov. Lee's FY 2027 Recommended Budget*, <u>Sycamore Inst.</u>,12 fig. 14 (Feb. 13, 2026), https://sycamoretn.org/wp-content/uploads/2026/03/fy-2027-budget-in-brief_updated-3.9.26.pdf.

criminal offense, but rather a violation of civil law. *Arizona v. United States*, 567 U.S. 387, 407 (2012) ("As a general rule, it is not a crime for a removable alien to remain present in the United States. If the police stop someone based on nothing more than possible removability, the usual predicate for an arrest is absent.").[5] That means that Tennessee law enforcement officers cannot arrest—nor can they even briefly detain for investigation—someone on suspicion of lacking lawful immigration status. *See Arizona*, 567 U.S. at 414–15; *United States v. Urrieta*, 520 F.3d 569, 574 (6th Cir. 2008) (holding police violated Fourth Amendment by prolonging detention of motorist to ask about apparent lack of lawful immigration status). That can be done only by immigration agents or by law enforcement officers who have been specially trained and certified to operate as immigration "task force" officers under a program known as "287(g)." 8 U.S.C. § 1357(g).[6]

33. For their part, however, immigration agents lack the power to detain or arrest people for ordinary traffic violations. *See* 8 U.S.C. § 1357(a). Thus, they cannot use traffic stops as a pretext to question motorists about their immigration status. *Id.* Nor can they stop motorists based simply on their perceived race or ethnicity to investigate their immigration status. *United States v. Brignoni-Ponce* 422 U.S. 873, 884 (1975) ("Except at the border and its functional equivalents, officers on roving patrol may stop vehicles only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant

---

[5] Even though entering the United States without permission is a misdemeanor, 8 U.S.C. § 1325(a), it is a non-continuing offense and so someone who entered without permission and is living in Tennessee is not committing a crime. *United States v. Rincon-Jimenez*, 595 F.2d 1192, 1194 (9th Cir. 1979).

[6] As of the Fall of 2025, the Defendants advised undersigned counsel, in separate litigation, that no THP officers were trained and certified as 287(g) task force officers, although the THP had entered into a 287(g) agreement in May 2025. On information and belief, none of the officers whose conduct is addressed in this Complaint have the requisite 287(g) task force certification.

suspicion that the vehicles contain aliens who may be illegally in the country."); *id.* at 886–87 (holding stop invalid when based simply on "Mexican appearance"). Lacking these powers, immigration agents cannot conduct "roving patrol[s]" on the roadways of the interior of the United States, including Tennessee. *Id.* at 884.

34.     As for the THP, its main duty is to "[p]atrol the state highways and enforce all laws, and all rules and regulations of the department of transportation regulating traffic on and use of those highways." Tenn. Code Ann. § 4-7-104(1). Its other powers are likewise enumerated, and they include activities such as investigating commercial vehicles, investigating vehicle thefts, and assisting in tax collection. Tenn. Code Ann. §§ 4-7-104(2), 105, 114. The THP is granted these powers for three purposes: to "[p]rotect the lives and safety of the traveling public on state highways," to "[c]onserve and preserve the state's property," and to "[a]ssist in the collection of state revenues." Tenn. Code Ann. § 4-7-113.

35.     Thus, the THP's powers are limited to those granted by the statute. Tenn. Attorney General Opinion, 1983 Tenn. AG LEXIS 120, *1–3 (Aug. 17, 1983) (opining as much, although advising that troopers can nonetheless make arrests for criminal offenses that they happen to see when traveling on a roadway other than a state highway); *see, e.g., State v. Dodd*, No. 02-c-01-9503-CC-93, 1995 Tenn. Crim. App. LEXIS 901, at *4 (Tenn. Crim. App. Nov. 15, 1995); *see generally* Tenn. Code Ann. § 4-5-103(a)(2) ("Administrative agencies shall have no inherent or common law powers, and shall only exercise the powers conferred on them by statute or by the federal or state constitutions."). Their statutory mandate also allows THP troopers, at a sheriff's request, to assist the sheriff in enforcing the criminal code. Tenn. Code Ann. § 38-3-103; *see Mullins v. State*, 304 S.W.2d 333, 358 (Tenn. 1957). But as for civil immigration law,

THP officers are not allowed to enforce such law unless, as mentioned, they are "certified as trained" under the appropriate 287(g) program. Tenn. Code Ann. § 4-7-121.

36.     Nonetheless, over the last year, the THP has jointly engaged with ICE in operations whose purpose has been to enforce civil immigration law. They have teamed up to do the kind of roving immigration patrols disallowed by the U.S. Supreme Court in *Brignoni-Ponce*. Public statements by the THP indicate that its leadership believes that these joint operations are legitimate as long as THP troopers are patrolling state highways and taking actions at least nominally related to enforcing traffic codes. (Ex. 2, THP Press Release.) But there are limits on the THP's exercise of police powers.

37.     One overarching limitation is this: When a law-enforcement operation is designed "on the administrative or planning level," the operation's real purpose matters. *State v. Hicks*, 55 S.W.3d 515, 536 (Tenn. 2001); *see City of Indianapolis v. Edmond*, 531 U.S. 32, 47 (2000) ("[A] program driven by an impermissible purpose may be proscribed while a program impelled by licit purposes is permitted, even though the challenged conduct may be outwardly similar."). That is, the validity of the "state interest" in an administratively planned operation is measured by its real purpose, not by its stated purpose, when the stated purpose is a mere "subterfuge." *Hicks*, 55 S.W.3d at 536. And so, if the THP programmatically uses a certain power as a subterfuge for achieving an ulterior goal, the legitimacy of the operation depends on the operation's real purpose. *See id.* at 536–37.

38.     There are also specific limitations relevant here.

39.     *First*, as mentioned, the THP is limited to its enumerated powers, which do not include the enforcement of civil immigration laws. *See supra* ¶¶ 32, 34–35. So when the real

14

purpose of an operation is the enforcement of civil immigration laws, the operation is *ultra vires* and is an illegal expenditure of THP resources, which are public funds.

