**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| TENNESSEE IMMIGRANT AND REFUGEE RIGHTS COALITION; PAUL ADAMS; JOHANNA KEOHANE; JONI LANEY; DAVID MORALES; MARIA OCEJA; BILLY VAUGHAN; and TERRY VO.<br><br>Plaintiffs,<br><br>v.<br><br>TENNESSEE HIGHWAY PATROL; TENNESSEE DEPARTMENT OF SAFETY AND HOMELAND SECURITY; JEFF LONG, Commissioner of the Department of Safety and Homeland Security, in his official capacity; COL. MATT PERRY, Deputy Commissioner of the Department of Safety and Homeland Security, in his official capacity,<br><br>Defendants. | No. 3:26-cv-832<br>Judge Trauger |

**MEMORANDUM IN SUPPORT OF**
**MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

Page

**I. INTRODUCTION** ........................................................................................................1

**II. STATEMENT OF FACTS** ...............................................................................................3

A. Operation Flood the Zone in Nashville. ....................................................................3

B. Robertson County Roadblock. . .............................................................................10

C. Joint Task Force Operations in Memphis. .............................................................11

**III. LEGAL STANDARD** ....................................................................................................15

**IV. ARGUMENT** ................................................................................................................16

**A. The plaintiffs are likely to succeed on the merits of their claims.** ..............................16

1. Claim 1: The THP's pretextual joint operations with ICE require its troopers to act beyond their statutory mandate ........................................................................................18

2. Claim 2: The THP's pretextual joint operations with ICE violate constitutional protections against unreasonable seizures because motorists are, by design, seized arbitrarily........................21

A. Pretextual roadblock ........................................................................................21

B. Programmatic pretextual traffic-stop operations ...................................................23

3. Claim 3: The THP's pretextual joint operations with ICE violate motorists' right to equal protection under the law due to rampant and deliberate racial profiling ........................................33

**B. The Defendants' illegal conduct is causing irreparable harm.** ....................................35

**C. The balance of the equities and the public interest weigh in favor of granting this injunction**. ........................................................................................................36

**V. CONCLUSION**...............................................................................................................37

**CERTIFICATE OF SERVICE** ..........................................................................................38

## I. INTRODUCTION

For the past year, the Tennessee Highway Patrol (THP) has been operating in tandem with the U.S. Immigration & Customs Enforcement (ICE) with the shared goal of detaining motorists to investigate their immigration status. These agencies have operated in tandem because the officers of each agency have powers that the officers of the other lack. THP troopers can detain motorists for traffic violations; ICE agents generally cannot. Meanwhile, ICE agents can detain people for violating civil immigration laws; THP troopers cannot. So these agencies have operated in tandem on Tennessee roadways: THP troopers stop vehicles for putative traffic violations when they suspect the motorists are noncitizens, and ICE agents—who either ride along with the troopers or are on standby nearby—then arrest the detained motorists if they develop probable cause of an immigration violation. Simply put, THP troopers exercise their traffic stop powers in service of ICE's arrest objectives.

These joint THP-ICE operations cause great harm to Tennesseans. THP troopers choose to detain, and to prolong the detention of, motorists based on perceived race or ethnicity. They also repeatedly detain motorists who, absent the THP's subservience to ICE's objectives, otherwise would not have been detained. And when THP troopers encounter motorists who obviously have U.S. citizenship, the troopers choose *not* to enforce traffic laws against them, even for serious violations. The THP's subservience to ICE turns our highways into ad hoc immigration check points, and it also deprives taxpayers of the THP's protection against dangerous misconduct on the state highways.

This programmatic subterfuge is illegal. First, when engaging in it, the THP acts outside its statutory mandate; its actions are *ultra vires*. Second, its warrantless detentions of motorists violate the Fourth Amendment of the U.S. Constitution and Article I, Section 7 of the Tennessee

Constitution because repeatedly detaining motorists based on a programmatic subterfuge is unreasonable. Third, the THP's track record during such operations shows that it detains motorists in violation of the Equal Protection Clause of the Fourteenth Amendments of the U.S. Constitution and Article I, Section 8 and Article XI, Section 8 of the Tennessee Constitution because its troopers deliberately and disproportionately stop motorists based on their perceived race or ethnicity.

The Tennessee Immigrant and Refugee Rights Coalition (TIRRC), along with Tennessee taxpayers, Paul Adams, Johanna Keohane, Joni Laney, David Morales, Maria Oceja, Billy Vaughan, and Terry Vo, have brought this action to seek declaratory and injunctive relief prohibiting the THP from engaging with immigration agents in joint operations whose purpose is the enforcement of civil immigration law. TIRRC and these Tennessee taxpayers do so in order to limit the THP to its proper role in law enforcement and to thereby stop its misuse and diversion of taxpayer funds for these illegal operations.

Relief is needed urgently. The THP has publicly claimed that such operations are legal, and the THP continues to engage in them, illegally wasting public resources to wrongfully seize Tennessee motorists. Absent action from this Court, the THP's violations, both of a statutory and constitutional nature, will continue unabated. This Court should enter a preliminary injunction under Federal Rule of Civil Procedure 65.[1]

[1] On June 18, 2026, the Respondents filed their removal notice in this Court; later that same day, the Petitioners filed their motion in state court for a temporary injunction under Tenn. R. Civ. P. 65; and then the Respondents filed their removal notice in state court (and neither party knew of the intentions or actions of the other until notified through electronic court filing notifications). Thus, when the Petitioners filed their temporary-injunction motion, the state court still had jurisdiction, which was concurrent with this Court's jurisdiction, *Burroughs v. Palumbo*, 871 F. Supp. 870, 872 (E.D. Va. 1994), and so the Petitioners could arguably rely in this Court on their already-filed temporary-injunction motion. *See Sun Forest Corp. v. Shvili*, 152 F. Supp. 2d 367, 387 (S.D.N.Y. 2001) (allowing plaintiff to rely on summary-judgment motion filed in state court

## II. STATEMENT OF FACTS

For more than a year, the THP has been operating in tandem with ICE with the goal of detaining motorists to investigate their immigration status. Three operations are described below.

### A. Operation Flood the Zone in Nashville

The THP and ICE jointly carried out Operation Flood the Zone[2] in Davidson County from May 3 to May 10, 2025. At any given time, about nine THP troopers participated in the operation.[3] ICE agents typically rode in the THP trooper's vehicle.[4] Other ICE agents often drove their own vehicle behind the THP trooper and others were on standby nearby.[5]

During this operation, THP troopers reportedly stopped 609 vehicles.[6] On the first night alone—over the span of about 8 hours—the THP made more traffic stops than did the Metro Nashville police in the whole county in that entire 48-hour weekend.[7] Sometimes just seconds elapsed between the end of one stop and the start of the trooper's next stop.[8] Yet troopers wrote just 48 citations, which was down nearly 80 percent from that same week in May 2024.[9]

---

prior to removal). But it seems most practical, given the congruence of Tenn. R. Civ. P. 65 and Fed. R. Civ. P. 65, for the Petitioners to proceed by filing this motion under Fed. R. Civ. P. 65.

[2] In immigration documents, ICE referred to the operation by this name.

[3] Ex. 25, Sarah Grace Taylor, '*Huntin' Time' – How ICE and Tennessee State Troopers Targeted Immigrants, Inflated Safety Claims*, Nashville Banner (Feb. 19, 2026), https://nashvillebanner.com/2026/02/19/immigration-deportation-ice-thp-nashville-operation/. (All exhibits, except videos, are submitted in the Appendix. Videos will be submitted manually to the Court.)

[4] *Id.*; *see also* Video No. 2025-05-04-0042 [(Redacted)_Axon_Body_4_Video_2025-05-04_0042_D01A8699Y.mp4], TIRRC, at 10:53 (on file with TIRRC) (trooper stating "we have ICE in every car").

[5] Ex. 25, Taylor, *supra* note 3.

[6] *Id.*

[7] Ex. 26, Steven Hale, *Less Than Half of the Nearly 200 Arrested in Nashville ICE Operation Had Criminal History*, Chattanooga Times Free Press (May 15, 2025), https://www.timesfreepress.com/news/2025/may/14/less-than-half-of-nearly-200-arrested-in/.

[8] Ex. 25, Taylor, *supra* note 3.

[9] *Id.*

Instead of writing citations, the troopers were helping ICE arrest motorists on suspicion of lacking lawful immigration status.[10] Indeed, the programmatic purpose of these traffic stops—as established at the administrative or planning level—was to find such motorists so ICE agents could arrest them. In short, the THP's enforcement of the traffic code was a subterfuge for enforcing civil immigration law. Three things make this fact perfectly clear.

*First*, the simple fact that THP troopers carried ICE agents with them in their own vehicles—and had them on standby nearby—speaks volumes about the real reason for the stops. *See State v. Hicks*, 55 S.W.3d 515, 537 (Tenn. 2001) (saying "one may infer" that the real purpose of a roadblock was *not* to check licenses because the officer had a drug dog with him).

