IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
AT NASHVILLE

| | | |
|---|---|---|
| **TENNESSEEE IMMIGRANT AND REFUGEE RIGHTS COALITION, et al.** | ) | |
| **Plaintiffs,** | ) | |
| | ) | **No. 3:26-CV-832** |
| **v.** | ) | **Judge Aleta A. Trauger** |
| **TENNESSEE HIGHWAY PATROL, et al.** | ) | |
| **Defendants.** | ) | |

## DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

### INTRODUCTION

The Tennessee Highway Patrol ("THP") has not made any immigration arrests in over a decade. Ex. 4, Perry Declaration at ¶ 39. But because, last year, THP assisted the U.S. Immigration & Customs Enforcement ("ICE") in *its* enforcement efforts, as it routinely does with other law enforcement agencies, Plaintiffs claim that THP has done something wrong. So Plaintiffs—an immigrant advocacy organization and seven Tennessee taxpayers—ask this Court to interfere now, over a year later, and enter an amorphous injunction about future law enforcement activity. All that while asking the Court to endorse their admittedly "novel" theory that THP is prohibited from making constitutional, probable-cause-backed traffic stops because THP troopers had allegedly "ugly" motives. Dkt. 11 at 25, 29, 30.

The Court should reject that extraordinary demand. To start, Plaintiffs base their request for injunctive relief solely on past conduct. So they cannot clearly show that this Court has

jurisdiction. Article III standing in this context requires a threat of future injury, not merely past exposure to unlawful conduct. *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983). And in the absence of an ongoing violation of federal law and requested relief properly characterized as prospective, sovereign immunity bars claims against state officials. *Diaz v. Michigan Dep't of Corr.*, 703 F.3d 956, 964 (6th Cir. 2013). Beyond those jurisdictional issues, Plaintiffs' reliance on past conduct also dooms their request for a preliminary injunction because irreparable harm—an indispensable element—must be "certain and immediate, rather than speculative or theoretical." *Michigan Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 154 (6th Cir. 1991).

Plaintiffs fare no better on the merits. Nothing THP has done exceeds the scope of its authority under state law. And the Supreme Court has "foreclose[d]" the "argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved." *Whren v. United States*, 517 U.S. 806, 813 (1996). "Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." *Id*. Finally, an Equal Protection selective-enforcement claim requires demonstration of a discriminatory purpose, which Plaintiffs have failed to establish with evidence.

Plaintiffs' motion should therefore be denied.

## BACKGROUND

### A. Interagency law enforcement collaboration is not taboo.

Occasionally, law enforcement agencies "operate[] in tandem because the officers of each agency have powers that the officers of the other lack." Dkt. 11 at 3. This type of interagency collaboration, which the U.S. Government Accountability Office has defined as "any joint activity by two or more organizations that is intended to produce more public value than could be produced when the organizations act alone," Ex. 1, GOA, *Results-Oriented Government: Practices That Can*

*Help Enhance and Sustain Collaboration among Federal Agencies*, GOA-06-15 at 6, 7 (October 2005)[1], is not only customary but encouraged, *id.* In carrying out its mission to serve, secure, and protect the citizens of Tennessee, THP routinely collaborates with other agencies at the local, state, and federal level. Ex. 4, Perry Declaration at ¶ 4.

At the state level, THP has partnered and collaborated with the Tennessee Bureau of Investigation ("TBI"), the Tennessee Department of Transportation ("TDOT"), the Tennessee Wildlife Resources Agency ("TWRA"), and the Tennessee Emergency Management Authority ("TEMA"). *Id*. at ¶¶ 5–9, 13. At the local level, THP assists local law enforcement partners across the state daily by providing personnel, resources, and specialized expertise in response to public safety needs. *Id*. at ¶ 10. THP also "strengthens local partnerships through school safety efforts, training opportunities, coordinated enforcement operations, and community engagement initiatives" and troopers "respond alongside local agencies during critical incidents." *Id*. at ¶¶ 10, 12. At the federal level, THP coordinates and conducts joint operations with various agencies, including the Drug Enforcement Administration ("DEA"), the Federal Bureau of Investigation ("FBI"), the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), and ICE. *Id*. at ¶ 18. "These partnerships allow THP to combine resources, intelligence, personnel, and specialized expertise with other agencies to address crime trends, improve communication, and enhance operational effectiveness." *Id*. at ¶ 19.

**B. THP's collaboration has proved to be valuable.**

THP has participated in "complex criminal investigations requiring resources and expertise from multiple jurisdictions." *Id*. at ¶ 25. "From 2024 through 2026, THP partnered with the DEA,

[1] Although the cited report "focuse[d] on the actions federal agencies can take to improve collaboration," the GOA acknowledged that "collaboration can involve federal and nonfederal governmental organizations as well as nongovernmental organizations." Ex. 1 at 7.

ATF, TBI, and local agencies in the multi-year 'Paris on Ice' investigation," which resulted in the arrest and federal indictment of seven individuals and the recovery of more than 50 grams of methamphetamine." *Id*. "Twelve additional individuals were subsequently indicted on related charges connected to the drug trafficking operation." *Id*. "The investigation disrupted a significant drug trafficking network and demonstrated the effectiveness of sustained cooperation among local, state, and federal law enforcement agencies." *Id*.

THP has also participated in several coordinated enforcement initiatives in Memphis and Shelby County which "demonstrate a sustained commitment by THP and its partners to address violent crime, criminal activity, traffic safety concerns, and other public safety challenges in the Memphis area." *Id*. at ¶ 20. Through the most recent initiatives, Bluff City Surge and Memphis Safe Task Force, THP has worked alongside various agencies, "including Homeland Security Investigations, the Federal Protective Service, United States Attorney's Office, FBI, DEA, Diplomatic Security Service, U.S. Customs and Border Protection, ATF, United States Marshals Service, and the Internal Revenue Service Office of Inspector General." *Id*. at ¶ 21. "Together, these agencies provide a unified approach to increasing law enforcement presence, reducing criminal activity, and improving public safety throughout Memphis and Shelby County." *Id*.

Due to these coordinated efforts, between September 2025 and May 2026, THP reported more than 1,600 felony arrests, recovered more than 240 stolen vehicles, conducted over 95,000 traffic stops, confiscated more than 190 weapons, and provided more than 3,000 motorist assists. *Id*. at ¶ 22. "These results demonstrate the operational impact that sustained, coordinated enforcement can have when agencies combine personnel, intelligence, and resources toward shared public safety goals." *Id*.