40.     *Second*, the THP cannot detain motorists without a warrant if it does so in a way that is "unreasonable." U.S. Const. Amend. IV; Tenn. Const. Art. I, § 7; *see State v. Downey*, 945 S.W.2d 102, 106 (Tenn. 1997) (treating the Fourth Amendment and Article I, Section 7 as equivalents). Granted, the law does allow an individual THP trooper to stop a motorist on a pretextual basis—that is, claiming a traffic offense is the reason for the stop when in fact the trooper has a hunch the motorist is committing another crime—because "subjective intentions [of the arresting officer] play no role in ordinary, probable cause Fourth Amendment analysis." *State v. Vineyard*, 958 S.W.2d 730, 734 (Tenn. 1997) (quoting *Whren v. United States*, 517 U.S. 806, 813 (1996)). But when the "subterfuge exists on the administrative or planning level," pretextual seizures of motorists are unreasonable because the court should consider the State's real, not the pretextual, interest in the seizure. *See Hicks*, 55 S.W.3d at 536. And when the real reason for the seizure is to investigate the motorist's immigration status, the seizure is unreasonable because it is illegal for a THP trooper to detain someone for an immigration investigation. *See id.* at 536–37; *Robertson v. State*, 198 S.W.2d 633, 635 (Tenn. 1947) ("Highway Patrol Officers . . . must exercise this right to check operators' licenses in good faith and not as a pretext or subterfuge for an inspection of or a prying into [other matters]." (citing *Cox v. State*, 181 S.W.2d 338, 340 (Tenn. 1944))). *See also supra* ¶32, 34–¶35 (setting forth limits on trooper's powers).

41.     Indeed, in the situation of a roadblock, where motorists are stopped without probable cause of any traffic violation, it is well-established that the stop is unconstitutional if programmatically done for an ulterior reason. *Hicks*, 55 S.W.3d at 536–37; *United States v. Huguenin*, 154 F.3d 547, 555 (6th Cir. 1998). Due to the overarching requirement that any

15

seizure be reasonable, that same rule logically applies to a traffic-stop operation that is designed on "the administrative or planning level" to serve an ulterior purpose. *Hicks*, 55 S.W.3d at 536. The "extreme practice" of *programmatically* exercising traffic-stop powers for an ulterior purpose is unreasonable because a police force breaches the social contract when it seizes the public repeatedly while systematically lying to them about the real reason for seizing them. *Whren*, 517 U.S. at 818 (stating that in the case of an "extreme practice" that is "unusually harmful" to privacy interests, a court could, notwithstanding the existence of probable cause of a traffic violation, find a seizure to be constitutionally unreasonable); *see* 2 Search and Seizure § 23.22 (2025) ("*Whren* does not stand for the notion that programmatic purpose is irrelevant. It may be quite relevant if the case involves a decision made by others . . . ."); *cf. Ellis v. State*, 211 Tenn. 321, 332 (1963) ("Nothing can destroy a government more quickly than . . . its disregard of the charter of its own existence." (quoting *Mapp v. Ohio*, 367 U.S. 643, 659 (1961))). Where, as here, a police force deliberately and systematically circumvents constitutional protections, those protections need to be reinforced to protect the public from programmatic overreach and to stop the slide towards a police state. *See, e.g.*, *Missouri v. Seibert*, 542 U.S. 600, 617 (2004) (Souter, J., plurality op.) (making *Miranda* protections more stringent because police departments were deliberately exploiting, through special "training instructions," a weakness in those protections); *id.* at 618–22 (Kennedy, J., concurring) (rejecting police "technique . . . designed to circumvent *Miranda*"). *See generally Johnson v. United States*, 333 U.S. 10, 17 (1948) (allowing police to have virtually unfettered search powers "would obliterate one of the most fundamental distinctions between our form of government, where officers are under the law, and the police-state where they are the law").

42.     *Third*, under no circumstance can a THP trooper stop a motorist or prolong[7] the stop of that motorist based on his or her race or ethnicity, which is what troopers will deliberately and regularly do when their real goal—established "on the administrative or planning level," *Hicks*, 55 S.W.3d at 536—is to enforce civil immigration laws. *Wren*, 517 U.S. at 813 (stating the Equal Protection Clause prohibits "selective enforcement of the law based on considerations such as race"); *United States v. Avery*, 137 F.3d 343, 355 (6th Cir. 1997) ("[W]e find that citizens are entitled to protection of the laws at all times. If law enforcement adopts a policy, employs a practice, or in a given situation takes steps to initiate an investigation of a citizen based solely upon that citizen's race, without more, then a violation of the Equal Protection Clause has occurred."); *see Floyd v. City of New York*, 959 F. Supp. 2d 540, 563 (S.D.N.Y. 2013) ("A police department may not target a racially defined group for stops in general—that is, for stops based on suspicions of general criminal wrongdoing—simply because members of that group appear frequently in the police department's suspect data. The Equal Protection Clause does not permit the police to target a racially defined group as a whole because of the misdeeds of some of its members."). In short, even if a seizure can be defended as "reasonable" under the Fourth Amendment, it violates the Fourteenth Amendment's Equal Protection Clause if motivated by race or ethnicity.

43.     As discussed below, when engaging in joint operations with immigration agents, the THP has regularly violated these three limits on its powers, and thus it has unlawfully

---

[7] *Rodriguez v. United States*, 575 U.S. 348, 356–57 (2015) (police cannot prolong a traffic stop to engage in "[o]n-scene investigation into other crimes," and there is no exception for "de minimis" delay); *see, e.g.*, *Urrieta*, 520 F.3d at 579 (holding that a very brief prolongation of a traffic stop—the time it took to ask immigration-related questions—violated the Fourth Amendment).

17

misused, and continues to unlawfully misuse, public funds, diverting those funds into unlawful operations.

### *Operation Flood the Zone*

44.     THP and ICE jointly carried out Operation Flood the Zone[8] in Davidson County from May 3 to May 10, 2025. At any given time, about nine THP troopers participated in the operation.[9] ICE agents typically rode in the THP trooper's vehicle.[10] Other ICE agents often drove their own vehicle behind the THP trooper and others were on standby nearby.[11]

45.     During this operation, THP troopers reportedly stopped 609 vehicles.[12] On the first night alone—over the span of about 8 hours—the THP made more traffic stops than did the Metro Nashville police in the whole county in that entire 48-hour weekend.[13] Sometimes just seconds elapsed between the end of one stop and the start of the trooper's next stop.[14] Despite stopping so many motorists during this operation, troopers wrote just 48 citations, which was down nearly 80 percent from that same week in May 2024.[15]

46.     Instead of writing citations, the troopers were helping ICE arrest motorists on suspicion of lacking lawful immigration status. Indeed, the programmatic purpose of these traffic

---

[8] In immigration documents, ICE referred to the operation by this name.
[9] Sarah Grace Taylor, '*Huntin' Time' – How ICE and Tennessee State Troopers Targeted Immigrants, Inflated Safety Claims*, Nashville Banner (Feb. 19, 2026), https://nashvillebanner.com/2026/02/19/immigration-deportation-ice-thp-nashville-operation/.
[10] *Id.*; *see also* Video No. 2025-05-04-0042 [(Redacted)_Axon_Body_4_Video_2025-05-04_0042_D01A8699Y.mp4], TIRRC, at 10:53 (on file with TIRRC) (trooper stating "we have ICE in every car").
[11] Taylor, supra note 9.
[12] *Id.*
[13] Steven Hale, *Less Than Half of the Nearly 200 Arrested in Nashville ICE Operation Had Criminal History*, Chattanooga Times Free Press (May 15, 2025), https://www.timesfreepress.com/news/2025/may/14/less-than-half-of-nearly-200-arrested-in/.
[14] Taylor, supra note 9.
[15] *Id.*

18

stops—as established at the administrative or planning level—was to find such motorists so ICE agents could arrest them. In short, the THP's enforcement of the traffic code was a subterfuge for enforcing civil immigration law. Three things make this fact perfectly clear.