Plus, as revealed by 52 hours of video footage from the operation's first night, the investigation of stopped motorists focused on immigration status, not a putative traffic violation. Once a trooper stopped a motorist, the ICE agent would listen in on the trooper's conversation with the motorist who was asked immigration-related questions,[11] or else the agent would himself pose immigration-related questions after getting a report from the trooper.[12] Unless the

---

[10] *See* Ex. 1, Kocher Declaration & Report, *A Geographical and Statistical Analysis of Tennessee Highway Patrol Traffic Stops in Nashville, May 2025* ["Kocher Report"], at 15, 17 (July 2026).
[11] *See* Editorial, *White Drivers Got a Warning. Latino Drivers Got Detained.*, at 2:01; 2:09; 3:35–3:45, N.Y. Times (April 29, 2026) https://www.nytimes.com/2026/04/29/opinion/ice-racial-profiling-supreme-court.html ("'Are you here illegally?'. . . 'Were you born here?' . . . 'Are you from Nashville?' 'Yeah, I'm from Nashville.' 'You are? You born here?' . . . 'How long have you been in this country?' . . . 'Were you born here?' . . . 'Were you born here in the United States?'"); Video No. 2025-05-03-2158 [(Redacted)_Axon_Body_4_Video_2025-05-03_2158_D01A8097K.mp4], TIRRC, at 4:58–5:20 (on file with TIRRC) (ICE agent in a trooper's car tells the trooper, "Ask him where he was born, if you don't mind." The trooper responds, "Okay," exits the vehicle and asks driver, "Where were you born at?"); Video No. 2025-05-04-0150 [(Redacted)_Axon_Body_4_Video_2025-05-04_0150_D01A7394R.mp4], TIRRC, at 2:39–2:59 (on file with TIRRC) ("'Are you from Nashville?' 'Yes sir, I am.' 'Born and raised?' 'Yes sir. . . . I was actually born in Egypt but raised here.'" Trooper to ICE agent: "Another Egyptian guy.") (To be submitted manually.)
[12] *Id.*

detained motorist spoke English with no foreign accent, the focus of the stop shifted quickly to immigration status.[13] *See State v. Hayes*, 188 S.W.3d 505, 517–18 (Tenn. 2006) (inferring the officer was "pursuing investigatory agendas that were wholly distinct and apart from the State's claimed interest" since he asked detained people questions related to the distinct agenda). Similarly, troopers would often delay taking the steps necessary to process the putative traffic offense in order to give ICE agents the chance to question the motorists about immigration status[14]—thereby wrongfully prolonging the traffic stop for an "[o]n-scene investigation into other" matters. *Rodriguez v. United States*, 575 U.S. 348, 356 (2015). Both the immediate presence of the ICE agent and the focus on immigration-related questioning indicate that the troopers were pursuing an agenda "wholly distinct and apart" from traffic enforcement, namely, the enforcement of civil immigration law. *Haynes*, 188 S.W.3d at 517.

*Second*, the 52 hours of video footage also makes it perfectly clear that the entire operation was a subterfuge designed at the administrative level. Footage shows that the troopers

---

[13] *Id.*

[14] Video No. 2025-05-03-2050 [(Redacted)_Axon_Body_4_Video_2025-05-03_2050_D01A8872Y.mp4], TIRRC (on file with TIRRC) (prolonging stop to wait for a relative to come to the scene and translate for a Middle Eastern passenger who did not speak English, yet was a U.S. citizen); Video No. 2025-05-03-2102 [(Redacted)_Axon_Body_4_Video_2025-05-03_2102_D01A8362P.mp4], TIRRC (on file with TIRRC) (trooper turns motorist over to ICE agent for questioning while trooper just stands and waits, rather than acting on the putative traffic offense); Video No. 2025-05-03-2212 [(Redacted)_Axon_Body_4_Video_2025-05-03_2212_D01A8362P.mp4], TIRRC (on file with TIRRC) (trooper hands driver's documents to ICE agents and waits to see what they decide, rather than acting on the putative traffic violation); Video No. 2025-05-03-2136 [(Redacted)_Axon_Body_3_Video_2025-05-03_2136_X60AF3694.mp4], TIRRC (on file with TIRRC) (after having already checked the driver's license, trooper stands by doing nothing—prolonging the stop—so ICE agent can ask motorists immigration questions); Video No. 2025-05-03-2227 [(Redacted)_Axon_Body_3_Video_2025-05-03_2227_X60AF3694.mp4], TIRRC (on file with TIRRC) (after having already confirmed validity of the driver's license, trooper prolongs the traffic stop so ICE agent can, due to U.S. citizen driver's "broken" English, ask him immigration questions).

formed teams with ICE agents—evidently teams 1 through 8—and these teams kept count of their immigration arrests, which was the operation's metric of success.[15] The teams went so far as to use a Sharpie pen to write their team number on detained immigrants, evidently to ensure they would be credited for their detentions.[16]

Troopers sought to win under this metric of success. One trooper explained to the ICE agents that he planned that night to stop any motorist with a temporary tag, and later that night he further explained that: "7 out of 10, if it's a temp tag, it's generally somebody that's either Hispanic or Egyptian."[17] That is, he planned to enforce a *particular* traffic law because he thought doing so would render more immigration arrests. At that same time, that trooper remarked that troopers were in fact succeeding in "*finding the ones we need to find*," namely, noncitizens whom ICE would arrest.[18] Another trooper, referencing the fact that this operation was planned at the administrative level, mentioned that he "kn[e]w they're wanting to focus on immigration" in making the traffic stops.[19] Another trooper, describing his participation in the operation, said that he was doing what "[s]omeone above told [him] to do."[20] At the end of his shift, another trooper, laughing, summed up his night's work by saying he was "just fucking

---

[15] Ex. 25, Taylor, *supra* note 3. For example, one trooper told another: "I stopped 15, *and I took seven* . . . [o]r ICE took seven." *Id.*

[16] *Id.*

[17] Video No. 2025-05-03-2112 [Redacted)_Axon_Body_3_Video_2025-05-03_2112_X60A3362S.mp4], TIRRC, at 21:27 to 21:40 (on file with TIRRC); Video No. 2025-05-03-2226 [(Redacted)_Axon_Body_3_Video_2025-05-03_2226_X60A3362S.mp4], TIRRC, at 23:49–24:27 (on file with TIRRC).

[18] Video No. 2025-05-03-2226 [(Redacted)_Axon_Body_3_Video_2025-05-03_2226_X60A3362S.mp4], TIRRC, at 23:42 (on file with TIRRC).

[19] Ex. 25, Taylor, *supra* note 3.

[20] *Id.*; *see also* Video No. 2025-05-03-2115 [(Redacted)_Axon_Body_4_Video_2025-05-03_2115_D01A8872Y.mp4], TIRRC, at 44:45–45:00 (on file with TIRRC) (supervisor asking troopers if they have a total for arrests so far for the night).

shipping people back off to damn Honduras and shit."[21] The troopers knew that their real job that night was detaining motorists to investigate their immigration status.

*Third*, the footage also shows that, because their real job was detaining motorists to investigate their immigration status, the troopers *avoided* enforcing the traffic and criminal codes since doing so would detract from their real job. When it was obvious a detained motorist was a U.S. citizen—due to their appearance, accent, and possession of a driver's license—troopers cut short the traffic stop, sometimes without even taking the one or two minutes required to run the license through their computer system.[22] Troopers even let U.S. citizens leave the scene without any citation after committing significant offenses, like driving with a "completely fake" temporary tag (a felony, according to the trooper), driving 64 mph in a 40-mph zone, and verbally threatening to kill officers with a gun.[23] Another trooper, when retrieving his citation-writing clipboard from the back of his vehicle, said he had thrown it in the back because he "was planning on not using it tonight."[24] The plan that night was to *not* waste time enforcing the traffic or criminal code. Doing so would "cut[] into" what one trooper called "huntin' time."[25]

In light of these factors—the immediate presence of ICE agents, the focus on immigration-related questioning, the effort to detain as many immigrant motorists as possible, and the effort to minimize time with non-immigrant motorists—it is crystal clear that the plan was for troopers to help enforce immigration law, not to enforce the criminal or traffic codes.

---

[21] Ex. 25, Taylor, *supra* note 3.
[22] *Id.*
[23] *Id.*; Video No. 2025-05-04-0042 [(Redacted)_Axon_Body_4_Video_2025-05-04_0042_D01A8699Y.mp4], TIRRC, at 15:15–15:30 (on file with TIRRC); *see also* Ex. 1, Kocher Report, *supra* note 10, at 13–14 (zero of the White drivers who were stopped were arrested or given a citation).
[24] Ex. 25, Taylor, *supra* note 3.
[25] *Id.*

Worse, in furtherance of that plan, troopers used race or ethnicity as their basis for choosing which motorists to detain. That is obvious both due to the way the operation was designed and due to how it was executed.

As for the plan's design, the THP chose to deploy the operation in precisely the Nashville neighborhoods that have the highest percentage of Hispanic people.[26] THP dispatch records show the location of their 609 stops from May 3 to 10, 2025. By plotting those stops geographically and comparing the distribution of stops with demographic data, Dr. Austin Kocher has determined that: (1) the number of "stops rose from 0.33 per 1,000 residents in the least-Hispanic tracts to 1.97 in the most-Hispanic tracts, a nearly sixfold difference;" (2) "76% of all stops fell in Zip codes [that are] more Hispanic than the county as a whole;" (3) despite the THP shifting to different neighborhoods over time, "the stops landed in Latino neighborhoods every single night;" and, (4) "[o]nly Hispanic areas are over-represented among the stops," not areas with relatively high numbers of other racial or ethnic minorities.[27] "At the busiest point of each night, between 10 and 15 stops were in progress simultaneously," and that concentration of stops by so many troopers on the same Hispanic neighborhoods "is the signature of a directed, centrally coordinated operation."[28]

But there is more: consider how this plan, which focused on Hispanic neighborhoods, was executed. Video footage of the first night, which involved 146 traffic stops, shows that the percentage of detained motorists *who were racial minorities was 92%.* A total of 65% of detained motorists were Hispanic, 18% were of African descent (most of whom were African-

[26] Ex. 1, Kocher Report, *supra* note 10, at 3–11 (July 2026).
[27] *Id.* at 4, 8–9, 11.
[28] *Id.* at 11–12.