In May 2025, THP supported a coordinated public safety effort operation with ICE, during which ICE Agents rode with Troopers while they conducted traffic stops based on probable cause of moving and non-moving violations. *Id*. at ¶¶ 29, 30. "Troopers initiated and conducted stops based on traffic violations, not immigration status," but "[i]f a situation arose about a person's legal presence in the United States, the ICE agent was present to assist and carry out any duties within ICE's authority." *Id*. at ¶ 30. "The operation was conducted during nighttime hours between May 3, 2025 and May 10, 2025." *Id*. at ¶ 31. "During the operation, approximately nine Nashville district THP troopers conducted 660 traffic stops in and around Nashville, primarily in areas with high traffic density and high crash rates." *Id*. at ¶ 32. THP's enforcement activity throughout the entirety of the operation was limited to enforcement of Tennessee law. *Id*. at ¶ 33.

Troopers "made traffic stops for speeding and non-moving violations related to license plates, registration, taillights, headlights, and illegal window tint." *Id*. at ¶ 35. Even though ICE agents were "present or available nearby," they neither initiated nor conducted any traffic stops. *Id*. at ¶ 36. And ICE agents "did not make a decision on which motorists were stopped." *Id*. ICE's involvement "was limited to their agents being available to carry out their enforcement authority if they deemed such action necessary based on the circumstances." *Id*. at ¶ 37. Likewise, Troopers "did not engage in immigration enforcement." *Id*. ¶ 38. "All immigration matters were handled solely by ICE agents in accordance with federal law." *Id*.

While the May 2025 operation in Davidson County was ongoing, THP also conducted separate, unrelated, and previously scheduled sobriety checkpoints in Robertson, Marion, Polk, Greene, Putnam, Cannon, Pickett, Perry, and Obion counties. *Id*. at ¶¶ 40, 41. THP chooses the location of a sobriety checkpoint based on multiple factors, but one of the most important considerations is "the volume of traffic in a particular area." *Id*. at ¶ 42. The Robertson County

checkpoint was scheduled from 8:00 p.m. to 10:00 p.m. CDT at the intersection of US 431 N and US 41 N. *Id*. at ¶ 40. During the Robertson County checkpoint, "ICE agents were parked off-site" and "did not actively participate." *Id*. at ¶ 43. At one point, THP pulled a car out of traffic due to an odor of marijuana coming from the vehicle. *Id*. at ¶ 44. The passenger of the car admitted to smoking marijuana and THP searched the vehicle but did not find any marijuana. *Id*. at ¶ 45. ICE assisted THP with the incident after the vehicle was pulled out of traffic and investigated the passenger pursuant to their federal authority. *Id*. at ¶ 46.

As mentioned previously, THP has also been bolstering the city's law-enforcement manpower as part of the Memphis Safe Task Force. *Id*. at ¶ 47. That task force is led by the U.S. Marshals Service, which deputizes THP troopers participating in the task force. *Id*. at ¶¶ 47, 48. Entering Fall 2025, Memphis had the highest violent crime rate in the country. *See* Ex. 5, Chasity Maynard, *This Tennessee city has highest violent crime rate in the* country, WSMV4 (Sept. 9, 2025). Much of that violence stemmed from organized crime, with at least four-dozen gangs operating in the city. *See* Ex. 6, Imani Williams, *At least 48 gangs are active in Memphis, according to MPD's Multi-Agency Gang Unit* (Nov. 26, 2024). Task force troopers make stops in high-crime and high-traffic areas in and around Memphis, and their primary focus is crime reduction, including the apprehension of criminals and known gang members. Ex. 4, ¶¶ 49, 50.

THP's collaboration with federal counterparts makes Tennessee safer. Last week, an illegal alien who was apprehended because of a THP-initiated traffic stop for suspected DUI was sentenced in federal court for possessing marijuana with intent to distribute and for possessing a firearm in furtherance of a drug trafficking offense. Ex. 7, Press Release, U.S. Attorney's Office, Western District of Tennessee (Aug. 25, 2026). The traffic stop that led to his arrest was conducted as part of the Memphis Safe Task Force operation. *Id*. And last year, ATF and THP, as part of the

Memphis Safe Task Force, apprehended a convicted felon who was in possession of two weapons, including "a Glock pistol equipped with a machinegun conversion device." Ex. 8, Press Release, U.S. Attorneys' Office, Western District of Tennessee (July 29, 2026). The convicted felon, Jordan Jones, ran a stop light in a stolen vehicle, struck another vehicle while being pursued by THP, and then fled on foot before he was apprehended. *Id*. Jones was sentenced in federal court last month to 78 months in prison. *Id*.

The May 2025 operation in Davidson County also resulted in significant arrests. Ex. 4, ¶ 34. Four individuals were arrested for driving under the influence, three individuals were arrested for drug-related offenses, and six arrests were made for outstanding felony warrants. *Id*. THP also recovered a stolen vehicle and arrested the individual for possession of a stolen vehicle. *Id*. One individual was arrested for felony evasion of arrest. *Id*. And another individual was arrested for child endangerment. *Id*.

### C. TIRRC and taxpayers sue to stop federal-state collaboration.

A year after THP's activities in Davidson and Robertson counties, Tennessee Immigrant and Refugee Rights Coalition ("TIRRC") and seven Tennessee taxpayers sued THP, Tennessee Department of Safety and Homeland Security ("the Department"), Commissioner Jeff Long, and THP Colonel Matt Perry alleging that THP's joint operations with ICE violate state and federal law. *See generally* Dkt. 1-1. Defendants removed the case to this Court. Dkt. 1. Plaintiffs allege that THP "has been operating in tandem with [ICE] with the shared goal of detaining motorists to investigate their immigration status." Dkt. 1-1, ¶ 1. By participating in those joint operations, Plaintiffs allege THP "engag[ed] in a subterfuge by programmatically using its traffic stop powers to serve ICE's immigration arrest objectives" and that "[t]his programmatic subterfuge is illegal." Dkt. 1-1, ¶ 4.