47.     *First*, the simple fact that THP troopers carried ICE agents with them in their own vehicles—and had them on standby nearby—speaks volumes about the real reason for the traffic stops. *See Hicks*, 55 S.W.3d at 537 (saying "one may infer" that the real purpose of a roadblock was *not* to check driver's licenses because the officer had a drug dog with him).

48.     Plus, as revealed by 52 hours of video footage from the operation's first night, the investigation of stopped motorists focused on immigration status, not a putative traffic violation. Once a trooper stopped a motorist, the ICE agent would listen in on the trooper's conversation with the motorist who was asked immigration-related questions,[16] or else the agent would himself pose immigration-related questions after getting a report from the trooper.[17] Unless the detained motorist spoke English with no foreign accent, the focus of the stop shifted quickly to immigration status.[18] *See State v. Hayes*, 188 S.W.3d 505, 517–18 (Tenn. 2006) (inferring the officer was "pursuing investigatory agendas that were wholly distinct and apart from the State's

---

[16] *See* Editorial, *White Drivers Got a Warning. Latino Drivers Got Detained.*, at 2:01; 2:09; 3:35–3:45, N.Y. Times (April 29, 2026) https://www.nytimes.com/2026/04/29/opinion/ice-racial-profiling-supreme-court.html ("'Are you here illegally?'. . . 'Were you born here?' . . . 'Are you from Nashville?' 'Yeah, I'm from Nashville.' 'You are? You born here?' . . . 'How long have you been in this country?' . . . 'Were you born here?' . . . 'Were you born here in the United States?'"); Video No. 2025-05-03-2158 [(Redacted)_Axon_Body_4_Video_2025-05-03_2158_D01A8097K.mp4], TIRRC, at 4:58–5:20 (on file with TIRRC) (ICE agent in a trooper's car tells the trooper, "Ask him where he was born, if you don't mind." The trooper responds, "Okay," exits the vehicle and asks driver, "Where were you born at?"); Video No. 2025-05-04-0150 [(Redacted)_Axon_Body_4_Video_2025-05-04_0150_D01A7394R.mp4], TIRRC, at 2:39–2:59 (on file with TIRRC) ("'Are you from Nashville?' 'Yes sir, I am.' 'Born and raised?' 'Yes sir. . . . I was actually born in Egypt but raised here.'" Trooper to ICE agent: "Another Egyptian guy.").
[17] *Id.*
[18] *Id.*

claimed interest" since he asked detained people questions related to the distinct agenda). Similarly, troopers would often delay taking the steps necessary to process the putative traffic offense in order to give ICE agents the chance to question the motorists about immigration status[19]—thereby wrongfully prolonging the traffic stop for an "[o]n-scene investigation into other" matters. *Rodriguez*, 575 U.S. at 356. Both the immediate presence of the ICE agent and the focus on immigration-related questioning indicate that the troopers were pursuing an agenda "wholly distinct and apart" from traffic enforcement, namely, the enforcement of civil immigration law. *Haynes*, 188 S.W.3d at 517 (quoting *Hicks*, 55 S.W.3d at 537).

49. *Second*, the 52 hours of video footage also makes it perfectly clear that the entire operation was a subterfuge designed at the administrative level. Footage shows that the troopers formed teams with ICE agents—evidently teams 1 through 8—and these teams kept count of their immigration arrests, which was the operation's metric of success.[20] The teams went so far

---

[19] Video No. 2025-05-03-2050 [(Redacted)_Axon_Body_4_Video_2025-05-03_2050_D01A8872Y.mp4], TIRRC (on file with TIRRC) (prolonging stop to wait for a relative to come to the scene and translate for a Middle Eastern passenger who did not speak English, yet was a U.S. citizen); Video No. 2025-05-03-2102 [(Redacted)_Axon_Body_4_Video_2025-05-03_2102_D01A8362P.mp4], TIRRC (on file with TIRRC) (trooper turns motorist over to ICE agent for questioning while trooper just stands and waits, rather than acting on the putative traffic offense); Video No. 2025-05-03-2212 [(Redacted)_Axon_Body_4_Video_2025-05-03_2212_D01A8362P.mp4], TIRRC (on file with TIRRC) (trooper hands driver's documents to ICE agents and waits to see what they decide, rather than acting on the putative traffic violation); Video No. 2025-05-03-2136 [(Redacted)_Axon_Body_3_Video_2025-05-03_2136_X60AF3694.mp4], TIRRC (on file with TIRRC) (after having already checked the driver's license, trooper stands by doing nothing—prolonging the stop—so ICE agent can ask motorists immigration questions); Video No. 2025-05-03-2227 [(Redacted)_Axon_Body_3_Video_2025-05-03_2227_X60AF3694.mp4], TIRRC (on file with TIRRC) (after having already confirmed validity of the driver's license, trooper prolongs the traffic stop so ICE agent can, due to U.S. citizen driver's "broken" English, ask him immigration questions).

[20] Taylor, supra note 9. For example, one trooper told another: "I stopped 15, *and I took seven . . . [o]r ICE took seven." *Id.*

20

as to use a Sharpie pen to write their team number on detained immigrants, evidently to ensure they would be credited for their detentions.[21]

50.     Troopers sought to win under this metric of success. One trooper explained to the ICE agents that he planned that night to stop any motorist with a temporary tag, and later that night he further explained that: "7 out of 10, if it's a temp tag, it's generally somebody that's either Hispanic or Egyptian."[22] That is, he planned to enforce a *particular* traffic law because he thought doing so would render more immigration arrests. At that same time, that trooper remarked that troopers were in fact succeeding in "*finding the ones we need to find*," namely, noncitizens that ICE would arrest.[23] Another trooper, referencing the fact that this operation was planned at the administrative level, mentioned that he "kn[e]w they're wanting to focus on immigration" in making the traffic stops.[24] Another trooper, describing his participation in the operation, said that he was doing what "[s]omeone above told [him] to do."[25] At the end of his shift, another trooper, laughing, summed up his night's work by saying he was "just fucking shipping people back off to damn Honduras and shit."[26] The troopers knew that their real job that night was detaining motorists to investigate their immigration status.