Americans, but some were foreign born),[29] and another 9% were non-white, non-African immigrants (Middle Eastern, South Asian, etc.).[30] Dr. Kocher has reviewed this assessment and, conservatively relying on only the 86 most reliably-coded stops, confirms that 57% of motorists stopped were Latino, 26% were Black, 10% were White, and 6% were Middle Eastern.[31] These numbers show that, after selecting Hispanic-dense neighborhoods for the operations, the THP troopers then deliberately focused their efforts on Hispanic motorists: whereas the neighborhoods were about 30% Hispanic, about 60% of stopped motorists were Hispanic.[32] Plus, recall that a trooper explained he would stop cars with temporary tags because he thought people with such tags were likely to be "Hispanic or Egyptian," and that troopers quickly released drivers who were obviously U.S. citizens. *See supra* at 6 & n. 17. The troopers were deliberately racially profiling, as borne out by these statistics and practices. The operation was a massive racial profiling event in the heart of Tennessee's immigrant community.

In sum, through Operation Flood the Zone, the THP chose to spearhead a roving immigration patrol—which is something that the U.S. Supreme Court prohibited in *United States v. Brignoni-Ponce*, 422 U.S. 873, 884 (1975)—and they thereby wrongfully turned certain city streets into ad hoc immigration check points.

---

[29] Stopping people of African descent was evidently expected to yield some immigration arrests. In one stop, the trooper approached an African-American driver, and his very first question was, "Do you speak English?" Video No. 2025-05-03-2125, [(Redacted)_Axon_Body_4_Video_2025-05-03_2125_D01A89665H.mp4], TIRRC, at 1:00 (on file with TIRRC).

[30] Ex. 2, Dec. of Anna Hale (Espinoza) at ¶ 6 (based on assessment of race and ethnicity of 185 motorists detained in the 52 hours of video).

[31] Ex. 1, Kocher Report, *supra* note 10, at 13.

[32] *Id.* at 12, 13 (showing the first night's stop were done in neighborhoods that were 29.9% Hispanic, but 57% of the people stopped were Hispanic).

The fact that the THP has denied doing as much is telling. Through a press release issued at the end of Operation Flood the Zone, the THP claimed that it had to "follow" Tenn. Code Ann. 7-68-105, which, according to the THP, "requires" its troopers to "support federal efforts to identify, detain, and transfer" people in violation of civil immigration laws, and so it had no choice but to have its troopers make the traffic stops in that Operation. That is false because § 7-68-105 applies only to local law enforcement, not the THP. Tenn. Code Ann. § 7-68-102(1). The THP also claimed its troopers in these ICE teams were engaged in "a coordinated public safety effort *focusing on* traffic enforcement." (Ex. 19, THP Press Release at 1 (emphasis added).) That too was false: as discussed above, the THP directed its troopers to make those traffic stops as a subterfuge to enforce civil immigration law. Finally, the THP claimed its troopers "did not enter neighborhoods or stop vehicles based on" race or ethnicity. (*Id.* at 2.) False again: only deliberate racial profiling can explain the rate at which troopers stopped racial minorities, especially Hispanics.

**B. Robertson County Roadblock**

On May 9, 2025, the THP engaged in another operation with ICE with a similar design. For two hours, the THP operated a "sobriety checkpoint" in Robertson County, Tennessee, which has a relatively high percentage of Hispanic residents.[33] THP records show that they stopped 732 vehicles and cited zero for driving under the influence or for any other sobriety-related offense (e.g. "open container"). (Ex. 20, Checkpoint Activity Report at 1–2.) Only five citations were issued for traffic matters, and one felony arrest was made. (*Id.*)

But, according to ICE's own records, its agents were assisting the THP with the Robertson County checkpoint. Indeed, the story of one person seized by ICE at the checkpoint

[33] Ex. 1, Kocher Report, *supra* note 10, at 6 (the 37212 Zip code is Robertson County).

reached the media. According to the driver—a white U.S. citizen—the THP was about to let her continue through the checkpoint when they noticed her Hispanic husband in the passenger seat, and detained them so her husband could be questioned by ICE agents, who were standing at the ready.[34] When the THP trooper decided to detain them for questioning, he knew nothing about her husband except for the color of his skin. Despite his marriage to a U.S. citizen who was several months pregnant, his three small U.S. citizen children, and his 25-years of residency in the United States, the ICE agents summarily arrested him.[35] It is unknown how many people ICE detained at this nominal "sobriety checkpoint." Like Operation Flood the Zone, this operation had the hallmarks of an immigration-enforcement subterfuge, *see Hicks*, 55 S.W.3d at 537; *Hayes*, 188 S.W.3d at 517–18, and was infected by racial profiling.

### C. Joint Task Force Operations in Memphis

The joint THP-DHS operations have continued through the present. Starting in the fall of 2025, several agencies formed the "Memphis Safe Task Force," whose goals included "enforc[ing] Federal immigration law."[36]) Two agencies with the greatest number of officers participating are the THP and Homeland Security Investigations (HSI), a component of ICE. (Ex.

---

[34] Ex. 28, Phil Williams, *Middle Tennessee Family Torn Apart After ICE-Highway Patrol Checkpoint "Looking for Color of Skin," Wife Says*, NewsChannel 5 Nashville (Jun. 12, 2025, 7:03 PM), https://www.newschannel5.com/news/newschannel-5-investigates/middle-tennessee-family-torn-apart-after-ice-highway-patrol-checkpoint-looking-for-color-of-skin-wife-says.

[35] It is unlawful for an ICE agent to seize a person on suspicion of being removable unless the agent has probable cause to think that person "is likely to escape before a warrant can be obtained for his arrest." 8 U.S.C. § 1357(a)(2); *see, e.g.*, *Nava v. Dep't of Homeland Sec.*, No. 18-cv-3757, 2025 U.S. Dist. LEXIS 198295, at *42–45 (N.D. Ill. Oct. 7, 2025) (finding warrantless immigration arrests unlawful in the absence of a risk of flight); *United States v. Pacheco-Alvarez*, 227 F. Supp. 3d 863, 889 (S.D. Ohio. 2016) ("This flight-risk determination is not mere verbiage. The Supreme Court held [immigration] officers to this constraint in *Arizona v. United States*, 567 U.S. 387 (2012).")

[36] Ex. 29, Donald J. Trump, *Restoring Law and Order in Memphis*, The White House (Sept. 15, 2025), https://www.whitehouse.gov/presidential-actions/2025/09/restoring-law-and-order-in-memphis/.

21, "Restoring Law and Order in Memphis, Operational Period #12.") Each day, the command deploys "multi-agency teams" to patrol in the Memphis area, and they report "administrative arrests," which are the arrests of people on suspicion of lacking immigration status. (*Id.*) From the fall of 2025 through May 2026, the task force operations produced about 800 immigration-related arrests.[37] About 80% of those arrests started with a traffic stop.[38] It appears the majority of these traffic stops that resulted in immigration arrests have been conducted by THP.[39]

Many of the Task Force's multi-agency teams are just like the teams in Operation Flood the Zone: THP troopers driving with DHS agents in their cars or with DHS agents driving behind in their own cars or on standby nearby.[40] As in Operation Flood the Zone, these teams have extra

---

[37] *Id.*

[38] *Id.*

[39] Through a public records request to the Governor's office, TIRRC obtained the names of all individuals arrested for immigration violations as part of the task force during a three-month period from October to December 2025. Using this data, a TIRRC employee made another public records request to THP for all records for individuals who were stopped on two of these days, October 2 and 3. Of the 22 individuals arrested for immigration violations on those two days, at least 16 appear to have originated from THP traffic stops, meaning that 73% of the immigration detentions in that sample started with stops by the THP. *See* Ex. 22, Restoring Law and Order in Memphis, Operational Period #04–#05 (10/02/25–10/03/25); Ex. 23, THP Task Force Arrests 10/02/25–10/03/25.