Although Plaintiffs concede for purposes of this case that THP officers make traffic stops "only when there actually is probable cause of a traffic violation" and that ICE makes an arrest "only when there actually is probable cause of an immigration violation," *Id*. at ¶ 2, n.1, they contend that THP's actions during these joint operations are *ultra vires* and violate motorists' rights under the Fourth Amendment and the Equal Protection Clause of the Fourteenth Amendment, *id.* at ¶¶ 64-76. On those theories, they seek a preliminary injunction enjoining Defendants from:

> (1) directing [THP] troopers to work jointly with [ICE] agents with the goal of detaining motorists to investigate their immigration status, (2) directing THP troopers to deliberately and systematically conduct traffic stops for the ulterior purpose of enforcing civil immigration law, and (3) directing or encouraging, either directly or indirectly, THP troopers to use race or ethnicity as a criteria for deciding whom to subject to a traffic stop.

Dkt. 9 at 1. But they are not entitled to such extraordinary relief.

## LEGAL STANDARD

A preliminary injunction is an "extraordinary and drastic remedy." *Enchant Christmas Light Maze & Mkt. Ltd. v. Glowco, LLC*, 958 F.3d 532, 539 (6th Cir. 2020) (citation omitted). It "should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion," which is "more stringent than the proof required to survive a summary judgment motion." *Id*. (citation omitted). Still, courts retain discretion to deny or limit relief, *Friendship Materials, Inc. v. Mich. Brick, Inc.*, 679 F.2d 100, 102 (6th Cir. 1982), and must "guard" injunctive relief "with extreme caution, and apply it only in very clear cases." *Doe v. Lee*, 137 F.4th 569, 575 (6th Cir. 2025) (citation omitted).

At a minimum, Plaintiffs must show that: (1) they are likely to succeed on the merits; (2) they will suffer irreparable harm absent the requested injunction; (3) the balance of equities favors them; and (4) an injunction would serve the public interest. *Memphis A. Philip Randolph Inst. v. Hargett*, 2 F.4th 548, 554 (6th Cir. 2021); *see EOG Res., Inc. v. Lucky Land Mgmt., LLC*, 134 F.4th

868, 883 (6th Cir. 2025). And because the Court cannot even *reach* the merits without jurisdiction, Plaintiffs "must also show a likelihood of success of establishing jurisdiction . . . [i]n addition to demonstrating a likelihood of success on the substantive claims." *Hargett*, 2 F.4th at 554 (citing *Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 900 F.3d 250, 256 n.4 (6th Cir. 2018)).

**ARGUMENT**

Plaintiffs cannot show that this Court has jurisdiction to reach the merits of this case, let alone that they are likely to succeed. While those shortcomings are fatal to their request for a preliminary injunction, they also fail to show that they face irreparable harm in the absence of an injunction—another deficiency that dooms their request. Finally, Plaintiffs cannot show that the balance of equities weighs in their favor or that an injunction would serve the public interest. Plaintiffs have therefore failed to carry their burden by a clear showing, and the motion should be denied.

**I. Plaintiffs' Inability to Show a Likelihood of Success on the Merits is Fatal to Their Request for a Preliminary Injunction.**

Plaintiffs cannot show a likelihood of success on the merits of their claims. On jurisdiction, Plaintiffs lack standing to bring this lawsuit. And their claims are barred by sovereign immunity. On the merits, Plaintiffs are unlikely to prove that THP's collaboration with ICE violates state or federal law. Those deficiencies are "fatal." *Gonzales v. Nat'l Bd. of Med. Examiners*, 225 F.3d 620, 625 (6th Cir. 2000).

**A. Plaintiffs lack Article III standing.**

"In evaluating plaintiffs' likelihood of success on the merits, [the Court should] examine first the issue of standing." *Ne. Ohio Coal. for Homeless & Serv. Emps. Int'l Union, Loc. 1199 v. Blackwell*, 467 F.3d 999, 1010 (6th Cir. 2006); *see Warth v. Seldin*, 422 U.S. 490, 498 (1975) (standing "is the threshold question in every federal case"). Article III of the United States

Constitution "limits federal courts' jurisdiction to 'cases' and 'controversies.'" *Am. Ass'n of Nurse Anesthesiology v. Kennedy*, 183 F.4th 427, 432 (6th Cir. 2026) (quoting U.S. Const. art. III, § 2). "For there to be a case or controversy under Article III, the plaintiff must have a personal stake in the case—in other words, standing." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (cleaned up).

To establish standing, a plaintiff must show "an injury in fact, that was caused by the conduct complained of, and which a favorable decision is likely to redress." *Kareem v. Cuyahoga Cnty. Bd. of Elections*, 95 F.4th 1019, 1022 (6th Cir. 2024) (cleaned up). Standing to seek damages for past harms and standing to seek prospective relief are analytically distinct inquiries. *WCI, Inc. v. Ohio Dep't of Pub. Safety*, 18 F.4th 509, 514 (6th Cir. 2021). To establish standing "for injunctive or declaratory relief, a plaintiff must show that he is under threat of suffering 'injury in fact' that is concrete and particularized, and that threat must be actual and imminent, not conjectural or hypothetical." *Sumpter v. Wayne Cnty.*, 868 F.3d 473, 491 (6th Cir. 2017) (cleaned up). "[P]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *Lyons*, 461 U.S. at 102 (citation omitted).

Neither TIRRC nor the Individual Plaintiffs have proven they meet those requirements.

**1. The Individual Plaintiffs have no standing to seek declaratory or injunctive relief.**

Plaintiffs Paul Adams, Johanna Keohane, Joni Laney, David Morales, Maria Oceja, Billy Vaughn, and Terry Vo (collectively, "the Individual Plaintiffs") have no personal stake in this case. They each sue in their "individual capacity as a taxpayer." Dkt. 1-1, ¶¶ 10–16. But they have failed to allege an actual and imminent threat that they will suffer a concrete and particularized injury. Instead, they simply disagree with how public funds are being used:

> They object to the Defendants' use of their tax payments to fund the THP operations described . . . because they believe that those operations are not statutorily authorized, that they systematically violate the constitutional rights of motorists, and that they divert taxpayer funds away from the THP's statutorily authorized operations in order to engage in these illegitimate operations.

*Id*. at ¶ 9.

That "taxpayer" theory of standing does not fly in federal court. It is well-established that "a plaintiff raising only a generally available grievance about government . . . does not state an Article III case or controversy." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 573–74 (1992). A plaintiff must do more than allege an injury that "is plainly undifferentiated and common to all members of the public." *Id*. at 575 (cleaned up). Rather, "a state taxpayer must allege direct and palpable injury with sufficient specificity" to establish standing. *Taub v. Com. of Ky.*, 842 F.2d 912, 918 (6th Cir. 1988).[2] Plaintiffs do not obtain standing "by virtue of their status as taxpayers" alone. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 346 (2006).