51.     *Third*, the footage also shows that, because their real job was detaining motorists to investigate their immigration status, the troopers *avoided* enforcing the traffic and criminal

---

[21] *Id.*

[22] Video No. 2025-05-03-2112 [Redacted)_Axon_Body_3_Video_2025-05-03_2112_X60A3362S.mp4], TIRRC, at 21:27 to 21:40 (on file with TIRRC); Video No. 2025-05-03-2226 [(Redacted)_Axon_Body_3_Video_2025-05-03_2226_X60A3362S.mp4], TIRRC, at 23:49–24:27 (on file with TIRRC).

[23] *Id.* at 23:42.

[24] Taylor, *supra note 9.*

[25] *Id.*; *see also* Video No. 2025-05-03-2115 [(Redacted)_Axon_Body_4_Video_2025-05-03_2115_D01A8872Y.mp4], TIRRC, at 44:45–45:00 (on file with TIRRC) (supervisor asking troopers if they have a total for arrests so far for the night).

[26] Taylor, supra note 9.

21

codes since doing so would detract from their real job. That is, for the subterfuge to be most effective, they had to minimize their actual enforcement of the criminal or traffic codes. Thus, when it was obvious a detained motorist was a U.S. citizen—due to their appearance, accent, and possession of a Tennessee driver's license—troopers cut short the traffic stop, sometimes without even taking the one or two minutes required to run the license through their computer system.[27] Troopers even let U.S. citizens leave the scene without any citation after committing significant offenses, like driving with a "completely fake" temporary tag (a felony, according to the trooper), driving 64 mph in a 40-mph zone, and verbally threatening to kill officers with a gun.[28] Another trooper, when retrieving his citation-writing clipboard from the back of his vehicle, said he had thrown it in the back because he "was planning on not using it tonight."[29] The plan that night was to *not* waste time enforcing the traffic or criminal code. Doing so would "cut[] into" what one trooper called "huntin' time."[30]

52. In light of these factors—the immediate presence of ICE agents, the focus on immigration-related questioning, the effort to detain as many immigrant motorists as possible, and the effort to minimize time with non-immigrant motorists—it is crystal clear that the plan, as designed on the administrative and planning level, was for troopers to help enforce civil immigration law, not to enforce the criminal or traffic codes.

53. Worse, in furtherance of that plan, troopers used race or ethnicity as their basis for choosing which motorists to detain. That is obvious both due to the way the operation was designed and due to how it was executed. As for the plan's design, the THP chose to deploy the

---

[27] *Id.*
[28] *Id.*; Video No. 2025-05-04-0042 [(Redacted)_Axon_Body_4_Video_2025-05-04_0042_D01A8699Y.mp4], TIRRC, at 15:15–15:30 (on file with TIRRC).
[29] Taylor, supra note 9.
[30] *Id.*

operation in Nashville neighborhoods having the highest percentage of Hispanic or foreign-born people.[31] Indeed, the THP chose to focus their first night on south Nashville, which is the most immigrant-dense zip code in the entire state, where 27% of the population is foreign-born and where, likewise, 27% of the population is Hispanic.[32] That choice itself reflects an effort to detain a relatively high percentage of racial or ethnic minorities.

54. But there is more: consider how this plan was executed. Video footage of the first night shows that the percentage of detained motorists *who were racial minorities was 92%.* A total of 65% of detained motorists were Hispanic, 18% were of African descent (most of whom were African-Americans, but some were foreign born),[33] and another 9% were non-white, non-African immigrants (Middle Eastern, South Asian, etc.). (Ex. 3, Dec. of Anna Espinoza at ¶ 6 (based on assessment of race and ethnicity of 185 motorists detained in the 52 hours of video).) Those figures are much higher than what random stops in that zip code would produce. Plus, recall that a trooper explained he would stop cars with temporary tags because he thought people with such tags were likely to be "Hispanic or Egyptian," and that troopers quickly released drivers who were obviously U.S. citizens. *See supra* ¶50. The troopers were deliberately racially profiling, as borne out by these statistics and practices. The operation was a massive racial profiling event in the heart of Tennessee's immigrant community.

---

[31] *Id.* (map showing this correlation).

[32] U.S. Census Bureau, Zip Code Tabulation Area 37211, https://data.census.gov/profile/ZCTA5_37211?g=860XX00US37211#income-and-poverty (last visited Apr. 28, 2026).

[33] Stopping people of African descent was evidently expected to yield some immigration arrests. In one stop, the trooper approached an African-American driver, and his very first question was, "Do you speak English?" Video No. 2025-05-03-2125, [(Redacted)_Axon_Body_4_Video_2025-05-03_2125_D01A89665H.mp4], TIRRC, at 1:00 (on file with TIRRC).

23

55. In sum, through Operation Flood the Zone, the THP chose to spearhead the kind of roving immigration patrol that the U.S. Supreme Court has prohibited in *Brignoni-Ponce*, turning certain city streets into ad hoc immigration check points. The fact that the THP has denied doing as much is telling. Through a press release issued at the end of Operation Flood the Zone, the THP claimed that it had to "follow" Tenn. Code Ann. 7-68-105, which, according to the THP, "requires" its troopers to "support federal efforts to identify, detain, and transfer" people in violation of civil immigration laws, and so it had no choice but to have its troopers make the traffic stops in that Operation. (Ex. 2, THP Press Release at 2.) That is false because § 7-68-105 applies only to local law enforcement, not the THP. Tenn. Code Ann. § 7-68-102(1). The THP also claimed its troopers in these ICE teams were engaged in "a coordinated public safety effort *focusing on* traffic enforcement." (Ex. 2, THP Press Release at 1 (emphasis added).) That too was false: as discussed above, the THP had its troopers programmatically make those traffic stops as a subterfuge to enforce civil immigration law. Finally, the THP claimed its troopers "did not enter neighborhoods or stop vehicles based on" race or ethnicity. (*Id.* at 2.) False again: only deliberate racial profiling can explain the rate at which troopers stopped racial minorities, especially Hispanics.

### *Robertson County Roadblock*

56. On May 9, 2025, the THP engaged in another operation with ICE with a similar design. For two hours, the THP operated a "sobriety checkpoint" in Robertson County, Tennessee. THP records show that they stopped 732 vehicles and cited zero for driving under the influence or for any other sobriety-related offense (e.g. "open container"). (Ex. 4, Checkpoint Activity Report at 1–2.) A total of five citations were issued for traffic matters, and one felony arrest was made by the THP. (*Id.*)

24

57.     But, according to ICE's own records, its agents were assisting the Tennessee Highway Patrol with the Robertson County checkpoint. Indeed, the story of one person seized by ICE at the checkpoint reached the media. According to the driver—a white U.S. citizen—the THP was about to let her continue through the checkpoint when they noticed her Hispanic husband in the passenger seat, and detained them so her husband could be questioned by ICE agents, who were standing at the ready.[34] When the THP trooper decided to detain them for questioning, he knew nothing about her husband except for the color of his skin. Despite his marriage to a U.S. citizen who was several months pregnant, his three small U.S. citizen children, and his 25-years of residency in the United States, the ICE agents summarily arrested him.[35] It is unknown how many people ICE detained at this nominal "sobriety checkpoint."