[40] Ex. 30, Brittany Brown et al., *State Troopers and Federal Agents Decide Memphis Residents' Fates During Traffic Stops*, MLK50 (Nov. 25, 2025), https://mlk50.com/2025/11/25/state-troopers-and-federal-agents-decide-memphis-residents-fates-during-traffic-stops/ (reporting: (1) "A Tennessee Highway Patrol vehicle and HSI agents driving two unmarked vehicles pulled over a black pickup truck . . ."; (2) a traffic stop involving a trooper "who also had an HSI agent riding in his vehicle"); Ex. 31, Lucas Finton, Shelby County Sheriff Signs Agreement With ICE To Hold Jailed Immigrants Upon Request, Memphis Commercial Appeal (Nov. 5, 2025, 5:51 PM), https://www.commercialappeal.com/story/news/local/2025/11/05/shelby-county-memphis-tennessee-sheriff-signs-agreement-with-ice/87093263007/ ("Pictures, videos and reporter eyewitness accounts have shown ICE agents riding in vehicles with Memphis police and THP officers."); Ex. 32, Marc Perrusquia et al., *Risky, High-Speed Chases Explode Under Memphis Safe Task Force*, Tennessee Lookout (Mar. 2, 2026, 5:00 AM), https://tennesseelookout.com/2026/03/02/risky-high-speed-chases-explode-under-memphis-safe-task-force/ ("Troopers engaged in pursuits often exceeding 100 mph, affidavits show, chasing fleeing motorists . . . followed at times by immigration agents and other federal officers who joined foot chases after fleeing Hispanic men bailed out of their cars and began to run.").

aggressively enforced the traffic code against Hispanics.[41] And, likewise, their *modus operandi* is to jointly make a traffic stop with the goal of checking the motorists' immigration status:

> The Tennessee Highway Patrol, which leads the task force's traffic enforcement efforts, usually initiates the traffic stops—often for minor violations such as a broken taillight or windows tinted too dark. Then immigration officers, who are often following the state troopers or riding with them, interrogate the driver and passengers, according to Vecindarios 901, an immigration rapid-response organization that has witnessed dozens of stops. Those who cannot provide proper documentation are arrested.[42]

Several volunteers from many walks of life—*e.g.,* a retired physician, a Rhodes College professor, a student, a Navy veteran, a photojournalist—have dedicated many hours to watching and filming these operations over the past several months.[43] What they have seen confirms that the operations use the same methods as used in Operation Flood the Zone:

> 5. I have noticed that the vast majority of Task Force activity consists of traffic stops involving a caravan of law enforcement vehicles. These caravans are typically led by a single Tennessee Highway Patrol ("THP") vehicle, followed by, in my experience, between three and six cars containing officers and agents from different state and federal agencies. On one occasion, I observed up to ten vehicles following a THP cruiser.
>
> 6. In my experience, THP officers, also known as state troopers, typically initiate the traffic stop. After THP has initiated the stop and approached the stopped car, additional law enforcement officials—almost always including federal agents—emerge from the other cars in the caravan.

---

[41] Ex. 33, Lucas Finton, *Many Arrests by Memphis Safe Task Force Are Immigration-Related, Shelby County Mayor Says*, Memphis Commercial Appeal (Oct. 14, 2025, 4:30 PM), https://www.commercialappeal.com/story/news/local/2025/10/14/memphis-safe-task-force-immigration-arrests/86678748007/ (immigration lawyer Colton Bane describing how a THP trooper had detained an Hispanic driver with a valid temporary tag in order for ICE to detain him, despite his valid immigration status).

[42] Ex. 34, Wendie Thomas et al., *Just 2% of Immigration Arrests by Memphis Safe Task Force Were for Violent Crime, Records Show*, ProPublica (Apr. 15, 2026, 5:30 AM), https://www.propublica.org/article/memphis-safe-task-force-immigration-arrests-crime-data.

[43] These witnesses are plaintiffs in *Hunter Demster et al. v. Todd Blanche et al.*, No. 26-cv-025456 (W.D. Tenn.), a lawsuit challenging the implementation of a law that criminalizes approaching within 25 feet of law enforcement officers, and their declarations are submitted here with the permission of the ACLU.

> 7. I have frequently seen agents from the Department of Homeland Security ("DHS"), including Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations ("HSI"), and Customs and Border Protection ("CBP") taking part in these traffic stops.[44]

For example, one agent expressly told retiree Melissa Peeler that he "had been in Memphis for the past week 'riding with' THP officers" and that "they had been conducting traffic stops all week."[45] Professor David Mason, who has observed these operations since last fall, says the practice of federal agents riding in the car of THP troopers grew "more common" such that "[b]y the end of November, it became common to see one federal agent riding with a state trooper."[46] Since the filing of the instant lawsuit, eyewitnesses have seen the THP continue to work with DHS agents using this same *modus operandi*, including DHS agents riding in THP vehicles. (Ex. 16, Oceja Dec.)

Agents in these operations engage in wanton and gratuitous violence against U.S. citizens who watch them.[47] Although that fact is not directly relevant to the claims in this case, it is indicative of the officers' willingness and propensity for abusing their powers in these joint operations. Officers who show such propensity for abusing U.S. citizens will presumably have no qualms with wrongfully stopping the car of a suspected noncitizen without probable cause, or wrongfully prolonging a putative "traffic stop" of a suspected noncitizen in order to do an

---

[44] Ex. 5, Halt Dec. at 2. *See also* Ex. 8, Mason Dec. at 2–4; Ex. 6, Gualdani Dec. at 3; Ex. 10, Reese Dec. at 3; Ex. 7, Kersey Dec. at 2–3; Ex. 4, Demster Dec. at 2.

[45] Ex. 9, Peeler Dec. at 9; *see also* Ex. 11, West Dec. at 9; Ex. 7, Kersey Dec. at 3 ("I have seen THP state troopers driving official state vehicles with HIS agents riding along.");

[46] Ex. 8, Mason Dec. at 3.

[47] These witnesses are all U.S. citizens, and they report shockingly abusive retaliation by Task Force officers. *See, e.g.,* Ex. 3, Chodor Dec. at 9–12 (describing—as supported by links to video footage—how a THP trooper violently tackled her to the ground for trying to watch a traffic stop from a legal distance); Ex. 6, Gualdani Dec. at 8–10 (describing many instances of "bumper rushing" where agents have aggressively driven at him to intimidate him). *See* Ex. 7, Kersey Dec. at 3 ("In my experience, THP troopers tend to be some of the most aggressive members of the Task Force.").

ulterior investigation into immigration status, or with selectively (and pretextually) enforcing traffic laws based on race or ethnicity. Indeed, these same U.S. citizen witnesses incidentally report having seen abusive conduct against motorists, including apparent racial profiling.[48] These Memphis operations are as patently abusive as Operation Flood the Zone.

## III. LEGAL STANDARD

The purpose of a preliminary injunction is to preserve the status quo until a trial on the merits. *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). Accordingly, "a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Id.*; *see Brown v. City of Upper Arlington*, No. 2:08-cv-849, 2008 U.S. Dist. LEXIS 89241, at *12 (S.D. Ohio Oct. 28, 2008) ("district courts within this circuit have considered, in connection with motions for preliminary injunction, evidence that would ordinarily be inadmissible" (collecting cases)); *Concentrix CVG Mgmt. Grp. Inc. v. Daoust*, No. 1:21-cv-131, 2021 U.S. Dist. LEXIS 83830, at *17–20 (S.D. Ohio May 3, 2021) (hearsay is usually accepted at preliminary-injunction stage); *Munoz v. Wolf*, No. 4:20-cv-2206, 2020 U.S. Dist. LEXIS 266785, at *19 (S.D. Tex. July 6, 2020) (giving due weight to newspaper articles submitted in support of preliminary-injunction motion).

"A preliminary injunction is an 'extraordinary and drastic remedy.'" *Munaf v. Green*, 553 U.S. 674, 689 (2008) (quoting 11 Wright & Miller, Federal Practice and Procedure § 2948 (2d ed. 1995)). "A plaintiff seeking a preliminary injunction must show that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that

---

[48] Ex. 9, Peeler Dec. at 4 (discussing Operation Viper in Memphis (a precursor to the Task Force) and stating: "The vast majority of drivers stopped were Hispanic, although I did see a few Black drivers. I also heard there was one white driver who was stopped."); Ex. 7, Kersey Dec. at 12–13 (describing seemingly racially-profiled traffic stop); Ex. 4, Demster Dec. at 13, 17 (same).

the balance of the equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (citing *Munaf v. Geren*, 553 U.S. 674, 689–690 (2008); *Amoco Prod. Co. v. Gambell*, 480 U.S. 531, 542 (1987); *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311–312 (1982)). Although there is debate as to whether these four criteria are rigid prerequisites or equitable factors to be "balance[ed]," *D.T. v. Sumner Cnty. Sch.*, 942 F.3d 324, 327 (6th Cir. 2019); *see id.* at 328–29 (Nalbandian, J., concurring), here the Petitioners can show each factor is satisfied and that they balance in Petitioners' favor. The Respondents' extraordinarily harmful practices are evidently unconstitutional, and so a preliminary injunction, albeit a "drastic" remedy, *Munaf*, 553 U.S. at 689, is fully justified to maintain the status quo pending a trial on the merits. *See Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) ("When a party seeks a preliminary injunction on the basis of a potential constitutional violation, 'the likelihood of success on the merits often will be the determinative factor.'" (quoting *Jones v. Caruso*, 569 F.3d 258, 265 (6th Cir. 2009))).

## IV. ARGUMENT

### A. The plaintiffs are likely to succeed on the merits of their claims.

The plaintiffs seek declaratory and injunctive relief on three legal claims. As discussed below, those claims are likely to succeed.

As designed and implemented, the joint THP-ICE traffic operations systemically violate the rights of motorists in at least three respects. These violations stem largely from the fact that the THP is using its traffic-stop powers to help ICE do something that the Supreme Court has forbidden: to conduct "roving patrol[s]" in which officers stop motorists on roads in the interior of the United States to check their immigration status absent any substantial reason to think they lack status. *United States v. Brignoni-Ponce* 422 U.S. 873, 884 (1975) ("Except at the border and

its functional equivalents, officers on roving patrol may stop vehicles only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country."); *id.* at 886–87 (holding stop invalid when based simply on "Mexican appearance"). When THP directs its troopers to make traffic stops to facilitate such immigration-enforcement operations, those troopers act outside their statutory mandate and, moreover, they violate constitutional protections against unreasonable seizures and against racial discrimination in the enforcement of the law.