That forecloses the Individual Plaintiffs' claims here. They have failed to allege any injury beyond mere disagreement with THP's operational decisions. *See* Dkt. 1-1, ¶¶ 10–16. The only Individual Plaintiff who has any personal experience with the allegations in this matter is Johanna Keohane, a resident of Robertson County, Tennessee, who was allegedly "subjected to a routine detention in the THP-ICE sobriety roadblock described in [the] Complaint." *Id*. at ¶ 11. But even if that seizure constituted an injury, which Defendants dispute, the sobriety checkpoint concluded at 10:00 p.m. CDT on May 9, 2025, [CITE], and Ms. Keohane fails to demonstrate that there is "a sufficient likelihood that [she] will again be wronged in a similar way." *Lyons*, 461 U.S. at 111. Thus, Ms. Keohane "is no more entitled to an injunction than any other citizen" of Robertson

[2] The only exception to this general rule is for Establishment Clause cases where Congress has directly contributed funding. *Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587, 609 (2007). That exception is inapplicable here.

County, Tennessee. *Id*. Put simply, "a federal court may not entertain a claim by any or all citizens who no more than assert that certain practices of law enforcement officers are unconstitutional." *Id*. That is precisely what the Individual Plaintiffs are attempting to do here. And their lack of standing dooms any likelihood of success on the merits.

**2. TIRRC lacks associational standing to bring this lawsuit on behalf of its members.**

TIRRC faces the same standing hurdle. The coalition purports to bring this lawsuit "on behalf of its members who have experienced previous injury and are subject to imminent future injury due to the defendants' unlawful collaboration with ICE." Dkt. 1-1, ¶ 17. "[A]ssociational standing, which allows an organization to sue on behalf of an injured member," requires three elements: "(1) at least one of the Association's members otherwise has standing in his own right, (2) the suit seeks to protect interests relevant to the Association's purpose, and (3) the claims and relief involved don't require individual members to participate in the lawsuit." *Kennedy*, 183 F.4th at 433.[3] TIRRC cannot make it past the first element.

TIRRC alleges that its "members have suffered a clear, constitutional injury—unlawful stops and seizures resulting from racial profiling—and face an imminent risk of experiencing that injury again at the hands of the defendants." Dkt. 1-1, ¶ 18. But to satisfy the first element of associational standing, TIRRC must "identify a member who has suffered (or is about to suffer) a

---

[3] Although the Sixth Circuit continues to apply this test, it has recognized that the doctrine of associational standing is in tension with the Supreme Court's modern standing jurisprudence. *Ass'n of Am. Physicians & Surgeons v. United States Food & Drug Admin.*, 13 F.4th 531, 538–42 (6th Cir. 2021). And more recently, Justice Thomas questioned the historical foundations of the associational-standing doctrine, which he stated, "appears to create serious problems, both constitutional and otherwise." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 403 (2024) (Thomas, J., concurring). Because TIRRC lacks standing even under the traditional three-part associational standing test, this Court need not address whether that test can be reconciled with the Supreme Court's recent standing decisions.

concrete and particularized injury from the defendant's conduct" and "show that its requested relief will redress this injury." *Ass'n of Am. Physicians & Surgeons*, 13 F.4th at 543. While TIRRC identifies a member who was stopped by a THP trooper near Memphis, that one member would not have standing in her own right to bring the instant lawsuit.

The TIRRC member, Rosa, was stopped earlier this year for two non-moving traffic violations. Dkt. 1-1, ¶ 18. Rosa allegedly "believed that she had been subjected to a pretextual traffic stop for the purpose of investigating her immigration status" and "[s]he experienced anxiety and a sense of powerlessness for the duration of the stop." *Id*. But even if such a stop constitutes a concrete and particularized injury, which Defendants dispute, "[t]he hypothetical threat of some future harm, even a likely future harm, is not an injury-in-fact," *WCI, Inc.*, 18 F.4th at 515, and TIRRC has failed to show that Rosa is *certain* to be stopped again, *id*. ("it is not enough that the future injury is reasonably likely to occur—the threatened injury must be certainly impending.) (cleaned up). Simply put, Rosa's fear that she will be stopped again is speculative and conjectural. *Lyons*, 461 U.S. at 108. Indeed, in the absence of Rosa declaring an intent to commit more traffic violations, there is *no threat* that she will be stopped again by THP.

Further dooming TIRRC's ability to establish associational standing is the fact that the claims involved in this suit require individual members' participation. TIRRC cannot plausibly assert highly individualized rights (like the right against unreasonable search and seizure) of others. *Faith Baptist Church v. Waterford Twp.*, 522 F. App'x 322, 332 (6th Cir. 2013) (citing *United States v. Pearce*, 531 F.3d 374, 381 (6th Cir. 2008)). Indeed, "Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted." *Rakas v. Illinois*, 439 U.S. 128, 133 (1978).

Because TIRRC does not allege that it has suffered an injury itself, associational standing is its only possible avenue to bring this lawsuit. But because TIRRC cannot satisfy the elements of associational standing, it is unlikely to succeed on the merits.

**B. Each of Plaintiffs' claims are barred by sovereign immunity.**

In addition to standing, Plaintiffs face another jurisdictional obstacle—sovereign immunity. Sovereign immunity "deprives federal courts of subject-matter jurisdiction when a citizen sues his own State unless the State waives its immunity or Congress abrogates that sovereign immunity." *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1046 (6th Cir. 2015). But a state's waiver of sovereign immunity, or consent to suit, must be "unequivocally expressed," *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 99 (1984), and the same applies to congressional intent to abrogate, *id*. There is only one more exception: "a suit challenging the constitutionality of a state official's action is not one against the State." *Pennhurst*, 465 U.S. at 102 (citing *Ex parte Young*, 209 U.S. 123 (1908)). The *Ex parte Young* exception "allows plaintiffs to bring claims for prospective relief against state officials sued in their official capacity to prevent future federal constitutional or statutory violations." *Boler v. Earley*, 865 F.3d 391, 412 (6th Cir. 2017).