58.     Like Operation Flood the Zone, this operation had the hallmarks of an immigration-enforcement subterfuge, *see Hicks*, 55 S.W.3d at 537; *Hayes*, 188 S.W.3d at 517–18, and was infected by racial profiling.

### *Joint Task Force Operations in Memphis*

59.     The joint THP-DHS operations have continued through the present. Starting in the Fall of 2025, several agencies formed the "Memphis Safe Task Force," whose goals included

---

[34] Phil Williams, *Middle Tennessee Family Torn Apart After ICE-Highway Patrol Checkpoint "Looking for Color of Skin," Wife Says*, NewsChannel 5 Nashville (Jun. 12, 2025, 7:03 PM), https://www.newschannel5.com/news/newschannel-5-investigates/middle-tennessee-family-torn-apart-after-ice-highway-patrol-checkpoint-looking-for-color-of-skin-wife-says.

[35] It is unlawful for an ICE agent to seize a person on suspicion of being removable unless the agent has probable cause to think that person "is likely to escape before a warrant can be obtained for his arrest." 8 U.S.C. § 1357(a)(2); *see, e.g., Nava v. Dep't of Homeland Sec.*, No. 18-cv-3757, 2025 U.S. Dist. LEXIS 198295, at *42–45 (N.D. Ill. Oct. 7, 2025) (finding warrantless immigration arrests unlawful in the absence of a risk of flight); *United States v. Pacheco-Alvarez*, 227 F. Supp. 3d 863, 889 (S.D. Ohio. 2016) ("This flight-risk determination is not mere verbiage. The Supreme Court held [immigration] officers to this constraint in *Arizona v. United States*, 567 U.S. 387 (2012).")

25

"enforc[ing] Federal immigration law."[36] "The Joint Operations Command Center" for this task force is "led by the U.S. Marshals Service." (Ex. 5, "Restoring Law and Order in Memphis, Operational Period #12.") Two of the agencies with the greatest number of officers participating are the THP and Homeland Security Investigations (HSI), a component of ICE. (*Id.*) Each day, the command deploys "multi-agency teams" to patrol in the Memphis area, and they report "administrative arrests," which are the arrests of people on suspicion of lacking immigration status. (*Id.*)

60. Some of these multi-agency teams are just like the teams in Operation Flood the Zone: THP troopers driving with DHS agents in their cars or with DHS agents driving behind in their own cars or on standby nearby.[37] As in Operation Flood the Zone, these teams have extra aggressively enforced the traffic code against Hispanics.[38] A report from April 2026 indicates

---

[36] Donald J. Trump, *Restoring Law and Order in Memphis*, The White House (Sept. 15, 2025), https://www.whitehouse.gov/presidential-actions/2025/09/restoring-law-and-order-in-memphis/.
[37] Brittany Brown et al., *State Troopers and Federal Agents Decide Memphis Residents' Fates During Traffic Stops*, MLK50 (Nov. 25, 2025), https://mlk50.com/2025/11/25/state-troopers-and-federal-agents-decide-memphis-residents-fates-during-traffic-stops/ (reporting: (1) "A Tennessee Highway Patrol vehicle and HSI agents driving two unmarked vehicles pulled over a black pickup truck . . ."; (2) a traffic stop involving a trooper "who also had an HSI agent riding in his vehicle"); Lucas Finton, Shelby County Sheriff Signs Agreement With ICE To Hold Jailed Immigrants Upon Request, Memphis Commercial Appeal (Nov. 5, 2025, 5:51 PM), https://www.commercialappeal.com/story/news/local/2025/11/05/shelby-county-memphis-tennessee-sheriff-signs-agreement-with-ice/87093263007/ ("Pictures, videos and reporter eyewitness accounts have shown ICE agents riding in vehicles with Memphis police and THP officers."); Marc Perrusquia et al., *Risky, High-Speed Chases Explode Under Memphis Safe Task Force*, Tennessee Lookout (Mar. 2, 2026, 5:00 AM), https://tennesseelookout.com/2026/03/02/risky-high-speed-chases-explode-under-memphis-safe-task-force/ ("Troopers engaged in pursuits often exceeding 100 mph, affidavits show, chasing fleeing motorists . . . followed at times by immigration agents and other federal officers who joined foot chases after fleeing Hispanic men bailed out of their cars and began to run.").
[38] Lucas Finton, *Many Arrests by Memphis Safe Task Force Are Immigration-Related, Shelby County Mayor Says*, Memphis Commercial Appeal (Oct. 14, 2025, 4:30 PM), https://www.commercialappeal.com/story/news/local/2025/10/14/memphis-safe-task-force-immigration-arrests/86678748007/ (immigration lawyer Colton Bane describing how a THP

26

that the *modus operandi* of the THP-DHS teams is just like the one used by such teams in Operation Flood the Zone:

> The Tennessee Highway Patrol, which leads the task force's traffic enforcement efforts, usually initiates the traffic stops—often for minor violations such as a broken taillight or windows tinted too dark. Then immigration officers, who are often following the state troopers or riding with them, interrogate the driver and passengers, according to Vecindarios 901, an immigration rapid-response organization that has witnessed dozens of stops. Those who cannot provide proper documentation are arrested.[39]

61.     These joint THP-DHS operations in Memphis have the same programmatic purpose as those in Operation Flood the Zone: to detain motorists to investigate their immigration status. On information and belief, these operations also use racial profiling to determine which motorists to stop.

62.     Since the Fall of 2025, the task force operations have produced about 800 immigration-related arrests.[40] About 80% of those arrests started with a traffic stop.[41] On information and belief, the majority of these traffic stops that resulted in immigration arrests have been conducted by THP.[42]

---

trooper had detained an Hispanic driver with a valid temporary tag in order for ICE to detain him, despite his valid immigration status).

[39] Wendie Thomas et al., *Just 2% of Immigration Arrests by Memphis Safe Task Force Were for Violent Crime, Records Show*, ProPublica (Apr. 15, 2026, 5:30 AM), https://www.propublica.org/article/memphis-safe-task-force-immigration-arrests-crime-data.

[40] *Id.*

[41] *Id.*

[42] Through a public records request to the Governor's office, TIRRC obtained the names of all individuals arrested for immigration violations as part of the task force during a three-month period from October to December 2025. Using this data, a TIRRC employee made another public records request to THP for all records for individuals who were stopped on two of these days, October 2 and 3. Of the 22 individuals arrested for immigration violations on those two days, at least 16 appear to have originated from THP traffic stops, meaning that 73% of the immigration detentions in that sample started with stops by the THP. Arrests for "Being Unlawfully Present" [Arrests for Being Unlawfully Present.xlsx], TIRRC (last modified May 18, 2026) (on file with TIRRC).