To put these three types of violations in context, it is necessary to note the respective limits on the powers of state law enforcement officers and ICE agents. The enforcement of immigration law is generally the task of immigration agents, not Tennessee law enforcement agencies or officers. That is so because, except in unusual circumstances, being present in the State of Tennessee without legal immigration status is not a criminal offense, but rather a violation of civil law. *Arizona v. United States*, 567 U.S. 387, 407 (2012) ("As a general rule, it is not a crime for a removable alien to remain present in the United States. If the police stop someone based on nothing more than possible removability, the usual predicate for an arrest is absent.").[49] That means that Tennessee law enforcement officers cannot arrest—nor can they even briefly detain for investigation—someone on suspicion of lacking lawful immigration status. *See Arizona*, 567 U.S. at 414–15; *United States v. Urrieta*, 520 F.3d 569, 574 (6th Cir. 2008) (holding police violated Fourth Amendment by prolonging detention of motorist to ask about apparent lack of lawful immigration status). That can be done only by immigration agents

---

[49] Even though entering the United States without permission is a misdemeanor, 8 U.S.C. § 1325(a), it is a non-continuing offense and so someone who entered without permission and is living in Tennessee is not committing a crime. *United States v. Rincon-Jimenez*, 595 F.2d 1192, 1194 (9th Cir. 1979).

or by law enforcement officers who have been specially trained and certified to operate as immigration "task force" officers under a program known as "287(g)." 8 U.S.C. § 1357(g).[50]

For their part, however, immigration agents lack the power to detain or arrest people for ordinary traffic violations. *See* 8 U.S.C. § 1357(a). Thus, they cannot use traffic stops as a pretext to question motorists about their immigration status. *Id.* Nor can they stop motorists based simply on their perceived race or ethnicity to investigate their immigration status. *Brignoni-Ponce* 422 U.S. at 884–87. Thus, whereas state law enforcement officers can generally stop motorists for traffic violations (assuming the requisite probable cause), ICE agents cannot; and whereas ICE agents can generally stop people for immigration violations (assuming the requisite probable cause), state law enforcement officers cannot.[51]

**1. Claim 1: The THP's pretextual joint operations with ICE require its troopers to act beyond their statutory mandate.**

Under Tennessee law, a state agency's powers are limited to those conferred by statute or constitution, and the extent of that grant of power must be "strictly construed." *Tenn. Public*

---

[50] As of the fall of 2025, the Defendants advised undersigned counsel, in separate litigation, that no THP officers were trained and certified as 287(g) task force officers, although the THP had entered into a 287(g) agreement in May 2025. On information and belief, none of the officers whose conduct is addressed in this Complaint have the requisite 287(g) task force certification. That is why, in Memphis, they continue to operate jointly with federal immigration agents.

[51] The Petitioners' Complaint assumes traffic stops are made only when there actually is probable cause of a traffic violation and that immigration arrests are made only when there actually is probable cause of an immigration violation. That assumption is generous. Law-enforcement officers who make pretextual traffic stops often overreach by stopping vehicles even absent probable cause of a violation. *See, e.g., State v. Binette*, 33 S.W.3d 215, 219 (Tenn. 2000); *United States v. Freeman,* 209 F.3d 464, 466 (6th Cir. 2000); *United States v. Gross*, 550 F.3d 578, 582 (6th Cir. 2008). And ICE agents, especially under the current Administration, often abuse their arrest powers. Ex. 24, Nicole Foy, ProPublica, *We Found That More than 170 U.S. Citizens Have Been Held by Immigration Agents. They've Been Kicked, Dragged and Detained for Days,* ProPublica (Oct. 16, 2025, 12:00 PM) https://www.propublica.org/article/immigration-dhs-american-citizens-arrested-detained-against-will. But those types of abuses are not the focus of the Complaint.

*Service Com. v. Southern R. Co.*, 554 S.W.2d 612, 613 (Tenn. 1977); *see* Tenn. Code Ann. § 4-5-103(a)(2) ("Administrative agencies shall have no inherent or common law powers, and shall only exercise the powers conferred on them by statute or by the federal or state constitutions."). That strict limitation applies to the THP, which is a state agency. Tenn. Attorney General Opinion, 1983 Tenn. AG LEXIS 120, *1–3 (Aug. 17, 1983) (opining as much, although advising that troopers can nonetheless make arrests for criminal offenses that they happen to see when traveling on a roadway other than a state highway); *see, e.g., State v. Dodd*, No. 02-c-01-9503-CC-93, 1995 Tenn. Crim. App. LEXIS 901, at *4 (Tenn. Crim. App. Nov. 15, 1995).

The Legislature granted the THP law-enforcement powers for three purposes: to "[p]rotect the lives and safety of the traveling public on state highways," to "[c]onserve and preserve the state's property," and to "[a]ssist in the collection of state revenues." Tenn. Code Ann. § 4-7-113. By statute, the THP's main duty is to "[p]atrol the state highways and enforce all laws, and all rules and regulations of the department of transportation regulating traffic on and use of those highways." Tenn. Code Ann. § 4-7-104(1). Its other powers are likewise enumerated, and they include activities such as investigating commercial vehicles, investigating vehicle thefts, and assisting in tax collection. Tenn. Code Ann. §§ 4-7-104(2), 105, 114. Plus, THP troopers, at a sheriff's request, can assist the sheriff in enforcing the criminal code. Tenn. Code Ann. § 38-3-103; *see Mullins v. State*, 304 S.W.2d 333, 358 (Tenn. 1957).

As for civil immigration law, THP officers have received no statutory authorization to assist federal authorities in enforcing civil immigration law. *Cf.* Tenn. Code Ann. § 38-3-103 (granting such authorization to assist sheriff's in enforcing the criminal code). Rather, they are authorized do assist with civil immigration enforcement only if they are "certified as trained" under the appropriate 287(g) program. Tenn. Code Ann. § 4-7-121. *See supra* at 17. Moreover,

whereas *local* law-enforcement are mandated by statute to cooperate with federal immigration authorities in some respects, that mandate does not extend to the THP, a state agency. Tenn. Code Ann. §§ 7-68-102(1), 105. Had the Legislature wanted to authorize the THP to cooperate with ICE—and to assist federal authorities in the enforcement of civil immigration laws—it would have been a "simple matter for [the Legislature] to have done so explicitly," but since it did not, the courts "must presume [the Legislature] did not intend such a result." *Tenn. Public Serv. Com.*, 554 S.W.2d at 613.

Nonetheless, as discussed in the Statement of Facts, the THP has been jointly engaging with ICE in operations whose purpose is to enforce civil immigration law. At the direction of supervisors, troopers are systematically using their traffic-stop powers for the ulterior purpose of helping ICE look for people lacking immigration status. Worse, they do so due to the supervisors' erroneous decision that Tennessee law "requires" them to do so. (*See* Ex. 19, THP Press Release at 2.) These programmatic, immigration-oriented traffic stops are unauthorized because they are beyond the scope of the THP's enumerated powers. *See Tenn. Public Serv. Com.*, 554 S.W.2d at 613; *see generally Sevier Cnty. v. Tenn. State Bd. of Equalization*, No. E2022-773-COA-R3-CV, 2023 Tenn. App. LEXIS 189, *17 (Tenn. Ct. App. May 8, 2023) (finding agency action "in excess of [its] statutory authority" when action was based on a "decision . . . in violation of statutory provisions").

This conclusion is driven home by the fact that when a law-enforcement operation is designed "on the administrative or planning level," the operation's real purpose matters. *State v. Hicks*, 55 S.W.3d 515, 536 (Tenn. 2001); *see City of Indianapolis v. Edmond*, 531 U.S. 32, 47 (2000) ("[A] program driven by an impermissible purpose may be proscribed while a program impelled by licit purposes is permitted, even though the challenged conduct may be outwardly

similar.”). That is, the validity of the “state interest” in an administratively planned operation is measured by its real purpose, not by its stated purpose, when the stated purpose is a mere “subterfuge.” *Hicks*, 55 S.W.3d at 536; *see generally Robertson v. State*, 198 S.W.2d 633, 635 (Tenn. 1947) (holding that when THP troopers exercise a statutory detention power, they must do so “in good faith” or else impermissibly distort their powers). Thus, when the THP programmatically uses a certain power as a subterfuge for furthering an ulterior purpose, the legitimacy of the operation depends on the legitimacy of that ulterior purpose. *See Hicks*, 55 S.W.3d at 536–37.

Here, the real purpose of these joint THP-ICE operations is the enforcement of immigration law. But, as discussed above, the THP has no statutory authority to enforce immigration law, and so the programmatic subterfuge makes it crystal clear that these operations are beyond the THP’s statutory powers. They are *ultra vires*.

**2. Claim 2: The THP’s pretextual joint operations with ICE violate constitutional protections against unreasonable seizures because motorists are, by design, seized arbitrarily.**

The THP cannot detain motorists without a warrant if it does so in a way that is “unreasonable.” U.S. Const. Amend. IV; Tenn. Const. Art. I, § 7; *see State v. Downey*, 945 S.W.2d 102, 106 (Tenn. 1997) (treating the Fourth Amendment and Article I, Section 7 as equivalents). To execute the Robertson County roadblock and its programmatic traffic-stop operations in Nashville and Memphis (and potentially elsewhere), the THP has detained motorists unreasonably.

**a. Pretextual roadblock**

In the situation of a roadblock, where motorists are stopped without probable cause of any traffic violation, it is well-established that stopping the motorists is unreasonable, and hence

unconstitutional, if the roadblock's nominal purpose is not actually its primary purpose. *Hicks*, 55 S.W.3d at 536–37. That is, pretextual or mixed-motive roadblocks are unreasonable and thus constitutional. *Id.*; *see United States v. Huguenin*, 154 F.3d 547, 557 (6th Cir. 1998) ("The problem with mixed-motive checkpoints is that they allow law enforcement officers the opportunity to use a pretext to question and search for contraband without probable cause[.]").