Each of Plaintiffs' claims are brought against the State. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) ("[A] suit against a state official in his or her official capacity is . . . no different from a suit against the State itself.") (citations omitted); *Thompson v. Tennessee*, No. 3:08-CV-251, 2009 WL 10869407, at *2 (E.D. Tenn. Mar. 31, 2009) ("the Tennessee Highway Patrol and the Tennessee Department of Safety are state agencies, and suits against state agencies are the same as a suit against the state.") (citations omitted). Tennessee "has not waived sovereign immunity." *Farmer v. Phillips*, No. 20-5730, 2021 WL 6210609, at *2 (6th Cir. Oct. 19, 2021) (citing Tenn. Code Ann. § 20-13-102(a)). And Congress did not abrogate the sovereign immunity

of the states in enacting 42 U.S.C. § 1983. *Will*, 491 U.S. at 70-71. Thus, this suit can proceed only if the *Ex parte Young* exception applies. *Russell*, 784 F.3d at 1046-47.

For that exception to apply, "a claim must seek prospective relief to end a continuing violation of federal law" by a state official. *Diaz*, 703 F.3d at 964; *Pennhurst*, 465 U.S. at 102. The exception "has been read narrowly." *EMW Women's Surgical Ctr. v. Beshear*, 920 F.3d 421, 445 (6th Cir. 2019). It "has no application in suits against the States and their agencies, which are barred regardless of the relief sought." *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993). And it "does not . . . extend to any retroactive relief." *S & M Brands, Inc. v. Cooper*, 527 F.3d 500, 508 (6th Cir. 2008) (citing *Quern v. Jordan*, 440 U.S. 332, 338 (1979)).

Plaintiffs' claims against THP and the Department clearly fall outside the *Ex parte Young* exception. Both entities are state agencies. *Thompson*, 2009 WL 10869407, at *2. So regardless of the relief sought, claims against those two agencies are claims against the State and, consequently, are barred by sovereign immunity. *Puerto Rico Aqueduct & Sewer Auth., Inc.*, 506 U.S. at 146.

The claims against Colonel Perry and Commissioner Long fare no better. Plaintiffs seek a declaratory judgment "[d]eclar[ing] that the Defendants have violated and continue to violate . . . the Fourth and Fourteenth Amendments of the U.S. Constitution" and injunctive relief "[e]njoin[ing] the Defendants from directing THP troopers" to engage in conduct which allegedly violates those constitutional provisions, Dkt. 1-1 at 30, 31. But a declaration that Defendants *have* violated constitutional provisions is not prospective. *Wernert v. Williamson Cnty. Bd. of Educ.*, No. 3:24-CV-01000, 2025 WL 2025166, at *4 (M.D. Tenn. July 18, 2025) ("Even though the plaintiffs seek relief in the form of a declaratory judgment . . . the declaration they seek is retroactive in nature, not prospective, because the plaintiffs ask the court to declare that [the state official's]

behavior in the past violated the [ ] plaintiff's constitutional rights."). And even though Plaintiffs purport to seek declaratory and injunctive relief for continuing constitutional violations, they have not clearly shown that Colonel Perry and Commissioner Long are engaged in any ongoing violations.

The allegedly unlawful joint operation between THP and ICE in Davidson County ended on May 10, 2025. Dkt. 1-1, ¶ 44. Likewise, the "roadblock" in Robertson County was a two-hour sobriety checkpoint that occurred on May 9, 2025. *Id*. ¶ 56. The only ongoing operation alleged by Plaintiffs is the Memphis Safe Task Force. *Id*. ¶ 59. But, as Plaintiffs point out, that task force is led by the U.S. Marshals Service—not Colonel Perry or Commissioner Long. *Id*. ¶¶ 59 ("'The Joint Operations Command Center' for this task force is 'led by the U.S. Marshals Service,'" which "deploys 'multi-agency teams' to patrol in the Memphis area."). So even though Plaintiffs purport to seek prospective relief against Colonel Perry and Commissioner Long for ongoing violations of federal law, their allegations demonstrate that they are merely seeking to declare past conduct of those officials unlawful. Sovereign immunity bars those claims.

And *Ex parte Young* does not apply to Plaintiffs' *ultra vires* claim. Dkt. 1-1, ¶¶ 64-66. There is no "greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law." *Pennhurst*, 465 U.S. at 106. Yet that is what Plaintiffs ask this court to do. They allege "Defendants are acting beyond" their "statutory powers by directing THP troopers to work jointly with U.S. Department of Homeland Security agents with the goal of detaining motorists to investigate their immigration status." Dkt. 1-1, ¶ 66. And Plaintiffs seek declaratory and injunctive relief on that basis. *Id*. at 30. Put another way, Plaintiffs ask this Court to "enjoin … state officials on the basis of … state law." *Pennhurst*, 465 U.S. at 125-26. But because "federal courts lack[] jurisdiction" over those claims, *id.*, the Court lacks

jurisdiction to enjoin Colonel Perry and Commissioner Long here. Plaintiffs thus have not carried their burden to "establish[] a substantial likelihood of success in demonstrating subject matter jurisdiction" for their *ultra vires* claim. *Hargett*, 2 F.4th at 560 (citing *Waskul*, 900 F.3d at 256 n.4).

In sum, sovereign immunity bars each of Plaintiffs' claims.[4]

**C. Plaintiffs have not clearly shown they will prevail on their novel theories.**

Setting aside the fatal jurisdictional defects, Plaintiffs have also failed to establish that they will likely succeed on the merits. They face an especially significant "headwind[]" to making the requisite "'clear showing' that they are likely to prevail on the merits," *L.W. v. Skrmetti*, 83 F.4th 460, 471 (6th Cir. 2023), *aff'd by United States v. Skrmetti*, 605 U.S. 495 (2025), because they concede that "[p]recedent does not address" the legality of the activities they challenge, Dkt. 11 at 29. Rather, they push into "new territory," *L.W.*, 83 F.4th at 471, with a "novel" theory, Dkt. 11 at 27. That "suggest[s] that the key premise of a preliminary injunction—a showing of a likelihood of success on the merits—is missing." *L.W.*, 83 F.4th at 471. Indeed, it is.