63. In the 2026 budget, the Legislature voted to provide increased funding to the THP so it can significantly expand its number of troopers (75 to 100) assigned to Memphis and permanently available to participate in the task force.[43]

**Claims for Relief**

*First Cause of Action:*
*Ultra Vires Operations*

64. Plaintiffs here repeat and incorporate by reference each of the foregoing allegations as if fully set forth here.

65. The Tennessee Annotated Code defines the powers of Tennessee Highway Patrol troopers.

66. The Defendants are acting beyond those statutory powers by directing THP troopers to work jointly with U.S. Department of Homeland Security agents with the goal of detaining motorists to investigate their immigration status. Likewise, they are doing so by directing THP troopers to deliberately and systematically conduct traffic stops for the ulterior purpose of enforcing civil immigration law.

*Second Cause of Action:*
*Violation of Article I, Section 7 of the Tennessee Constitution and Fourth Amendment of the*
*U.S. Constitution*

67. Plaintiffs here repeat and incorporate by reference each of the foregoing allegations as if fully set forth here.

---

[43] Alex Coleman, *TN Highway Patrol Denies ICE Traffic Stop Allegations*, NewsChannel 3 (Feb. 25, 2026, 04:18 PM), https://wreg.com/news/mid-south/tn-highway-patrol-denies-ice-traffic-stop-allegations.

68.     Article I, Section 7 of the Tennessee Constitution provides: "That the people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures . . . ."

69.     The Fourth Amendment of the U.S. Constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."

70.     The Defendants are violating Article I, Section 7 and the Fourth Amendment by directing THP troopers to work jointly with U.S. Department of Homeland Security agents with the goal of detaining motorists to investigate their immigration status. Likewise, they are doing so by directing THP troopers to deliberately and systematically conduct traffic stops for the ulterior purpose of enforcing civil immigration law.

### *Third Cause of Action:*
### *Violation of Article I, Section 8 and Article XI, Section 8 of the Tennessee Constitution and the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution*

71.     Plaintiffs here repeat and incorporate by reference each of the foregoing allegations as if fully set forth here.

72.     Article I, Section 8 of the Tennessee Constitution provides: "That no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers, or the law of the land."

73.     Article XI, Section 8 of the Tennessee Constitution provides:

The Legislature shall have no power to suspend any general law for the benefit of any particular individual, nor to pass any law for the benefit of individuals inconsistent with the general laws of the land; nor to pass any law granting to any individual or individuals, rights, privileges, immunitie, or exemptions other than such as may be, by the same law extended to any member of the community, who may be able to bring himself within the provisions of such law.

29

74. Together, Article I, Section 8 and Article XI, Section 8 "guarantee privileges and immunities for all those similarly situated." *Tenn. Small Sch. Sys. v. McWherter*, 851 S.W.2d 139, 152 (Tenn. 1993).

75. The Fourteenth Amendment of the U.S. Constitution provides: "No State . . . shall deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. 14, § 1.

76. The Defendants are violating Article I, Section 8 and Article XI, Section 8, and Section 1 of the Fourteenth Amendment by directing THP troopers to work jointly with U.S. Department of Homeland Security agents with the goal of detaining motorists to investigate their immigration status, because those operations involve troopers choosing to stop motorists based primarily on their perceived race or ethnicity.

### Request for Relief

WHEREFORE, the Plaintiffs respectfully request that this Court:

1. Declare that the Defendants have violated and are continuing to violate Article I, Section 7, Article I, Section 8, and Article XI, Section 8 of the Tennessee Constitution, and the Fourth and Fourteenth Amendments of the U.S. Constitution by directing THP troopers to work jointly with U.S. Department of Homeland Security agents with the goal of detaining motorists to investigate their immigration status, and also by directing THP troopers to deliberately and systematically conduct traffic stops for the ulterior purpose of enforcing civil immigration law.

2. Enjoin the Defendants from directing THP troopers to work jointly with U.S. Department of Homeland Security agents with the goal of detaining motorists to investigate their immigration status, and also from directing THP troopers to deliberately and systematically conduct traffic stops for the ulterior purpose of enforcing civil immigration law.

30

3.      Enjoin the Defendants from directing or encouraging, either directly or indirectly, THP troopers to use race or ethnicity as a criteria for deciding who to subject to a traffic stop.

4.      Grant the Plaintiffs attorney's fees, expenses, and costs to the extent authorized by law.

5.      Grant any other relief that the Court deems appropriate.

Date: May 19, 2026.

Respectfully submitted,

*/s/ Michael C. Holley*
Michael C. Holley
Tennessee Bar No. 021885
Spring Miller
Tennessee Bar No. 026485
Julio Colby
Tennessee Bar No. 042091
TENNESSEE IMMIGRANT & REFUGEE RIGHTS COALITION
3310 Ezell Road
Nashville, TN 37211
Phone: (615) 457-4768
mike@tnimmigrant.org
spring@tnimmigrant.org
julio@tnimmigrant.org

## Certificate of Service

I hereby certify that, on May 19, 2026, a true and correct copy of the foregoing was filed and served via email to David Wickenheiser and Will Ayers, Assistant Attorneys General, Office of the Tennessee Attorney General, P.O. Box 20207, Nashville, TN 37202 at david.wickenheiser@ag.tn.gov and will.ayers@ag.tn.gov.

*/s/ Michael C. Holley*
Michael C. Holley

31

# EXHIBIT 1



*Via Overnight Mail*

May 4, 2026

Jeff Long, Commissioner
Tennessee Department of Safety and Homeland Security
312 Rosa L. Parks Avenue
Nashville, TN 37243

Colonel Matt Perry, Deputy Commissioner
Tennessee Highway Patrol
Tennessee Department of Safety and Homeland Security
1150 Foster Avenue
Nashville, TN 37243

Dear Commissioner Long and Colonel Perry:

We write on behalf of our organization and Tennessee taxpayers—Paul Adams, Johanna Keohone, David Morales, and Terry Vo—to ask that you desist from directing Tennessee Highway Patrol troopers to engage in joint operations with U.S. Department of Homeland Security agents, who accompany the troopers to investigate the immigration status of motorists. We are at the anniversary of THP's participation in Operation Flood the Zone, which was an operation in which the THP troopers programmatically aimed to detain motorists for an investigation into their immigration status and, moreover, clearly engaged in racial profiling. Based on reports we've received from many people, including both first-hand reports and those from the media, it is clear the THP continues to operate in tandem with DHS agents in Memphis and other places with the purpose of detaining motorists to investigate their immigration status. We believe these ongoing practices continue to waste state funds both by diverting troopers from the activities that the public pays them to perform and by committing troopers to activities that are unlawful. These joint operations with DHS agents are unlawful because they fall beyond the scope of the THP's statutory duties and because they systematically violate the Fourth and Fourteenth Amendments of the U.S. Constitution, and Article I, Sections 7 and 8 and Article XI, Section 8 of the Tennessee Constitution since these seizures are both unreasonable and made based on race or ethnicity.