Consider *Hicks*, where officers from the THP and local police departments operated a joint roadblock with the nominal purpose of checking driver's licenses. *Hicks*, 55 S.W.3d at 519. When an officer stopped Hicks and asked for his driver's license, other officers claimed to smell marijuana and then ran their K-9 drug-detection dog around the car to investigate that hunch. *Id.* When the dog alerted, they searched Hicks' car, found marijuana, and charged him with its possession, and Hicks moved to suppress that evidence. *Id.*

The Tennessee Supreme Court suppressed the evidence because it held that roadblock operation violated article I, section 7 of the Tennessee Constitution since the purpose of checking driver's licenses was a pretext for either drug interdiction or ordinary law enforcement, neither of which could legitimately serve as the purpose for a roadblock. *Id.* at 519, 536–38. It explained that "a checkpoint designed or operated to further illegitimate law enforcement practices [such as drug interdiction] under the pretext of a lawful purpose [such as checking licenses] is unreasonable under Article I, section 7, irrespective of other indicia of reasonableness." *Id.* at 536. It so held because, when "the subterfuge exists on the administrative or planning level, such that the roadblock is primarily designed to further" an interest other than the roadblock's nominal interest, the roadblock will "necessarily fail for lack of a sufficiently compelling state interest." *Id.* The *Hicks* Court further explained that this particular roadblock was unconstitutionally unreasonable in light of proof the roadblock had a purpose other than checking driver's licenses,

namely, the fact that "at least one officer on the scene possessed and used a drug dog," that another officer came prepared to identify a rape suspect, and that the time and place of the checkpoint did not seem chosen to specifically detect and deter unlicensed drivers. *Id.* at 537; *see also Huguenin*, 154 F.3d at 557 (rejecting mixed-motive roadblocks).

Here, the nominal purpose of the Robertson County roadblock was to detect drunk drivers. But three facts, which are similar to the key facts in *Hicks*, show this roadblock's nominal purpose was not its primary purpose; rather, that purpose was to enforce immigration law. *Hicks*, 55 S.W.3d at 536. First, ICE agents were on the scene and at the ready even though they have no powers to enforce drunk-driving laws. The fact of their presence alone speaks volumes—as did the presence of a drug dog at the putative driver's-license checkpoint in *Hicks*. Second, the THP troopers referred a vehicle's passenger to ICE agents for further detention and questioning, and, worse, they did so based simply on seeing the color of his skin. That fact confirms their purpose of enforcing immigration laws. Third, the joint THP-ICE operation yielded zero detections of drunk driving or open-container offenses. Under *Hicks*, these three facts reliably establish the roadblock was a subterfuge, which makes it "unreasonable" and a violation of article 1, section 7. *Id.* It likewise violated the Fourth Amendment. *Huguenin*, 154 F.3d at 557. At a minimum, it is likely that Plaintiffs will prevail in showing that this THP-ICE roadblock—and any others following the same model—was unconstitutional.

**b. Programmatic pretextual traffic-stop operations**

**i. These operations present a novel situation.**

Second, consider the programmatic traffic-stop operations in which the THP has directed its troopers to make pretextual traffic stops so that ICE agents, who accompany them by riding in the trooper's car or trailing behind or waiting on standby nearby, can investigate the motorists for

immigration violations. The question is whether such traffic stops, which undoubtedly constitute warrantless "seizures" for constitutional purposes, are "reasonable." *Delaware v. Prouse*, 440 U.S. 648, 653 (1979). To assess the reasonableness of a warrantless investigative seizure, a court must "weigh[]" three factors: "the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty." *Brown v. Texas*, 443 U.S. 47, 50–51 (1979) (citing *Brignoni-Ponce*, 442 U.S. at 878–83). There are two well-trod routes for officers to satisfy this test: acting on probable cause of a crime or following an appropriate administrative plan.

Under the first route, a seizure is almost always reasonable when "specific, objective facts indicate that society's legitimate interests require the seizure of the individual," *Brown*, 443 U.S. at 51, such as when there is probable cause that the person detained is committing a crime. *See Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001). Under this route, the probable cause requirement is typically deemed a sufficient safeguard against arbitrary seizures. *See Prouse*, 440 U.S. at 654–55. But what if the officer acts pretextually, *i.e.*, detains the suspect on probable cause of committing one crime only so he can investigate a different suspected crime? That ulterior subjective purpose is ordinarily immaterial because the objective presence of probable cause will serve, regardless of the subjective ulterior purpose, as the requisite safeguard against arbitrary seizures. *Whren v. United States*, 517 U.S 806, 817 (1996). That is, "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis," and so, ordinarily, "the actual motivations of the individual officers involved" in making the probable-cause seizure are irrelevant. *Id.* at 813. Thus, *Whren* generally authorizes pretextual traffic stops

executed by "individual officers." *Id*.; *see State v. Vineyard*, 958 S.W.2d 730, 734–36 (Tenn. 1997) (following *Whren*).[52]

Under the second route, a seizure can be reasonable if it is "carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers" such that the resulting seizures will satisfy *Brown*'s three-part balancing test. *Brown*, 443 U.S. at 51. Examples of such appropriate, administratively planned intrusions include an inventory search pursuant to department policy for impounded vehicles, *Florida v. Wells*, 495 U.S. 1, 3–5 (1990), or a roadblock of motorists for a predetermined, proper purpose. *See Michigan Dep't of State Police v. Sitz*, 496 U.S. 444, 449–50, 455 (1990); *Hicks*, 55 S.W.3d at 524. Under this route, the administrative plan essentially serves as a "substitute" for "traditional probable cause" to safeguard against individual arbitrary seizures. Walter F. LaFave, *The "Routine Traffic Stop" From Start to Finish*, 102 Mich. L. Rev. 1843, 1853 (Aug. 2004). Thus, the plan must be designed on the administrative level in a way to *prevent* arbitrary seizures, thereby satisfying *Brown*. 443 U.S. at 51; *see, e.g., Hicks*, 55 S.W.3d at 524.

But what if the administrative plan has a pretextual purpose? As explained in the previous section, that is forbidden. That is so because if officers are acting for a purpose other than the administrative plan's official purpose, then the plan as officially designed *is not preventing*

[52] This doctrine has come under increasing attack mainly because traffic violations are so minor and commonplace that the existence of probable cause of such a violation does not actually serve as a safeguard against arbitrary seizures. *See Maryland v. Wilson*, 519 U.S. 408, 423 (1997) (Kennedy, J., dissenting) ("When *Whren* is coupled with today's holding, the Court puts tens of millions of passengers at risk of arbitrary control by the police."); *United States v. Weaver*, 9 F.4th 129, 171 (2d Cir. 2021) (Pooler, J., dissenting) (stressing that because "state traffic laws prohibit many innocuous activities, such as hanging an air freshener from a rearview mirror or having a loud exhaust, 'probable cause as to a minor traffic violation can be so easily come by that its existence provides no general assurance against arbitrary police action.'" (quoting Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment*, Vol. 1, § 1.4(f) (6th Ed. 2020))).

arbitrary warrantless seizures. *Hicks*, 55 S.W.3d at 536–37; *see City of Indianapolis*, 531 U.S. at 47; *Huguenin*, 154 F.3d at 555, 557 ("[T]he Fourth Amendment requires that police deception and subterfuge must be carefully scrutinized in regard to pretextual checkpoints[.]"); *Wells*, 495 U.S. at 4 ("[A]n inventory search must not be a ruse for general rummaging in order to discover incriminating evidence."); *Colorado v. Bertine*, 479 U.S. 367, 372 (1987) (finding it significant that there had been "no showing that the police who were following standardized procedures, acted in bad faith or for the sole purpose of investigation"); *New York v. Burger*, 482 U.S. 691, 716 n.27 (1987) (noting that the warrantless administrative inspection upheld did not appear to be "a 'pretext' for obtaining evidence of . . . violation of . . . penal laws"); *but see Ashcroft v. al-Kidd*, 563 U.S. 731, 739–40 (2011) (upholding an arrest *warrant* that was allegedly obtained on a pretext).

In sum, the two usual routes to satisfying *Brown*'s reasonableness test for warrantless investigative detentions diverge: (1) under the probable-cause route, it is the objective existence of probable cause that serves as the safeguard against arbitrariness, and so pretext by an individual officer ordinarily does not matter, *Whren*, 517 U.S at 813–17; whereas, (2) under the administrative-plan route, it is the plan's design that serve as the safeguard against arbitrariness, and so if the design covertly endorses pretextual searches or seizures, pretext does matter. *Hicks*, 55 S.W. 3d at 536–37.

But these doctrinal lines are jumbled in the instant case because the THP has designed an administrative plan that combines the two routes described above. Under the THP programmatic pretextual traffic-stop plan, the THP directs—from the administrative level—its troopers to systematically use the probable cause of traffic violations as a pretext to stop motorists for an ulterior investigation into something else. In essence, the THP has deliberately chosen to

systematically exploit the *Whren* doctrine by incorporating it into an administrative plan. By doing so, it has designed and implemented an administrative plan that *promotes* arbitrary seizures, rather than *prevents* them. The THP has turned the salutary role of an administrative plan—its tendency to prevent arbitrary seizures—on its head. Such a perverse administrative plan severely undercuts the (already questionable)[53] ability of the probable-cause requirement to prevent arbitrary seizures since the administrative plan itself promotes arbitrary conduct.