**1. THP's activities are authorized by Tennessee law.**

Plaintiffs first claim that Defendants are acting *ultra vires*, i.e., beyond their state-law statutory powers. Dkt. 1-1 at 28. "A state officer may be said to act *ultra vires* only when he acts

[4] That Defendants removed this case to federal court does not change that conclusion. True, the Supreme Court has held "that the State's action joining the removing of this case to federal court waived its Eleventh Amendment immunity[.]" *Lapides v. Bd. of Reg. of Univ. Sys. of Georgia*, 535 U.S. 613, 624 (2002). But the *Lapides* exception is "limited 'to the context of state-law claims, in respect to which the State has explicitly waived immunity from state-court proceedings.'" *Dantz v. Am. Apple Grp., LLC.*, 123 Fed. App'x 702, 706-07 (6th Cir. 2005) (quoting *Lapides*, 535 U.S. at 617). Unlike in *Lapides*, Tennessee has not waived immunity for Plaintiffs' claims here. *See supra* 14. In fact, the General Assembly made clear when it repealed Tenn. Code Ann. § 1-3-121, which had been interpreted as a waiver of sovereign immunity, that it "never intended … to waive Tennessee's sovereign immunity" for actions seeking declaratory or injunctive relief regarding the "legality or constitutionality of a government action." *See* 2026 Tenn. Pub. Act, ch. 664 (repealing Tenn. Code Ann. § 1-3-121). As a result, *Lapides* is inapposite. And the Court thus does not have jurisdiction over Plaintiffs' claims. *See Pennhurst*, 465 U.S. at 106.

without any authority whatever." *Skatemore, Inc. v. Whitmer*, 40 F.4th 727, 736 (6th Cir. 2022) (cleaned up). This is a "very narrow" doctrine. *Pennhurst*, 465 U.S. at 114 n.25. And this lenient standard merely asks "whether the state official had a colorable basis for the exercise of authority." *Skatemore*, 40 F.4th at 736 (cleaned up). Similarly, under Tennessee law, an action is *ultra vires* only if it is "wholly outside the scope" of the officer's authority or if the action is inconsistent with mandatory provisions. *Allmand v. Pavletic*, 292 S.W.3d 618, 626 (Tenn. 2009).

Here, THP troopers are acting within their statutory authority. Tennessee law requires THP to "[p]atrol the state highways and enforce all laws" regulating traffic on those highways. Tenn. Code Ann. § 4-7-104. And the dispute in this case stems from "THP troopers stop[ping] vehicles for putative traffic violations." Dkt. 1-1, ¶ 2. THP has authority to make those stops. Plaintiffs argue that when THP's subjective "purpose [for] an operation is the enforcement of civil immigration laws," it is acting *ultra vires*. Dkt. 1-1, ¶ 41. But allegedly ulterior motives do not strip public officials of their statutory authority. *See Skatemore*, 40 F.4th at 736; *Pennhurst*, 465 U.S. at 102 n.11. Because troopers are statutorily authorized to stop vehicles for traffic violations, they have "a colorable basis" for exercising that authority. *Skatemore*, 40 F.4th at 736.

And, in any event, Tennessee law provides THP with the authority Plaintiffs allege is missing. All law enforcement agencies and officials are required to "communicate with the appropriate federal official regarding the immigration status of any individual, . . . [and] otherwise cooperate with the appropriate federal official in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States." Tenn. Code Ann. § 7-68-105. Plaintiffs argue that this statute "applies only to local law enforcement, not the THP." Dkt. 11 at 12. But that argument begs the question of why state law enforcement cannot also willingly comply. Under Plaintiffs' logic, it is okay for local law enforcement to cooperate with ICE because they must, but

state law enforcement is not allowed to do the same simply because such cooperation is not mandated. That logic is flawed.

Given the explicit statutory duties imputed onto THP and THP troopers, the allegations described in the Complaint are not *ultra vires*.

**2. Plaintiffs have not clearly shown that THP will violate the Fourth Amendment.**

Because Plaintiffs concede that every stop THP has made was supported by probable cause, Dkt. 11 at 20 n.51, they have not proven THP will violate the Fourth Amendment. The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated and no Warrants shall issue, but upon probable cause." U.S. Const. amend. IV. A plaintiff challenging a seizure must show (1) that the actions taken were "attributable to the government," (2) that the actions constituted a "search or seizure" under the Fourth Amendment, and (3) that the search or seizure was "unreasonable." *Relford v. Lexington-Fayette Urb. Cnty. Gov't*, 390 F.3d 452, 457 (6th Cir. 2004) (internal quotations removed). Because temporary detention of individuals during the stop of an automobile constitutes a "seizure" of "persons" within the meaning of the Fourth Amendment, the stop must be reasonable. *Whren*, 517 U.S. at 809-810.

A law enforcement officer may reasonably "stop a car when he [or she] has probable cause to believe that a civil traffic violation has occurred." *United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008) (citation omitted). Probable cause requires a "reasonable ground for belief supported by less than prima facie proof but more than mere suspicion." *Id*. This analysis requires courts to evaluate the "objective fact" of whether officers have probable cause, not to examine the "subjective intent" of what those officers' motivations were. *United States v. Hughes*, 606 F.3d 311, 315 (6th Cir. 2010). Indeed, an officer's "ulterior motivations, if any, are irrelevant." *United*

*States v. Sanford*, 476 F.3d 391, 395 (6th Cir. 2007) (citing *Whren*, 517 U.S. at 813). The upshot is that regardless of intent, "the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren*, 517 U.S. at 810.

Application of this doctrine here is straightforward. Plaintiffs concede that THP "traffic stops are made only when there actually is probable cause of a traffic violation and that [ICE's] immigration arrests are made only when there actually is probable cause of an immigration violation." Dkt. 1-1, ¶ 2 n.1. Therefore, THP's "decision[s] to stop [] automobile[s] [are] reasonable" because its officers had "probable cause to believe that [] traffic violation[s] ha[ve] occurred." *Whren*, 517 U.S. at 810. That alone disposes of Plaintiff's Fourth Amendment claim.

To circumvent this straightforward application of law, Plaintiffs argue that Defendants are violating the Fourth Amendment by "directing THP troopers to work jointly with U.S. Department of Homeland Security agents *with the goal of detaining motorists* to investigate their immigration status." Dkt. 1-1, ¶ 70 (emphasis added). They present a "novel" theory that a systemic policy of "conduct[ing] traffic stops for the ulterior purpose of enforcing civil immigration law" creates a constitutional violation. *Id.*; Dkt. 11 at 29. The Fourth Amendment does not stretch that far.

Plaintiffs overread the precedent cited in the Complaint. For example, Plaintiffs cite *State v. Hicks* and *City of Indianapolis v. Edmond* for the proposition that a traffic stop is unlawful if some sort of "subterfuge exists on the administrative or planning level." Dkt. 1-1, ¶¶ 37, 40-41 (citing 55 S.W.3d 515 (Tenn. 2001) and 531 U.S. 32 (2000)). But those cases concerned roadblocks, not standard traffic stops. This distinction is important because, unlike a traffic stop made with probable cause, a roadblock lacks an "individualized suspicion of wrongdoing." *Edmond*, 531 U.S. at 37. As a result, courts evaluating the Fourth Amendment implications of a roadblock must determine whether the "program was designed to serve special needs, beyond the

normal need for law enforcement." *Id*. (internal quotations removed). That particular inquiry, and inherent skepticism against stops made without suspicion, requires looking at the purpose of the roadblock. *Id*. at 37-40. Here, Plaintiffs allege that THP stops are made with probable cause, and as a result, inquiry into the motivation behind the stops is inappropriate and irrelevant. *Whren*, 517 U.S. at 810.