Although we understand from your agency's public statements that you believe the THP's joint operations with DHS are lawful, we disagree and believe they are an unlawful waste of public funds, as well as harmful to many community members and to the very fabric of our society. For these reasons, we are asking you to officially and permanently desist from any operations in which your troopers work jointly with DHS agents, whether those agents ride in the troopers' vehicle or are on standby nearby to participate in a traffic stop. We would welcome the opportunity to discuss the matter with you. Please contact the undersigned at 615-457-4768 or



mike@tnimmigrant.org if you would like to discuss the matter. A failure either to respond by close of business, Monday, May 11, 2026, or to officially announce the requested change in policy by then will be deemed to be a denial of this request, in which case we intend to promptly file a lawsuit seeking this relief or to consider other legal action.

Sincerely,

Spring A. Miller, Senior Director of Legal Strategy
Michael Holley, Senior Litigation Counsel


Cc:     Roger Hutto, General Counsel and Deputy Commissioner
        Tennessee Department of Safety and Homeland Security
        312 Rosa L. Parks Avenue
        Nashville, TN 37243

# EXHIBIT 2

Anthony Glover
Assignment Editor
FOX 17 News

---

**From:** Jason Pack <Jason.Pack@tn.gov>
**Sent:** Friday, May 9, 2025 12:36 PM
**Subject:** [EXT]THP UPDATE

**CAUTION:** This email originated from outside of Sinclair. Do not click links or open attachments unless you recognize the sender and know the content is safe.

At the request of U.S. Immigration and Customs Enforcement (ICE), the Tennessee Highway Patrol continues to support a coordinated public safety effort focusing on traffic enforcement. THP's role is to observe driving behavior and conduct lawful stops based on violations of Tennessee traffic laws.

Overnight, the less than 10 troopers assigned to this operation observed 120 traffic violations, resulting in stops.

From those stops, 9 individuals were detained by ICE for further investigation. The stops resulted in one DUI, 1 drug arrest and 1 person with a warrant.

To date, including the numbers above, preliminary results of this operation resulted in 588 stops for observed traffic violations. These included:

- Hazardous Moving Violations

- 4 DUI arrests

- 1 child endangerment arrest

- 1 felony evading arrest

- 3 drug arrests

- 6 felony wanted persons

During the operation so far, ICE has detained 103 individuals for further investigation.

According to ICE, this includes a convicted child sex predator, a known Tren de Aragua gang member, an MS 13 Gang Member wanted for aggravated murder out of El Salvador.

Several of the other encounters involved suspected gang members, including Tren de Aragua affiliates and MS 13.

The operation also led to the recovery of illegal drugs and firearms—taking dangerous elements off the street and making Tennessee safer.

**Troopers continue to follow Tennessee Code Annotated § 7-68-105.**

**Tennessee Code Annotated § 7-68-105 requires that state and local law enforcement agencies, including the Tennessee Highway Patrol, cooperate with federal immigration authorities by honoring immigration detainers and complying with requests to transfer custody of individuals who are subject to removal from the United States. It reinforces that state troopers must support federal efforts to identify, detain, and transfer individuals unlawfully present in the country when there is a valid immigration request.**

In cases where individuals were found to be in the country illegally, those matters were handled separately by ICE in accordance with federal law.

THP's role is to enforce Tennessee traffic laws fairly and consistently, and our troopers continue to make lawful stops, based solely on traffic infractions, in an effort keep Tennesseans safe. We do not enter neighborhoods or stop vehicles based on who someone is —we stop based on what they do behind the wheel.

During this operation, less than 10 Troopers were assigned to this operation, THP enforced Tennessee traffic laws related to hazardous moving violations, as we are required to do under state law. Immigration matters were handled separately by ICE under federal authority.

# EXHIBIT 3

## DECLARATION OF ANNA ESPINOZA

I, Anna Espinoza, declare and state as follows:

1. I am over the age of 18, of sound mind, and fully competent to make this declaration. I also have personal knowledge of the factual statements contained herein. I reside in Nashville, Tennessee.

2. In the Spring semester of 2026, I was a law student at Vanderbilt University, and I did an externship with the Immigrant and Refugee Rights Coalition. One of my assigned tasks was to review the approximately 52 hours of video footage from the Tennessee Highway Patrol traffic stops in Nashville of May 3 to 4, 2025.

3. I reviewed those videos, and one purpose of the review was to ascertain the race or ethnicity of each motorist stopped.

4. In the set of videos I reviewed, the THP stopped a total of 137 vehicles. It appears that, in those 137 vehicles, a total of 198 motorists—drivers and passengers—were stopped. In just a few stops, it is difficult to tell exactly how many passengers were involved, either because only dash camera footage of that stop taken from a distance is available, or because it is evident from the context that there are multiple passengers in the vehicle but body-worn camera footage does not reveal the rear seats of the vehicle.

5. As for the race or ethnicity of the motorists, I reached the following conclusions, which I believe are reasonably accurate. A person's race or ethnicity is not always obvious, and, moreover, sometimes the quality or circumstances of the video made it difficult to ascertain a person's race or ethnicity. In some instances, although I personally could not ascertain a person's race or ethnicity, they ultimately told a trooper or an ICE agent what their race or ethnicity was. I could not reach a reasonably accurate conclusion about race

1

or ethnicity with respect to 13 of the 198 motorists, and I did reach such a conclusion with respect to 185 motorists.

6. Of the 185 motorists about whose race or ethnicity I was able to reach a reasonably accurate conclusion, 121 were Hispanic (65%), 33 were of African descent (18%), 11 were Middle Eastern (6%), 14 were White (8%), and 6 were non-White, non-Hispanic, non-Middle Eastern immigrants who did not appear to be of African descent (3%). Of the 33 people of African descent, 2 appeared to be immigrants rather than African-American.

7. As mentioned, watching and listening to a video of a person does not always allow one to be completely certain about that person's race or ethnicity, but frequently it does. I feel reasonably certain I am correct about the classification of each person I counted. If I limited my count to just the motorists about whose classification I was completely certain, the percentages would come out approximately the same. Of the 156 motorists about whose race or ethnicity I feel completely certain, 107 were Hispanic (67%), 30 were of African descent (19%), 5 were Middle Eastern (3%), 11 were White (7%), and 3 were non-White, non-Hispanic, non-Middle Eastern immigrants who did not appear to be of African descent (2%).