Worse yet, the true and ulterior purpose of seizures under the THP's administrative plan is to investigate potential violations of civil immigration laws, which are laws that the THP troopers lack the power to enforce. *See supra* at 17. That is, the THP has designed an administrative plan that not only systematically exploits *Whren*, but that does so by mandating pretextual traffic stops for an ulterior purpose that is outside the THP's jurisdiction.

Precedent does not address this new hybrid situation presented by an administrative plan deliberately designed to systematically use pretextual traffic stops to investigate matters outside the law-enforcement officer's jurisdiction. Thus, the THP's programmatic pretextual-traffic stop operations present a novel question. And that novel question is very important because, not incidentally, these novel operations have been causing starkly arbitrary conduct on the street level, as shown by the video footage of Operation Flood the Zone. That footage shows that troopers blatantly lied to one motorist after another about the purpose of their seizure; troopers wrongfully expanded and prolonged those putative "traffic stops" so immigration status could be investigated; and troopers, using race and ethnicity as a proxy for immigration violations, deliberately focused their pretextual enforcement of traffic laws against people of a certain race

---

[53] *See supra* at 24 n. 52.

or ethnicity.[54] The footage also shows that troopers engaged in these arbitrary actions in order to satisfy the administrators who planned the operation. This goal of satisfying the administrators caused the arbitrary conduct to be both rampant and particularly ugly: officers kept a count of people arrested for the ulterior purpose, and they even marked those arrested people with Sharpies to ensure they got credit for their ulterior-purpose arrests.

**ii. This novel situation should be addressed by following fundamental Fourth Amendment principles.**

This new hybrid situation—an administrative plan directing officers to make pretextual traffic stops—should be addressed under *Brown*'s balancing test for reasonableness because *Brown*'s test ultimately applies to all investigative seizures. *See Whren*, 517 U.S. at 817 ("It is of course true that in principle every Fourth Amendment case, since it turns upon a 'reasonableness' determination, involves a balancing of all relevant factors."). Under that test, the THP's programmatic pretextual traffic-stop operation surely fails:

- *The gravity of the state's interest.* The Court should consider the state's interest to be the enforcement of civil immigration law since that is the interest that the operation is designed on the administrative level to serve. *Hicks*, 55 S.W.3d at 536–37. And so there is no valid state interest because state law enforcement officers lack the power to enforce civil immigration law. If, in the alternative, the Court were to consider the state's interest to be enforcement of the traffic code,

[54] It is no secret that pretextual traffic stops are especially likely to be used in an especially offensive and humiliating way against racial minorities. *United States v. Cole*, 21 F.4th 421, 437 (7th Cir. 2021) (Hamilton, J., dissenting) (explaining that experience shows that pretextual stops under *Whren* involve "intrusive and humiliating police tactics [that] are used disproportionately on Black and Hispanic drivers[.]"); *Weaver*, 9 F.4th at 160 (Lohier, J., dissenting) ("As a practical matter, *Whren* and later cases have unfortunately given police officers a green light to make pretextual stops based on racial profiling.").

that interest could in theory be significant, *see Atwater*, 532 U.S. at 354, but, practically speaking, it is somewhat limited because traffic violations are relatively minor and are so commonplace. *See supra* at 24 n. 52.

- *The degree to which the seizure advances this state interest.* If the Court considers the state's interest to be immigration enforcement, this factor cannot weigh in favor of the seizure since that interest is illegitimate. But even if the Court considers the state's interest to be traffic-code enforcement, this factor does *not* weigh in favor of the seizure. That is so because, as shown by Operation Flood the Zone, officers acting under such an administrative plan will deliberately *refrain from enforcing* the traffic code in order to maximize the time they have to pursue the plan's covert ulterior purpose.
- *The severity of the interference with individual liberty*. The interference with the liberty of the motoring public is severe in this situation because: (1) any seizure of a motorist for a possible traffic infraction is a significant intrusion since it interrupts travel and can involve an "unsettling show of authority," *Prouse*, 440 U.S. at 657; *see also id.* at 662–63;[55] (2) here, those seizures go beyond the

---

[55] The *Prouse* Court remarked on society's need to travel freely on the roadways:

> Automobile travel is a basic, pervasive, and often necessary mode of transportation to and from one's home, workplace, and leisure activities. Many people spend more hours each day traveling in cars than walking on the streets. Undoubtedly, many find a greater sense of security and privacy in traveling in an automobile than they do in exposing themselves by pedestrian or other modes of travel. Were the individual subject to unfettered governmental intrusion every time he entered an automobile, the security guaranteed by the Fourth Amendment would be seriously circumscribed.

*Id.*

processing of a traffic infraction because the officers are actually intent on investigating immigration status, which means they will ask confusing and unsettling questions unrelated to a traffic violation and will often wrongfully prolong the stop; (3) the severity of the intrusion is further increased because, whereas in a normal traffic stop only the motorist is the focus of traffic investigation, in this situation the investigation also necessarily aims to include all passengers despite their lack of responsibility for any perceived traffic offense; and, (4) finally, the intrusion is especially severe since officers, intent on enforcing immigration law, tend to engage in racial profiling, and that racial profiling makes the seizure all the more insulting, unnerving, and destructive of the social fabric.

Weighing the *Brown* factors makes it perfectly clear why the THP's programmatic pretextual traffic-stop operations are "unreasonable." First, whatever relatively slight interest the state has in enforcing minor traffic infractions is *not* meaningfully served because troopers acting on the administrative plan will deliberately refrain from enforcing the traffic code in order to maximize the time they have to pursue the plan's covert ulterior purpose. Second, the seizures of motorists will constitute an especially severe interference with liberty because the seizures will be confusing, inordinately extensive, and racially targeted. For these reasons, the THP's administrative plan, and its resulting operations, fail the *Brown* test.

Plus, these operations are simply an affront to the rule of law. The troopers lie to one motorist after another, telling them they were stopped for a traffic offense when in fact they were stopped to be investigated for immigration status, which is something the trooper lacks the power to even investigate. This charade violates our social contract. Society gives officers certain

powers to police the public for its own good. For a police department to mandate the use of those limited powers against the public in bad faith in such a deliberate, systematic, and institutionalized manner is anathema to the Fourth Amendment, whose fundamental purpose is to stop police from treating the public arbitrarily. *See generally Johnson v. United States*, 333 U.S. 10, 17 (1948) (commenting that allowing police to have virtually unfettered search powers "would obliterate one of the most fundamental distinctions between our form of government, where officers are under the law, and the police-state where they are the law"). These operations are unreasonable and unconstitutional.

Presumably, the Defendants will argue that *Whren* forecloses the foregoing analysis. That is mistaken for three reasons. First, *Whren* simply did not address this situation. In *Whren*, the stop was singular and based on the on-the-fly subjective decision of an individual officer; but here, the stops are systematic and widespread because they are based on the objective design of an administrative plan. *Whren*, 517 U.S. at 808–09; *see id.* at 813 (holding that the "subjective intentions" of an "individual officer" are immaterial to the ordinary probable cause analysis). Thus, here, the challenge is to the programmatic purpose, not to the individual officer's decision to make a stop. *See* 2 John Wesley Hall, Search and Seizure § 23.22 (6th ed. 2025) ("*Whren* does not stand for the notion that programmatic purpose is irrelevant. It may be quite relevant if the case involves a decision made by others . . . ."). The Plaintiffs' challenge is, as mentioned, to a new hybrid situation produced by the THP's brash decision to systematically use pretextual traffic stops to enforce laws outside its jurisdiction to enforce. Those differences take this case beyond the scope of *Whren*.

Second, *Whren* itself says its rule on pretexts does not apply when "searches or seizures [are] conducted in an extraordinary manner" that are "unusually harmful to an individual's

privacy or even physical interests." 517 U.S. at 818. Such is the case here. For reasons detailed above, the programmatic exploitation of *Whren* gives birth to an operation like Operation Flood the Zone, which is in fact unusually harmful to motorists' interests protected by the Fourth Amendment. Indeed, the "core," "basic purpose," and "central concern" of the Fourth Amendment is protecting liberty and privacy against arbitrary governmental interference. *Wolf v. Colorado*, 338 U.S. 25, 27 (1949); *Camara v. Muni. Court*, 387 U.S. 523, 528 (1967); *United States v. Ortiz*, 422 U.S. 891, 895 (1975). That Amendment cannot countenance the deliberate, systematic, and bad faith abuse of power displayed in Operation Flood the Zone and subsequent joint operations.

Finally, when addressing this new situation, the Court can take guidance from *Missouri v. Seibert*, 542 U.S. 600 (2004). There, the Supreme Court chose to fortify *Miranda* protections because police departments were deliberately and systematically exploiting, through special "training instructions," a perceived weakness in *Miranda* protections that stemmed from the Court's previous rejection of the "cat out of the bag" theory in *Oregon v. Elstad*, 470 U.S. 298 (1985). *Seibert*, 552 U.S. at 615, 617 (Souter, J., plurality op.); *id.* at 618–22 (Kennedy, J., concurring) (rejecting police "technique . . . designed to circumvent *Miranda*"). Here, the THP is deliberately and systematically exploiting a perceived weakness in Fourth Amendment protections that stems from *Whren*'s acceptance of pretextual traffic stops conducted on an individual basis. This Court should counteract this bad-faith exploitation of *Whren* by filling the gap in the law such that it fortifies the Fourth Amendment and article I, section 7 of the Tennessee Constitution and rejects that exploitation. *Cf. Robertson*, 198 S.W.2d at 635 ("Highway Patrol Officers . . . must exercise this right to check operators' licenses in good faith

and not as a pretext or subterfuge for an inspection of or a prying into [other matters].” (citing *Cox v. State*, 181 S.W.2d 338, 340 (Tenn. 1944))).