Indeed, the language of each case cited in the Complaint rejects Plaintiffs' preferred reading. The United States Supreme Court in *Edmond* held that "subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis" but that "programmatic purposes may be relevant to the validity of Fourth Amendment intrusions undertaken pursuant to a general scheme *without individualized suspicion*." 531 U.S. at 45–46 (cleaned up) (emphasis added). Similarly, in *Hicks*, the Tennessee Supreme Court articulated that "an officer's subjective intentions in stopping an automobile, no matter how questionable, would not affect the validity of the stop so long as probable cause existed." 55 S.W.3d at 538 (internal citation removed). The Tennessee Supreme Court only suppressed the evidence in *Hicks* "because roadblocks are operated without the protections provided by the probable cause requirement." *Id*.

Apparently recognizing the distinction between suspicionless roadblocks and probable-cause-based stops, Plaintiffs secondarily try to argue that joint operations with federal agents constitute an "extreme practice" such that probable cause is not sufficient to make the stop reasonable. Dkt. 1-1, ¶ 41 (quoting *Whren*, 517 U.S. at 818). Plaintiffs are mistaken. As an initial matter, the complained-about "extreme practice" is THP supposedly "exercising traffic-stop powers for an ulterior purpose." *Id*. But even accepting that characterization, that's merely the definition of a constitutional, pretextual stop. *Hughes*, 606 F.3d at 315. And even if the alleged practice was an open question, it falls far short of the sort of "extreme practice" described in *Whren*.

The examples the Supreme Court gives there are "seizure by means of deadly force," "unannounced entry into a home," "entry into a home without a warrant," and "physical penetration of the body." 517 U.S. 818. Pretextual traffic stops made with the protections of probable cause are not the sort of "extreme practice" the Supreme Court was describing, and the Court should decline to find that probable cause is insufficient here.

Plaintiffs also briefly suggest that new protections should be created "to protect the public from programmatic overreach and to stop the slide towards a police state." Dkt. 1-1, ¶ 41. The supposed basis for that policy request is that THP is "deliberately and systemically circumvent[ing] constitutional protections." *Id*. But as Plaintiffs concede, THP has probable cause for vehicle stops. Dkt. 1-1, ¶ 2 n.1. Plaintiffs' claim relies on an incorrect reading of the Fourth Amendment.[5]

Plaintiffs' jurisdictional failures also doom the merits of their novel claims. Regardless of the scope of the Fourth Amendment, the Individual Plaintiffs' "taxpayer" status, *see supra* 10–12; Dkt. 1-1, ¶ 9, does nothing to prove a Fourth Amendment violation. Six of the seven Individual Plaintiffs have not even claimed that they were ever pulled over. As a result, they have not identified a "search or seizure" under the Fourth Amendment. *Redford*, 390 F.3d at 457 (cleaned up). And the only Individual Plaintiff who alleges that she was pulled over by THP was Johanna Keohane, but she makes no allegations that she was stopped unreasonably. Dkt. 1-1, ¶ 11. As a result, she has not claimed that *her stop* was "unreasonable under the Fourth Amendment." *Redford*, 390 F.3d at 457. The Individual Plaintiffs thus have no Fourth Amendment claim.

TIRRC runs into a similar problem because it has not individually suffered a Fourth Amendment violation, and it cannot assert the highly individualized Fourth Amendment rights of

---

[5] And if Plaintiffs are referring to their equal protection claim, then they can simply raise that claim separately. There is no basis for turning their equal protection claim into a new Fourth Amendment requirement.

others. TIRRC makes no allegations that it has personally suffered an unreasonable search or seizure. *See* Dkt. 1-1, ¶¶ 17-20 (describing TIRRC's status as bringing a lawsuit on behalf of its members). It has therefore failed to allege its own Fourth Amendment violation. *Redford*, 390 F.3d at 457. And as discussed, TIRRC cannot vicariously assert such highly individualized rights of others. *See supra* 13.

Under a straightforward application of the case law, Plaintiffs have failed to clearly show a likelihood of success on the merits of their Fourth Amendment claims.

#### 3. Plaintiffs have not clearly shown that THP will violate the Fourteenth Amendment.

The Equal Protection Clause prohibits any "State [from] . . . deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. "Fundamentally, the Clause protects against invidious discrimination among similarly situated individuals or implicating fundamental rights." *Scarbrough v. Morgan County Bd. of Educ.*, 470 F.3d 250, 260 (6th Cir. 2006). In effect, it "prohibits discrimination by government [that] burdens a fundamental right, targets a suspect class, or intentionally treats one differently than others similarly situated without any rational basis for the difference." *Loesel v. City of Frankenmuth*, 692 F.3d 452, 461 (6th Cir. 2012) (quoting *Rondigo, L.L.C. v. Twp. of Richmond*, 641 F.3d 673, 681–82 (6th Cir. 2011)).

To prove a selective enforcement claim, Plaintiffs must show that "the challenged police action had a discriminatory effect and that it was motivated by a discriminatory purpose." *Bennett v. City of Eastpointe*, 410 F.3d 810, 818 (6th Cir. 2005) (citation removed). Discriminatory effect can be shown by identifying "a person of another race who the police treated differently" or through "statistical evidence" showing "similarly situated individuals of another race were treated differently." *Id*. Discriminatory purpose requires showing that a "decisionmaker selected or

reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group." *Farm Lab. Org. Comm. v. Ohio State Highway Patrol*, 308 F.3d 523, 534 (6th Cir. 2002).