8. I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated: May __5__, 2026

Anna Espinoza

2

# EXHIBIT 4



# TENNESSEE DEPARTMENT OF SAFETY & HOMELAND SECURITY
## Tennessee Highway Patrol
## Checkpoint Activity

☒ Site Approved Prior to Checkpoint    Approved by Whom:    Christopher Dye

☒ Media notified    ☐ TV    ☐ Radio    ☒ Printable

☒ Cones Utilized    ☒ Traffic Vests/High Visibility Clothing Worn    ☒ Notification/Warning Signs Used

During Hours of Darkness:    ☒ Checkpoint Area Illuminated    ☒ Flashlight Batons Used

### NUMBER OF CITATIONS

| | | | |
|---|---|---|---|
| 1 CRD Law | ☐ Felony Drug | 2 Light Law | ☐ Other DL Law |
| ☐ DUI | ☐ Misdemeanor Drug | ☐ Open Container | ☐ Safety Belt Law |
| ☐ Registration Law | ☐ Equipment Law (Non-CVE) | 1 Revoked/Suspended DL | 1 Other |
| ☐ Financial Responsibility | | | |

5 **Total Citations**

Notes: _____

### NUMBER OF WARNINGS

24 Warnings Issued

### NUMBER OF PERSONS INCARCERATED (TAKEN TO JAIL)

1 Felony Arrests    ☐ Misdemeanor Arrests    1 **Total Arrests**



# TENNESSEE DEPARTMENT OF SAFETY & HOMELAND SECURITY
## Tennessee Highway Patrol
## Checkpoint Activity

**NUMBER OF RELATED ACTIVITY**

732 Vehicles Passing Through Checkpoint      3 Vehicles Searched

30 Vehicles Detained      ☐ Vehicles Seized

☐ Recovered Stolen Vehicles      ☐ Safety Literature/Items Distributed

☐ Weapons Seized

Estimated Amount of Drugs Seized:
0

The predetermined sequence or pattern of which vehicles were stopped:
All

**Submitted By:**

_____      5/13/2025
Signature                                            Date

Vincent Meaker
_____
Print Name

**Approved By:**

_____      5/19/2025
Signature                                            Date

Christopher Dye
_____
Print Name

SF-1152 (Rev. 3/18)      RDA 291

# EXHIBIT 5



# Restoring Law and Order in Memphis
## Operational Period #12 – 10/10/2025



## Operational Summary

□ The Joint Operations Command Center (JOCC) continues to be led by the U.S. Marshals Service (USMS) Incident Management Team (IMT) with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) IMT integrated to enhance command and control.

□ Eighty-four (84) multi-agency teams were deployed throughout the Memphis area in support of the mission.

□ Four (4) juveniles reported as missing were located.

□ Danthony Leeray Conley was arrested for Possession with Intent to Distribute and was in possession of one (1) firearm, methamphetamine, and fentanyl.

□ Jarvis Woods was arrested for Distribution of a Controlled Substance and was in possession of one (1) firearm and $78,000 US currency. A search warrant was also executed which resulted in the seizure of a Cadillac, Lexus, Silverado, and four (4) Rolex watches.

□ Joseph Robinson was arrested for Possession with Intent to Distribute and Felon in Possession of a Firearm. Robinson was in possession of one (1) firearm and fentanyl.

□ Yeager Clark was arrested for Possession of Controlled Substances (Fentanyl, Cocaine, and Marijuana).

□ 59 criminal arrests during this Operational Period.
□ 9 administrative arrests during this Operational Period.
□ 14 firearms were seized during this Operational Period.

## Cumulative Statistics

| Arrests | Charges | Firearms Seized |
|---|---|---|
| | Homicide – 4 | |
| | Narcotics – 69 | |
| | Firearms – 93 | |
| | Warrants – 253 | |
| 695 | Probation/Parole – 2 | 169 |
| | Sex Offenses – 29 | |
| | Other – 105 | |
| | Administrative – 140 | |

| | | | |
|---|---|---|---|
| Juvenile Arrests – 15 | | Missing Children Located – 41 | |
| Known Gang Members – 51 | | Search Warrants Executed – 8 | |
| Traffic Citations – 3,354 | | Misdemeanor Citations – 53 | |

### Police Districts, Sectors, and Service Areas

| Division | Precincts | # of Teams |
|---|---|---|
| 1 | Airways | 5 |
| 1 | Mt Moriah | 6 |
| 1 | Raines | 6 |
| 1 | Ridgeway | 5 |
| 2 | Appling Farms | 5 |
| 2 | Austin Peay | 6 |
| 2 | Crump | 5 |
| 2 | North Main | 6 |
| 2 | Tillman | 5 |
| 1 & 2 | Memphis City - Wide | 35 |
| | **Total Number of Teams** | **84** |

## Task Force Composition

| | | |
|---|---|---|
| Total Agencies | | 31 |
| Total Personnel Op period # 12 | | 1779 |
| Projected Personnel Op Period # 13 | | 1521 |

| Agency | 10/10/2025 | 10/11/2025 |
|---|---|---|
| U.S. Marshals Service (USMS) | 102 | 95 |
| Bureau of Alcohol, Tobacco, Firearms & Explosives (ATF) | 42 | 20 |
| Customs and Border Protection (CBP) | 22 | 20 |
| Diplomatic Security Service (DSS) | 21 | 28 |
| Drug Enforcement Administration (DEA) | 44 | 27 |
| Enforcement and Removal Operations (ERO) | 2 | 2 |
| Federal Bureau of Investigation (FBI) | 145 | 145 |
| Federal Protective Service (FPS) | 3 | 3 |
| Health and Human Services (HHS) | 2 | 2 |
| Homeland Security Investigations (HSI) | 160 | 185 |
| Internal Revenue Service (IRS) | 27 | 27 |
| Memphis Police Department (MPD) - Surge | 136 | 53 |
| Memphis Police Department (MPD) - Patrol | 748 | 650 |
| Offices of Inspector General (OIG) – 9 Agencies | 15 | 16 |
| Shelby County Sheriff's Office (SCSO) | 46 | 14 |
| Tennessee Alcoholic Beverage Commission (TABC) | 9 | 0 |
| Tennessee Bureau of Investigation (TBI) | 38 | 30 |
| Tennessee Department of Corrections (TDOC) | 4 | 5 |
| Tennessee Highway Patrol (THP) | 126 | 112 |
| Tennessee National Guard | 64 | 64 |
| Tennessee Wildlife Resource Agency (TWRA) | 22 | 22 |
| U.S. Attorney's Office (USAO) | 1 | 1 |
| U.S. Probation Office (USPO) | 0 | 0 |
| U.S. Secret Service | 0 | 0 |

Case 3:26-cv-00832    Document 1-1    Filed 06/18/26    Page 45 of 45 PageID #: 48