For the foregoing reasons, the Plaintiffs are, at a minimum, likely to succeed in their Fourth Amendment challenge to the THP’s programmatic pretextual traffic-stop operations.

**3. Claim 3: The THP’s pretextual joint operations with ICE violate motorists’ right to equal protection under the law due to rampant and deliberate racial profiling.**

The Fourteenth Amendment to the U.S. Constitution and Article I, Section 8 and Article XI, Section 8 of the Tennessee Constitution “guarantee equal privileges and immunities for all those similarly situated.” *Tenn. Small Sch. Sys. v. McWherter*, 851 S.W.2d 139, 152 (Tenn. 1993). They guarantee “the equal protection of the laws.” U.S. Const. Amend. 14, § 1.

Accordingly, under no circumstance can a THP trooper stop a motorist or prolong[56] the stop of that motorist based on his or her race or ethnicity, which is what troopers will deliberately and regularly do when their real goal—established “on the administrative or planning level,” *Hicks*, 55 S.W.3d at 536—is to enforce civil immigration laws. *See Whren*, 517 U.S. at 813 (stating the Equal Protection Clause prohibits “selective enforcement of the law based on considerations such as race”); *United States v. Avery*, 137 F.3d 343, 355 (6th Cir. 1997) (“[W]e find that citizens are entitled to protection of the laws at all times. If law enforcement adopts a policy, employs a practice, or in a given situation takes steps to initiate an investigation of a citizen based solely upon that citizen’s race, without more, then a violation of the Equal Protection Clause has occurred.”); *Floyd v. City of New York*, 959 F. Supp. 2d 540, 563

[56] *Rodriguez*, 575 U.S. at 356–57 (police cannot prolong a traffic stop to engage in “[o]n-scene investigation into other crimes,” and there is no exception for “de minimis” delay); *see, e.g.*, *Urrieta*, 520 F.3d at 579 (holding that a very brief prolongation of a traffic stop—the time it took to ask immigration-related questions—violated the Fourth Amendment).

(S.D.N.Y. 2013) ("A police department may not target a racially defined group for stops in general—that is, for stops based on suspicions of general criminal wrongdoing—simply because members of that group appear frequently in the police department's suspect data. The Equal Protection Clause does not permit the police to target a racially defined group as a whole because of the misdeeds of some of its members." (citations omitted) (citing *City of Indianapolis v. Edmond*, 531 U.S. 32, 41–42 (2000)). That is, even if a seizure can be defended as "reasonable" under the Fourth Amendment, it violates the Equal Protection Clause if motivated by race or ethnicity.

The Plaintiffs' proof shows they are likely to prevail on their equal protection claim. To date, the most comprehensive and meaningful sample of evidence that the Plaintiffs have is that regarding the first night of Operation Flood the Zone, primarily the 52 hours of video footage, along with the dispatch reports for the 609 stops. That evidence firmly shows both a "discriminatory effect" and a "discriminatory purpose." *United States v. Armstrong*, 517 U.S. 456, 465 (1996). As for discriminatory effect, analysis of the video footage shows that, in neighborhoods that were about 30% Hispanic, about 60% of the stopped motorists were Hispanic, and overall it appears that 92% of detained motorists were racial or ethnic minorities. (*See* Ex. 1, Kocher Report at 12–13; Ex. 2, Hale Dec. at ¶ 6.) As for discriminatory purpose, consider three things. First, the THP chose to systematically focus its roving Operation Flood the Zone on the most Hispanic-dense neighborhoods (Ex. 1, Kocher Report at 4–11), and, similarly, it chose to operate its joint THP-ICE roadblock in Robertson County, which has a substantial and growing Hispanic population. (*See id.* at 6; Ex. 13, Keohane Dec.) Second, the candid statements caught on video between THP and ICE agents reflect that they were fully aware that their operation's goal was to detain as many immigrants as possible. Indeed, they went so far as to

choose to vigorously enforce the temporary-tag law because they thought people of a certain race or ethnicity were likely to be violating it. (*See supra* at 6–7.) Third, the video reveals that THP troopers deliberately minimized their time processing the traffic stops of white motorists, whereas those stops were prolonged against Hispanic motorists in particular (*see supra* at 7), reflecting that "similarly situated individuals of a different race were not" subjected to the same degree of investigatory detention. *Armstrong*, 517 U.S. at 465. Likewise, in the Robertson County roadblock, THP troopers held a Hispanic man for immigration questioning based on the color of his skin, whereas they refrained from doing so for plaintiff Keohane, a white motorist. (Ex. 13, Keohane Dec.) Discriminatory purpose is obvious from the administrative level down to the street level, resulting in discriminatory effect.

Because this evidence shows violations of the constitutional guarantee to equal protection under the law, the Plaintiffs have, at a minimum, a strong likelihood of prevailing on the merits.

**B. The Defendants' illegal conduct is causing irreparable harm.**

"When constitutional rights are threatened or impaired, irreparable harm is presumed." *Obama for Am.*, 697 F.3d at 436.

As described above, if the THP is allowed to continue with its pretextual, immigration-enforcement traffic stop operations, the public will be harmed by being seized in violation of their constitutional rights. Motorists will be detained who otherwise would not have been detained, which is a serious physical and psychological intrusion. Many will suffer this intrusion due to their race or ethnicity. And many will suffer an unjustifiably prolonged intrusion as THP troopers wrongfully use the traffic stop to root around for an immigration violation. Meanwhile, the public will lose in terms of safety because funds earmarked for the earnest enforcement of criminal and traffic codes on the roadways will be used to repeatedly make traffic stops without

any intention of actually enforcing those codes. These injuries to motorists and to the public in general would not be undone by money damages, and hence a preliminary injunction is proper.

Plus, these operations continue apace. According to volunteers at Vecindarios 901, in the recent weeks since the filing of the Petitioner's Complaint, they have continued to see THP and DHS working in the same manner, jointly using pretextual traffic stops to investigate immigration status. (Ex. 16, Oceja Dec.) Indeed, the THP has publicly stated that it believes its joint operations with ICE are legal (Ex. 19. THP Press Release), and so they will continue unless enjoined.

**C. The balance of the equities weighs and the public interest weight in favor of granting this injunction.**

The balance of equities and public interest, which merge in a suit against the government, *see Daunt v. Benson*, 956 F.3d 396, 422 (6th Cir. 2020), weigh heavily in favor of a preliminary injunction. "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *G & V Lounge, Inc. v. Michigan Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994); *see, e.g., Tennessee v. U.S. Dep't of Educ.*, 615 F. Supp. 3d 807, 841 (E.D. Tenn. 2022) (finding where plaintiffs showed likelihood of success, "[d]efendants do not have a legitimate in enforcing" guidance that is likely invalid).

The challenged operations violate statutory law and constitutional law, as explained above. Moreover, because state law enforcement officers lack the power to enforce civil immigration law, there can be no valid government interest. Even if the Court were to consider the state's interest to be enforcement of minor traffic code violations, although that interest may be legitimate, *see Atwater*, 532 U.S. at 354, it is vastly outweighed by the interest of individuals in not being racially profiled and systematically subjected to unlawful pretextual traffic stops.

Likewise, it is in the public interest to prevent unconstitutional restraints on the use of our

roadways and to prevent the systematic harassment of minorities. As the taxpayer plaintiffs report, these operations have deterred minorities within the community from going to work, school and church, which harms both those individuals and society as a whole. (Ex. 12, Adams Dec.; Ex. 13, Keohane Dec.; Ex. 14, Laney Dec.; Ex. 16, Oceja Dec.; Ex. 17, Vaughan Dec.; Ex. 18, Vo Dec.) Not only are the operations causing fear, but they are causing acute pain to the families ensnared in these operations, as parents are suddenly and cruelly separated from their small children. (Ex. 16, Oceja Dec.; *see* Ex. 14, Laney Dec.) Finally, these operations are tarnishing the public image of law enforcement and governmental authorities since troopers have been directed to systematically stop the public arbitrarily and to lie to them repeatedly. (Ex. 12, Adams Dec.; Ex. 13, Keohane Dec.)

These factors, like the others, weigh firmly in favor of relief pending trial.

## V. CONCLUSION

The Court should issue a preliminary injunction that enjoins the Defendants from (1) directing THP troopers to work jointly with U.S. Department of Homeland Security agents with the goal of detaining motorists to investigate their immigration status, (2) directing THP troopers to deliberately and systematically conduct traffic stops for the ulterior purpose of enforcing civil immigration law, and (3) directing or encouraging, either directly or indirectly, THP troopers to use race or ethnicity as a criteria for deciding whom to subject to a traffic stop.

Respectfully submitted,

*/s/ Michael C. Holley*
Michael C. Holley
Tennessee Bar No. 021885
Spring Miller
Tennessee Bar No. 026485
Julio Colby
Tennessee Bar No. 042091
TENNESSEE IMMIGRANT & REFUGEE RIGHTS COALITION
3310 Ezell Road
Nashville, TN 37211
Phone: (615) 457-4768
mike@tnimmigrant.org
spring@tnimmigrant.org
julio@tnimmigrant.org

**CERTIFICATE OF SERVICE**

I hereby certify that on July 9, 2026, I electronically filed this pleading with the U.S. District Court Clerk by using the CM/ECF system to John W. Ayers, Assistant Attorney General, Office of the Attorney General, P.O. Box 20207, Nashville, TN 37202.

s/ *Michael C. Holley*
MICHAEL C. HOLLEY