Plaintiffs claim that the May 2025 Davidson and Robertson County operations establish both a discriminatory effect and discriminatory purpose. Dkt. 11 at 36, 37. Plaintiffs assert that the motorists stopped during the Davidson County operation were disproportionately racial or ethnic minorities. *Id*. at 36. But even if Plaintiffs' statistical evidence demonstrates a discriminatory effect, the evidence and Plaintiffs' own concessions belie the theory that race or ethnicity was a consideration when THP was conducting traffic stops over that seven-day period. First, all traffic stops occurred during nighttime hours. Ex. 4, Perry Declaration at ¶ 31. So the accusation that motorists were stopped based on appearance is irrational because THP troopers could not *see* the individual motorists. *Id*. At the very least, Plaintiffs haven't put forward evidence that the THP troopers making stops were aware of the race of those that were stopped before any Fourth Amendment seizure occurred. Second, and again, Plaintiffs concede that THP troopers only made traffic stops when there was probable cause of a traffic violation. Dkt. 11, at 20 n.51; Ex. 4, ¶ 30. This indicates that, regardless of the statistics, all stops were based on traffic violations rather than race or ethnicity.

In an attempt to demonstrate discriminatory purpose, Plaintiffs cite the locations of the stops in the Davidson County operation and the checkpoint in Robertson County. In Davidson County, they claim the stops were conducted in "Hispanic-dense neighborhoods" and Robertson County "has a substantial and growing Hispanic population." Dkt. 11 at 36. But the stops in Davidson County were primarily focused on high-volume arterial roads with high crash rates, i.e., Nolensville Pike and Murfreesboro Pike. Ex. 4, ¶ 32; Dkt. 13-1 at 14–17. Similarly, the Robertson

County checkpoint was conducted at a busy intersection. Ex. 2, Map: US 431 N @ US 41 N; Ex. 3, May 2025 Tennessee Highway Patrol Checkpoint Enforcement List.[6] And THP conducted checkpoints that same night in eight other counties: Marion, Polk, Greene, Putnam, Cannon, Pickett, Perry, and Obion. The location of each of these checkpoints was based on, among other factors, the volume of traffic in the area. Ex. 4, ¶ 42. All this cuts against any argument that the stops served any purpose other than enforcement of traffic laws.

All that Plaintiffs are left with is their contention that THP troopers made comments regarding race, ethnicity, and illegal immigration and that some persons were subject to longer investigatory detention. But, even accepting Plaintiffs' characterization, the statements of individual troopers carry little weight unless they can be imputed to those higher up in the chain of command. Even then, it was ultimately up to the federal agents, not the THP troopers, whether a motorist was detained for investigation regarding immigration status. Ex. 4, ¶ 37. And "apparent ethnicity . . . when considered along with other salient factors" is relevant to whether reasonable suspicion exists for an immigration stop. *Noem*, 146 S. Ct. at 3 (Kavanaugh, J., concurring). So, for ICE's purposes, race and ethnicity were lawful and relevant considerations. Regardless, those considerations, if they arose, came *after* motorists were lawfully stopped for traffic violations.

## II. Plaintiffs Have Failed to Show that They Will Suffer Irreparable Harm in the Absence of an Injunction.

Plaintiffs have also failed to clearly show that they will suffer irreparable harm if the Court does not grant their request for a preliminary injunction. Plaintiffs claim that, in the absence of an injunction, "motorists" and "the public" will be harmed "by being seized in violation of their constitutional rights" and because of alleged misuse of funds. Dkt. 11 at 37, 38. But "the issue is

[6] THP checkpoint lists are publicly available at https://www.tn.gov/safety/tnhp/checkpoints.html.

whether *the plaintiff(s)*, and not merely *someone*, would suffer irreparable injury." *Memphis A. Phillip Randolph Inst. v. Hargett*, 482 F. Supp. 3d 673, 702 (M.D. Tenn.), *aff'd on other grounds sub nom.* 978 F.3d 378 (6th Cir. 2020) (emphasis in original).

Plaintiffs have failed to present any evidence that *they* will suffer irreparable harm in the absence of an injunction. And, even if they could, "the harm alleged must be both certain and immediate, rather than speculative or theoretical." *Michigan Coal. of Radioactive Material Users, Inc*, 945 F.2d at 154. As discussed, the Individual Plaintiffs have failed to demonstrate that they face any imminent harm and TIRRC has failed to do the same for itself and its members. *See supra* 10–13. Thus, "there's no need to grant relief now as opposed to at the end of the lawsuit." *D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 327 (6th Cir. 2019).

## III. The Public Harm Favors Denial of a Preliminary Injunction.

The Court must deny the request for a preliminary injunction given Plaintiffs' failure to make a clear showing on the first two requirements. *Doe #11 v. Lee*, 609 F. Supp. 3d 578, 591 (M.D. Tenn. 2022) (holding that irreparable injury must be present and that courts cannot issue an injunction without likelihood of success on the merits). Even so, the final two requirements—harm to others and the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Overly broad injunctions against law enforcement activity, especially when there is no evidence of an unconstitutional policy, directly harm the public by degrading law enforcement's capacity to protect the community. *See Gale v. O'Donohue*, 751 F. App'x 876, 885 (6th Cir. 2018). Beyond direct operational harm, enjoining law enforcement can harm the public interest by undermining public confidence in government integrity. *Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 579 (6th Cir. 2002). Both harms are likely here where the requested

injunction would sweep broadly across lawful enforcement activity without any proven unconstitutional policy.

## CONCLUSION

The Court should deny Plaintiffs' request for a preliminary injunction.

Respectfully submitted,

JONATHAN SKRMETTI
Attorney General and Reporter

*/s/ Samantha P. Morris*
SAMANTHA P. MORRIS, BPR# 038178
Assistant Attorney General
Law Enforcement and
Special Prosecutions Division

ANDREW DENNING, BPR# 042208
Assistant Attorney General
Constitutional Defense Division

Office of the Attorney General
P.O. Box 20207
Nashville, Tennessee 37202-0207
Phone: (615) 741-4469
Samantha.Morris@ag.tn.gov
Andrew.Denning@ag.tn.gov
*Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and exact copy of the foregoing was filed and served by operation of the Court's electronic filing system on September 1, 2026, upon:

Julio Quiroz Colby
Tennessee Immigrant & Refugee Rights Coalition
3310 Ezell Rd
Nashville, TN 37211
281-389-0659
julio@tnimmigrant.org

Michael C Holley
The Law Office of Michael C. Holley
922 Main Street
Suite C-161
Nashville, TN 37206
615-457-4768
mholley@holleylegal.com

Spring A. Miller
Tennessee Immigrant and Refugee Rights Coalition
3310 Ezell Rd.
Nashville, TN 37211
615-609-9216
spring@tnimmigrant.org

*/s/ Samantha P. Morris*
SAMANTHA P. MORRIS
Assistant Attorney General