IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| **TENNESSEE IMMIGRANT AND REFUGEE RIGHTS COALITION *et al.*,** | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **Case No. 3:26-cv-00832** |
| | ) | **Judge Aleta A. Trauger** |
| **TENNESSEE HIGHWAY PATROL *et al.*,** | ) | |
| **Defendants.** | ) | |

**MEMORANDUM**

Before the court is the plaintiffs' Motion for Preliminary Injunction (Doc. No. 9), which asks the court to enjoin the defendants (1) from directing Tennessee Highway Patrol ("THP") troopers to work jointly with U.S. Department of Homeland Security to detain motorists to investigate their immigration status, (2) from directing THP troopers to deliberately and systematically conduct traffic stops for the ulterior purpose of enforcing civil immigration law, and (3) from directing or encouraging THP troopers to use race or ethnicity as a criterion for deciding whom to subject to a traffic stop. (Doc. No. 9 at 1.) For the reasons set forth herein, the motion will be denied.

## I. INTRODUCTION AND BACKGROUND

Plaintiffs in this case are the Tennessee Immigrant and Refugee Rights Coalition ("TIRC") and seven individual Tennessee taxpayers. The defendants are the THP; the Tennessee Department of Safety and Homeland Security ("DSHS"); and the Commissioner and Deputy Commissioner of DSHS, Jeff Long and Matt Perry, sued in their official capacities only. The plaintiffs originally filed this lawsuit in the Chancery Court for Davidson County, Tennessee on May 19, 2026,

asserting claims based on violations of Tennessee law and the Tennessee Constitution, as well as claims under 42 U.S.C. § 1983 for violations of the Due Process and Equal Protection Clauses of the U.S. Constitution. The defendants promptly removed the case to this court on the basis of federal question jurisdiction. (Doc. No. 1-1.)

The plaintiffs' state court motion seeking a temporary injunction was filed on the same day as, but before they received notice of, the removal, but they opted to refile their Motion for Preliminary Injunction, with supporting Memorandum (Doc. No. 11), in this court. As discussed below, their claims are based on allegations that the THP has, for the past eighteen months, been operating in tandem with U.S. Immigration & Customs Enforcement ("ICE") to detain motorists to investigate their immigration status, with agents from each office exercising powers that agents from the other do not possess. That is, THP troopers stop vehicles for putative traffic violations when they suspect that the motorists are noncitizens, and ICE agents—who either ride along with the THP troopers or follow them closely—arrest the detained motorists if they develop probable cause for an immigration violation. (*See* Doc. No. 11 at 3.) In other words, THP troopers exercise their traffic-stop powers (that ICE agents do not possess) to permit ICE to question individuals who appear to be foreign about their immigration status (a power that troopers do not possess).

The plaintiffs maintain that this operation is illegal because (1) when the THP acts outside its statutory mandate, its actions are *ultra vires* and illegal under Tennessee law; (2) warrantless detentions of motorists violate the Fourth Amendment of the U.S. Constitution and the equivalent clause in the Tennessee Constitution, because "repeatedly detaining motorists based on a programmatic subterfuge is unreasonable"; and (3) THP's detention of motorists in their joint operation with ICE violates the motorists' rights under the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution (and the Tennessee Constitution's parallel clause)

"because its troopers deliberately and disproportionately stop motorists based on their perceived race or ethnicity." (Doc. No. 9 at 3–4.)

The defendants filed a Response to the plaintiffs' Motion for Preliminary Injunction (Doc. No. 30), the plaintiffs filed a Reply (Doc. No. 33), and the court held oral argument on the motion on September 22, 2026. Following some concessions by the plaintiffs, the matter as now before the court has been substantially narrowed. Specifically, there is no dispute at this point (1) that the court cannot enjoin state officials to comply with state law, *Ladd v. Marchbanks*, 971 F.3d 574, 582 (6th Cir. 2020), rendering moot the question of (2) the individual plaintiffs' standing as Tennessee taxpayers to bring the state claims, and (3) that THP and DSHS, as arms of the state, are entitled to absolute sovereign immunity from suit in federal court, *Morgan v. Bd. of Pro. Resp.*, 63 F.4th 510, 515 (6th Cir. 2023). In addition, the plaintiffs concede that, under federal law, the court cannot issue a declaration that state officials have violated the law in the past. *See Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993). In other words, it is clear that the plaintiffs, for purposes of their Motion for Preliminary Injunction, have *no* likelihood of success on their state law claims, the individual taxpayers' claims, the claims against the state agencies, and the request for a declaration regarding past conduct. The court, therefore, engages in no further analysis regarding these claims and will focus on the claims brought by TIRC under the Fourth and Fourteenth Amendments against the two state official defendants, Long and Perry, in their official capacities for allegedly ongoing constitutional violations.[1]

Regarding those claims, the issues raised by the briefing are whether TIRC has associational standing to bring the claims in the first place and, if so, whether it has established

---

[1] Accordingly, from this point forward, the court will refer to TIRC as the "plaintiff," in the singular, and to Perry and Long as the "defendants."

that a preliminary injunction is warranted with respect to its Fourth and Fourteenth Amendment claims under 42 U.S.C. § 1983.

## II. FACTS

With its briefing, TIRC presents substantial facts concerning "Operation Flood the Zone" in Nashville, which took place from May 3 to May 10, 2025, and a Robertson County "sobriety checkpoint" roadblock that took place on May 9, 2025. It presents fewer facts concerning the defendants' involvement in ongoing operations with a multi-agency task force in Memphis, Tennessee and no facts about operations elsewhere in Tennessee.[2] While the facts concerning the Nashville and Robertson County operations may provide some context for the ongoing operations in Memphis, the plaintiff does not allege that the Nashville and Robertson County operations are ongoing; nor has the plaintiff presented evidence regarding any TIRC member in those geographical regions who professes to reasonably fear being pretextually pulled over again. Because TIRC concedes that it may only proceed in federal court on its claims against Tennessee officials in their official capacity seeking prospective injunctive relief and cannot seek any relief based on past, completed conduct, the Nashville and Robertson County operations in May 2025 are of marginal relevance to the question of whether TIRC may be entitled to the requested injunctive relief, TIRC's argument to the contrary notwithstanding. The court, therefore, will not dwell on the facts concerning those operations.

Regarding the Memphis operation, the evidence in the record shows that, beginning in the Fall of 2025, several federal and state agencies formed the Memphis Safe Task Force ("Task

[2] At oral argument, plaintiff's counsel stated that TIRC is seeking statewide relief. Because the plaintiff has presented no factual basis for this expansive relief, the court will address only the clearly ongoing operations in Memphis.

Force" or "Memphis Task Force") pursuant to a presidential order. (*See* Doc. No. 13-29.[3]) The stated objective of the Task Force is to "end street and violent crime in Memphis." (*Id.* at 1.) To that end, the Task Force is authorized to, among other things, "enforce Federal immigration law." (*Id* at 2.) The participating agency with the greatest number of officers dedicated to the Task Force on a given day (based on a snapshot of Task Force composition as of October 10 and October 11, 2025) appears, by a wide margin, to be the Memphis Police Department (between 650 to 748 officers), followed by Homeland Security Investigations ("HSI") (a division of ICE) (160 to 185 officers), the Federal Bureau of Investigation (145 officers), and the THP (112 to 126 officers). (*See* Doc. No. 13-21.) Each day, the command deploys "multi-agency teams" to patrol in the Memphis area, and they report criminal arrests, firearms seized, and "administrative arrests," which are the arrests of people on suspicion of lacking immigration status. (*Id.*)[4]

According to records cited in an April 2026 ProPublica article on which the plaintiff relies ("ProPublica Article"), from the Fall of 2025 through May 2026, the task force operations produced about 800 immigration-related arrests, approximately 80% of which started with a traffic stop and only 17 of which—a minute percentage—were related to violent crimes. (*See* Doc. No. 11 at 15 & n.42 (citing Doc. No. 13-34[5]).) According to TIRC, a majority of these traffic stops that

---

[3] This exhibit, filed by the plaintiff, is a Presidential Memorandum dated September 15, 2025, entitled "Restoring Law and Order in Memphis." (Doc. No. 13-29 at 1.) It establishes the Memphis Safe Task Force, orders that it be chaired by an individual selected by the Attorney General, and directs that it be made up of representatives from thirteen federal agencies or departments working in conjunction with local and state law enforcement agencies. (*Id.* at 1–2.)

[4] During the two-day period at issue in the plaintiff's exhibit, there were 59 criminal arrests, 14 firearms seized, and 9 administrative arrests. (Doc. No. 13-21.)

[5] The article as filed by the plaintiff is blurry and difficult to read. It may also be found at Wendie Thomas *et al.*, "Trump's Memphis Crime Task Force Arrested Over 800 Immigrants, Records Show. Only 2% of the Arrests Were for Violent Crimes." *ProPublica* (Apr. 15, 2026, 5:30 AM), https://www.propublica.org/article/memphis-safe-task-force-immigration-arrests-crime-data [https://perma.cc/A4X9-ADWW].

resulted in immigration arrests appear to have been conducted by THP. (*Id.* at 14 & n.39.[6])

TIRC also claims that many of the teams of law enforcement officers are similar to those deployed during Operation Flood the Zone in Davidson County.[7] THP troopers drive with HSI agents in their cars, just behind in their own cars, or are otherwise standing close by. (*See, e.g.*, Doc. No. 13-30, 13-31, 13-32; *see also* Doc. Nos. 13-2 through -11.) These teams "aggressively enforce[] the traffic code against Hispanics." (Doc. No. 11 at 14–15 (citing Doc. No. 13-13).) And their standard procedure is to make a traffic stop with the true goal of checking the motorists' immigration status. (*Id.* at 15.)

## III. STANDING

"Standing is a jurisdictional requirement grounded in Article III of the Constitution that 'ensure[s] that federal courts do not exceed their authority and limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong.'" *Moms for Liberty – Wilson Cnty., Tenn. v. Wilson Cnty. Bd. of Educ.*, 155 F.4th 499, 508–09 (6th Cir. 2025) (some internal quotation marks omitted) (quoting *State ex rel. Tenn. Gen. Assembly v. U.S. Dep't of State*, 931 F.3d 499, 507 (6th Cir. 2019)). Because standing is a jurisdictional matter, the court must consider it first. *Kanuszewski v. Mich. Dep't of Health & Hum. Servs.*, 927 F.3d 396, 405 (6th Cir. 2019).

---

[6] In support of this claim, TIRC cites Doc. Nos. 13-22 and 13-23, which include statistics and arrest records for a two-day period in October 2025. TIRC explains that, "[t]hrough a public records request to the Governor's office, TIRRC obtained the names of all individuals arrested for immigration violations as part of the task force during a three-month period from October to December 2025. Using this data, a TIRRC employee made another public records request to THP for all records for individuals who were stopped on two of these days, October 2 and 3. Of the 22 individuals arrested for immigration violations on those two days, at least 16 appear to have originated from THP traffic stops, meaning that 73% of the immigration detentions in that sample started with stops by the THP." (Doc. No. 11 at 14 n. 39 (citing Doc. Nos. 13-22, 13-23.)

[7] It appears to be undisputed that the Nashville operation included only THP and ICE officers, thus differing greatly from the multi-agency operation in Memphis.

To establish constitutional standing, a plaintiff must show that it "suffered (1) an injury in fact that is likely (2) caused by the defendant's conduct and (3) redressable by a favorable judgment." *Am. Ass'n of Nurse Anesthesiology v. Kennedy*, 183 F.4th 427, 432 (6th Cir. 2026) (citing *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021)). TIRC does not assert that it has standing in its own right. Rather, this case concerns associational standing, which "allows an organization to sue on behalf of an injured member." *Id.* (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)). To have associational standing, an association must show that "(1) at least one of [its] members otherwise has standing in his own right, (2) the suit seeks to protect interests relevant to the [plaintiff's] purpose, and (3) the claims and relief involved don't require individual members to participate in the lawsuit." *Id.* at 433.

Further, however, as the defendants point out, standing to seek damages for past harms and standing to seek prospective relief are analytically distinct inquiries. *WCI, Inc. v. Ohio Dep't of Pub. Safety*, 18 F.4th 509, 514 (6th Cir. 2021). Here, because TIRC sues state officials in their official capacity, in order to avoid the sovereign immunity bar, its claims must fall within the scope of the *Ex parte Young* exception. "*Ex parte Young* can only be used to avoid a state's sovereign immunity when a 'complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Ladd*, 971 F.3d at 581 (quoting *Verizon Md. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002)).

The defendants argue that TIRC's claims must be dismissed because the plaintiff cannot meet the first and third elements of associational standing. As for the third element, the defendants argue that TIRC cannot show that the individual members' participation is *not* required, because constitutional rights like those asserted here are "highly individualized" personal rights that "may not be vicariously asserted." (Doc. No. 30 at 13 (first citing *Faith Baptist Church v. Waterford*

*Twp.*, 522 F. App'x 322, 332 (6th Cir. 2013); and then quoting *Rakas v. Illinois*, 439 U.S. 128, 133 (1978)).) The cases the defendants cite do not pertain to associational standing and do not support their contention. As this court has previously recognized, "the Sixth Circuit has long allowed plaintiffs with associational standing to bring claims under § 1983 against state officials in their official capacity, under *Ex parte Young*." *Pharm. Rsch. & Mfrs. of Am. v. Skrmetti*, No. 3:25-cv-00582, 2026 WL 803261, at *8 (M.D. Tenn. Mar. 23, 2026) (citing *Universal Life Church Monastery Storehouse v. Nabors*, 35 F.4th 1021, 1031–42 (6th Cir. 2022) (finding that nonprofit organization had associational standing to bring § 1983 claim against state officials in their official capacity and that these claims fell within *Ex parte Young* exception to Eleventh Amendment immunity); *Barry v. Lyon*, 834 F.3d 706, 716 (6th Cir. 2016) (finding that nonprofit advocacy organization had associational standing to bring § 1983 claim against state official in his official capacity); *Westside Mothers v. Haveman*, 289 F.3d 852, 862 (6th Cir. 2002) (same)). Because this court is bound by Sixth Circuit and Supreme Court precedent authorizing plaintiffs asserting associational standing to bring § 1983 claims against state officials in their official capacity under *Ex parte Young*, the court rejects the defendants' argument that the plaintiff cannot satisfy the third element of associational standing.

Regarding the first element of associational standing, which requires a showing that at least one of TIRC's members would have standing to bring claims in his or her own right, the defendants contend that TIRC cannot "identify a member who has suffered (or is about to suffer) a concrete and particularized injury from the defendant's conduct." (Doc. No. 30 at 12–13 (quoting *Ass'n of Am. Physicians & Surgeons v. U.S. Food & Drug Admin.*, 13 F.4th 531, 543 (6th Cir. 2021)).) The exhibits filed with the plaintiff's motion reference only one TIRC member, "Rosa" (not her real name), who is Hispanic and who was stopped by THP troopers acting in conjunction with ICE as

part of the Memphis Task Force. (*See* Doc. No. 13-5.) The defendants contend that Rosa cannot show that she is reasonably likely to suffer a future injury based on one stop that occurred in the past. (*See id.* at 13 ("Simply put, Rosa's fear that she will be stopped again is speculative and conjectural. . . . Indeed, in the absence of Rosa['s] declaring an intent to commit more traffic violations, there is no *threat* that she will be stopped again by THP.").) The defendants argue that Rosa must show that she is *certain* to be stopped again in the future. (*Id.*)

In response to the defendants' standing argument, the plaintiff filed a Supplemental Declaration discussing the experiences of both Rosa and "Pablo" (not his real name), another TIRC member. According to this Declaration, Rosa is a native of Mexico and a lawful permanent resident of the United States. She was pulled over in January 2026, a few minutes from her home in the Berclair neighborhood of Memphis, allegedly because her car's window tint was too dark. (Doc. No. 33-1 ¶¶ 4–7.) The THP trooper who pulled her over and asked for identification told her that "she had the whole alphabet soup of agencies behind her—HSI, FBI, DEA, and state troopers." (*Id.* ¶ 7.) Although she was released after an identification check without incident and without significant delay, she was afraid and intimidated and remains traumatized, particularly because it is clear to her that she was "targeted for her ethnicity." (*Id.* ¶ 12.) She lives just a few minutes away from where she was stopped, drives by that intersection frequently, and has heard about several other traffic stops and arrests happening near where she was stopped. (*Id.* ¶¶ 8–12.) "She sees THP and federal agents regularly around her neighborhood, frequently parked in vehicles" and "has continued to see them through the present day"; she remains afraid that she will be stopped again. (*Id.* ¶¶ 11–12.)

The plaintiff also points to the arrest of Pablo, a native of Guatemala who is legally in this country and awaiting a visa so he can apply for lawful permanent residence. (*Id.* ¶ 13.) In October

2025, he was a passenger in a "work truck" driven by a coworker that was pulled over while they were on their way to work. (*Id.* ¶ 14.) He and the driver were both detained by ICE agents, and he was held for a week in a Louisiana detention center before being released. He was traumatized by the event. Because he lives a few minutes from where the detention occurred and continues to see Task Force officers in the area on his way to work, he is fearful of being stopped and detained again. (*Id.* ¶¶ 15–17.) In addition, both Rosa and Pablo fear retaliation if they speak out against THP. (*Id.* ¶ 18.)

TIRC also points to evidence showing that high-level THP officers mandated the joint immigration operations in Memphis, as well as in Nashville and Robertson County, and have "deliberately persisted with those operations—continuously and intensively—in Memphis for almost a year." (Doc. No. 33 at 4.) TIRC points to the Declaration of defendant Perry, who reports that his troopers conducted 95,000 traffic stops in Shelby County in the nine-month period from September 2025 through May 2026. (Doc. No. 30-4, Perry Decl. ¶ 22.) According to the plaintiff, this amounts to one stop for every six licensed drivers in the county in less than a year. (Doc. No. 33 at 4 n.3 (citing https://www.tn.gov/content/dam/tn/safety/documents/LicensesByCounty.pdf (showing 580,245 licensed drivers in Shelby County as of 2014, the last year for which statistics are available)).)

While disputing whether the plaintiff's evidence is sufficient to support standing, both parties cite *City of Los Angles v. Lyons*, 461 U.S. 95 (1983), in support of their respective positions. In that case, the plaintiff sought an injunction against the City of Los Angeles to ban the use of chokeholds by law enforcement officers in most circumstances. 461 U.S. at 97–98. The plaintiff had previously been subjected to an illegal chokehold by a Los Angeles police officer. *Id.* at 105. The Court found that the bare threat of future unlawful conduct by some law enforcement officers

did not establish standing, reasoning that standing for purposes of seeking an injunction against future unlawful conduct would require proof either "(1) that all police officers in Los Angeles always choke any citizen with whom they happen to have an encounter . . . or, (2) that the City ordered or authorized police officers to act in such manner." *Id.* at 105–06. Absent such proof, the plaintiff's allegations failed to demonstrate an imminent risk of harm sufficient to seek injunctive relief. *Id.* at 106.

Conversely, in *Shaw v. Smith*, 166 F.4th 61 (10th Cir. 2026), the court found that the plaintiffs satisfied the *Lyons* standard in a case alleging that Kansas Highway Patrol troopers, "as a matter of practice and training," stopped out-of-state drivers "specifically because they are coming from out of state." *Shaw*, 166 F.4th at 71. The Tenth Circuit held that, under the circumstances of that case, the plaintiffs had demonstrated a "substantial risk" of another encounter with KHP troopers, even assuming that the plaintiffs would "endeavor to follow the law and not purposefully drive in a manner that would lead to [their] being pulled over." *Id.* at 75. The court expressly recognized that "even a diligent, good faith attempt to follow the law cannot guarantee that a driver will not be stopped by law enforcement," as "[t]raffic infractions are incredibly common and may be caused by any number of mere mistakes." *Id.* at 76. Moreover, as the court also observed, the plaintiffs could be passengers in vehicles crossing into Kansas and thus not responsible for the traffic violations. *Id.* In short, the court found that traffic stops are "routine and beyond the control of drivers" and that there was a substantial risk that the plaintiffs could be pulled over again, no matter how carefully they drove, particularly because KHP policy required its troopers to "STOP A LOT OF CARS." *Id.* at 76–77.

This case is much more similar to *Shaw* than to *Lyons*. The defendants' assertion that Rosa could avoid being pulled over simply by ensuring that she follows traffic rules in the future is

unrealistic, and Pablo was a passenger when the vehicle he was in was pulled over, with no control over whether the vehicle complied with traffic laws. Further, the plaintiffs have presented statistical evidence showing that something like one out of six Memphians was pulled over in the nine-month period under review. Given the evidence of THP's pervasive presence in Rosa's and Pablo's neighborhoods, these statistics are sufficient to establish that the risk that Rosa or Pablo would be the driver of, or passenger in, a vehicle pulled over by THP in coordination with ICE in the near future is sufficiently high to establish "imminent" injury, for purposes of standing. *Accord id.* at 77 ("The odds in this case are far greater [than in *Lyons*]. The occurrence of a future event is never certain, but Plaintiffs have met their burden to establish imminence."); *see also Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013) ("Our cases do not uniformly require plaintiffs to demonstrate that it is literally certain that the harms they identify will come about.").

The court finds that TIRC has associational standing to bring the claims at issue here on behalf of its members.

## IV. LEGAL STANDARD – PRELIMINARY INJUNCTION

"A preliminary injunction is 'an extraordinary remedy.'" *L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 470–71 (6th Cir. 2023) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). When faced with a motion for a preliminary injunction, the court must consider four factors: "(1) the plaintiff's likelihood of success on the merits; (2) the risk of irreparable harm to the plaintiff in the absence of an injunction; (3) the risk that an injunction will harm others; and (4) the broader public interest." *PCC Airfoils, LLC v. Daugherty*, 176 F.4th 509, 512–13 (6th Cir. 2026) (quoting *Winter*, 555 U.S. at 20). District courts typically "should engage with all four factors in a sliding-scale inquiry. A strong showing as to one factor may 'outweigh[]' a weaker showing as to another factor." *Id.* at 513 (quoting *Winter*, 555 U.S. at 23–24). After weighing all four factors against one another, the court "may grant a preliminary injunction only if a plaintiff

has made 'a clear showing that [it] is entitled to such relief.'" *Id* (quoting *Winter*, 555 U.S. at 22). In other words, the movant does not need to establish each of the factors with a specific "quantum of proof, whether a preponderance or clear and convincing evidence, . . . to be eligible for preliminary relief." *Id.*

The Sixth Circuit has identified two exceptions to that principle:

> If the plaintiff has *no* likelihood of success on the merits, there is nothing left to balance and the plaintiff's request for a preliminary injunction must fail regardless of its showing on the other factors. Likewise, a court must reject a plaintiff's request for a preliminary injunction if it fails to show any risk of irreparable injury. [A]lthough the extent of an injury may be balanced against other factors, the existence of an irreparable injury is mandatory.

*Id.* (emphasis added) (internal citations and quotation marks omitted).

## V. ANALYSIS

### A. Likelihood of Success on the Merits

TIRC asserts that, when THP directs its troopers to make traffic stops to facilitate immigration-enforcement operations, those troopers, aside from acting outside their statutory mandate, violate constitutional protections against unreasonable seizures, in violation of the Fourth Amendment, and engage in racial discrimination in enforcing the law, in violation of the Fourteenth Amendment's Equal Protection Clause.

#### *1. Fourth Amendment Claim*

The Fourth Amendment protects "[t]he right of the people" to be "secure in their persons . . . and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. It is well established that the "[t]emporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of this provision." *Whren v. United States*, 517 U.S. 806, 809–10 (1996). Consequently, an automobile stop must be "reasonable" to comply with the Fourth Amendment's

imperative. *Id.* And, as a general matter, the Supreme Court and Sixth Circuit have repeatedly recognized that "the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Id.* at 810 (citations omitted); *see also Devenpeck v. Alford*, 543 U.S. 146, 152 (2004); *United States v. Morgan*, 71 F.4th 540, 543 (6th Cir. 2023); *United States v. McKenzie*, No. 21-3587, 2022 WL 1744500, at *5 (6th Cir. May 31, 2022); *United States v. Brooks*, 987 F.3d 593, 599 (6th Cir. 2021).

More to the point, however, "the constitutional reasonableness of traffic stops" does *not* "depend[] on the actual motivations" or "[s]ubjective intentions" of the arresting officers. *Whren*, 517 U.S. at 813. While "selective enforcement of the law based on considerations such as race" is prohibited by the Constitution, the source of that prohibition is the "Equal Protection Clause, not the Fourth Amendment." *Id.* Accordingly, when a traffic stop is supported by probable cause, an assessment of the constitutional reasonableness of the stop does not require a "balancing of all relevant factors." *See id.* at 817 ("It is of course true that in principle every Fourth Amendment case, since it turns upon a 'reasonableness' determination, involves a balancing of all relevant factors. With rare exceptions not applicable here, however, the result of that balancing is not in doubt where the search or seizure is based upon probable cause."). When probable cause exists, the Supreme Court has required such a balancing test only in situations involving "searches or seizures conducted in an extraordinary manner, unusually harmful to an individual's privacy or even physical interests—such as, for example, seizure by means of deadly force, unannounced entry into a home, entry into a home without a warrant, or physical penetration of the body." *Id.* at 818 (internal citations omitted). No extraordinary circumstances of these types are alleged in this case, and the court does not find the THP's alleged practice of "programmatically exercising

traffic-stop powers for an ulterior purpose," as the plaintiff alleges, to be "extreme." (*See* Doc. No. 1-1, Compl. ¶ 41.)

Application of the balancing test established in *Brown v. Texas*, 443 U.S. 47 (1979), is required, however, in the context of motorist "checkpoints" or other searches or seizures conducted without an individualized assessment of probable cause. *Mich. Dep't of State Police v. Sitz*, 496 U.S. 444, 450 (1990); *United States v. Huguenin*, 154 F.3d 547, 551 (6th Cir. 1998). This test "weighs the 'gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty.'" *Huguenin*, 154 F.3d at 552 (quoting *Brown*, 443 U.S. at 50–51). In the case of programmatic stops, such as road blocks, the balancing test is generally satisfied only if it is "carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers." *Brown*, 443 U.S. at 51. In other words, in the case of programmatic stops conducted in the absence of probable cause, "the administrative plan essentially serves as a 'substitute' for 'traditional probable cause' to safeguard against individual arbitrary seizures." (Doc. No. 11 at 26 (quoting Walter F. LaFave, *The "Routine Traffic Stop" from Start to Finish*, 102 Mich. L. Rev. 1843, 1853 (2004)).) And, to provide the necessary safeguard, "the plan must be designed on the administrative level in a way to prevent arbitrary seizures." (*Id.* (citations omitted).) When the administrative plan itself has a pretextual purpose, it typically will not be deemed constitutionally reasonable. *See, e.g.*, *Huguenin*, 154 F.3d at 555 ("[T]he Fourth Amendment requires that police deception and subterfuge must be carefully scrutinized in regard to pretextual checkpoints, as checkpoints constitute an exception to the Fourth Amendment's requirement for a warrant and probable cause."); *Florida v. Wells*, 495 U.S. 1, 4 (1990) ("[A]n inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence."); *Colorado v. Bertine*, 479 U.S. 367, 372 (1987) (finding it

significant that there had been "no showing that the police who were following standardized procedures, acted in bad faith or for the sole purpose of investigation").

In sum, to be reasonable, a traffic stop must be supported by probable cause to believe a traffic violation has occurred, or it must be supported by an administrative plan designed to avoid arbitrary seizures and pretextual stops. TIRC argues that, in this case, THP has "jumbled" these two "doctrinal lines" by "design[ing] an administrative plan that . . . directs—from the administrative level—its troopers to systematically use the probable cause of traffic violations as a pretext to stop motorists for an ulterior investigation into something else"—specifically, potential violations of civil immigration laws.[8] (Doc. No. 11 at 28, 29.) "In essence," according to TIRC, "the THP has deliberately chosen to systematically exploit the *Whren* doctrine by incorporating it into an administrative plan"—that is, "it has designed and implemented an administrative plan that promotes arbitrary seizures, rather than prevents them." (*Id.* at 28–29.) TIRC argues that "[t]his new hybrid situation—an administrative plan directing officers to make pretextual traffic stops—should be addressed under *Brown*'s balancing test for reasonableness because *Brown*'s test ultimately applies to all investigative seizures." (*Id.* at 30 (citing *Whren*, 517 U.S. at 817).) And, according to TIRC, "THP's programmatic pretextual traffic-stop operation surely fails" the test. (*Id.*)[9] As TIRC's counsel emphasized during oral argument, TIRC's position is that, irrespective

[8] As TIRC points out, entering the United States without permission is a misdemeanor. 8 U.S.C. § 1325(a). It is a non-continuing offense, however, so someone who entered without permission and is living in Tennessee is not committing a crime. *Accord United States v. Rincon-Jimenez*, 595 F.2d 1192, 1194 (9th Cir. 1979). Thus, being present in Tennessee without legal immigration status is not, *per se*, a criminal offense, but instead a violation of civil law. *See Arizona v. United States*, 567 U.S. 387, 407 (2012) ("As a general rule, it is not a crime for a removable alien to remain present in the United States. If the police stop someone based on nothing more than possible removability, the usual predicate for an arrest is absent.").

[9] In something of an aside, the plaintiff argues that video footage of traffic stops in Nashville during Operation Flood the Zone—which is not alleged to be an ongoing operation—shows that troopers "wrongfully expanded and prolonged those putative 'traffic stops' so

of the existence of probable cause, the pretextual traffic stops being conducted in Memphis by THP troopers acting in conjunction with ICE officers and targeting Hispanics in particular is unreasonable under *Brown*.

The defendants argue in response that, because the plaintiff concedes for purposes of this case that every traffic stop is supported by probable cause,[10] the plaintiff cannot establish a Fourth Amendment violation and, therefore, that application of *Brown*'s balancing test is unnecessary, irrespective of pretext. (Doc. No. 30 at 19; *see also id.* at 20 ("The upshot is that regardless of intent, 'the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred.'" (quoting *Whren*, 517 U.S. at 810)).) The defendants also contend that the plaintiff does not have a substantial likelihood of success on its "'novel' theory that a systemic policy of 'conduct[ing] traffic stops for the ulterior purpose of enforcing civil immigration law' creates a constitutional violation." (*Id.* at 20 (quoting Doc. No. 11 at 39).)

The court finds on this record that the plaintiff has no likelihood of success on the Fourth Amendment claim, even if the court accepts as true that THP troopers, pursuant to policy, are pretextually pulling over non-White motorists in Memphis for the purpose of aiding ICE agents to investigate the motorists' immigration status. Supreme Court precedent is clear: a pretextual traffic stop supported by probable cause to believe a traffic violation has occurred does not violate the

immigration status could be investigated." (Doc. No. 11 at 29.) *See United States v. Urrieta*, 520 F.3d 569, 574 (6th Cir. 2008) ("To detain a motorist any longer than is reasonably necessary to issue a traffic citation, an officer must have a reasonable suspicion that the individual has engaged in more extensive criminal conduct." (citing *United States v. Townsend*, 305 F.3d 537, 541 (6th Cir. 2002))). They do not point to specific evidence of Memphis traffic stops being thus unlawfully extended. Instead, the Supplemental Declaration of Lisa Nilolaus indicates that Rosa's stop was not unlawfully extended, and it does not clearly show whether Pablo's was. The defendants do not respond to this argument.

[10] *See* Doc. No. 1-1, Compl. ¶ 2 n.1 ("This Complaint assumes traffic stops are made only when there actually is probable cause of a traffic violation and that immigration arrests are made only when there actually is probable cause of an immigration violation.").

Fourth Amendment, irrespective of the arresting officers' subjective intent. The plaintiff's novel theory of incorporating the standard that applies to administrative stops unsupported by probable cause is not grounded in legal precedent.[11] Moreover, its claim regarding pretext and the true reason for the traffic stops is much more firmly grounded in Fourteenth Amendment jurisprudence, as discussed below. *Accord Whren*, 517 U.S. at 813 (observing that the appropriate basis for objecting to selective enforcement of the law based on race or ethnicity is under the Fourteenth Amendment). The plaintiff simply has not shown as a matter of law that its members' *Fourth Amendment* right to be free from an unreasonable seizure is implicated by the pretextual stops.

Because the court finds no likelihood of success on the merits of the Fourth Amendment claim, "there is nothing left to balance and the plaintiff's request for a preliminary injunction must fail regardless of its showing on the other factors." *PCC Airfoils*, 176 F.4th at 513 (citation omitted). Even if the court were to find some slight likelihood of success on the merits, the absence of significant proof on this factor means that the plaintiff also has not made a substantial showing of the risk of irreparable harm to rights protected by the Fourth Amendment in the absence of an injunction. Weighing the factors against each other, the court finds that the plaintiff has not made "a clear showing" that it is entitled to a preliminary injunction. *Id.* (quoting *Winter*, 555 U.S. at 22).

---

[11] As at least one jurist has noted, "[t]he Supreme Court's decision in *Whren v. United States*, which held that the Fourth Amendment allows officers to stop a driver or passenger for an impermissible reason, such as their race or gender, if the officer has probable cause that a traffic law violation has occurred no matter how minor the violation, continues to have unjustifiably far-reaching and detrimental ramifications. Pretextual traffic stops disproportionately target people of color, increase the dangers to drivers and passengers, and fail to have a deterrent effect on serious crime." *United States v. Weaver*, 9 F.4th 129, 170–71 (2d Cir. 2021) (Pooler, J., dissenting) (citing *Whren*, 517 U.S. at 813).

*2. Fourteenth Amendment Claim*

The Fourteenth Amendment to the U.S. Constitution provides that no State "shall . . . deprive any person within its jurisdiction of the equal protection of the laws." U.S. Const. Amend. 14, § 1. This clause "prohibits selective enforcement of the law based on considerations such as race." *Whren*, 517 U.S. at 813. "The Fourteenth Amendment guarantees the equal protection of the law to anyone who may be within the territorial jurisdiction of a State." *Zobel v. Williams*, 457 U.S. 55, 69 (1982) (Brennan, J., concurring).

The Equal Protection Clause, unlike the Fourth Amendment, "does not contain a seizure requirement." *United States v. Avery*, 137 F.3d 343, 353 (6th Cir. 1997). Thus, individuals are "cloaked at all times with the right to have the laws applied to them in an equal fashion—undeniably, the right not to be exposed to the unfair application of the laws based on their race." *Id.* The protection provided by the Fourteenth Amendment, in other words, "becomes relevant even before a seizure occurs." *Id.* at 352. And it is well established that, under the Equal Protection Clause, "[a] person cannot become the target of a police investigation solely on the basis of skin color." *Id.* at 354.

To prevail on an equal protection claim, a plaintiff must show "that the challenged police action 'had a discriminatory effect and that it was motivated by a discriminatory purpose.'" *Bey v. Falk*, 946 F.3d 304, 319 (6th Cir. 2019) (quoting *Bennett v. City of Eastpointe*, 410 F.3d 810, 818 (6th Cir. 2005)). To show the latter, a plaintiff typically must show that the specific officers involved in the police action, as the "decisionmakers in *his* case," "acted with discriminatory purpose." *Id.* (quoting *McCleskey v. Kemp*, 481 U.S. 279, 292–93, 297 (1987)). The Sixth Circuit also recognizes that, at the organizational level, "[i]f law enforcement adopts a policy [or] employs a practice [of] . . . initiat[ing] an investigation . . . based solely [on] . . . race, without more, then a violation of the Equal Protection Clause has occurred." *Avery*, 137 F.3d at 355; *see also Floyd v.*

*City of New York*, 959 F. Supp. 2d 540, 563 (S.D.N.Y. 2013) ("A police department may not target a racially defined group for stops *in general* . . . simply because members of that group appear frequently in the police department's suspect data. The Equal Protection Clause does not permit the police to target a racially defined group as a whole because of the misdeeds of some of its members." (footnoted citation omitted)). In the absence of direct evidence, a plaintiff may rely on indirect evidence of intent, "which can include 'valid relevant statistical evidence of disparate impact or other circumstantial evidence.'" *Id.* (quoting *Avery*, 137 F.3d at 355).

In support of their equal protection claim, the plaintiff's opening brief primarily relies on statistics and video footage from the first night of Operation Flood the Zone in Nashville, which show that the stops were conducted in neighborhoods that were approximately 30% Hispanic, but 60% of the stopped motorists were Hispanic and 92% of the detained motorists were racial or ethnic minorities. In addition to the evidence relating to Operation Flood the Zone, TIRC cites the ProPublica Article discussed above, which indicates that the THP's operations in Memphis, in conjunction with the Task Force, appear to target a majority Black community that is also "one of the fastest growing Hispanic neighborhoods in Memphis." (Doc. No. 13-34.) And, as already stated, according to that article, of the 800 immigrant arrests made in Memphis by the Task Force, approximately 2% were for violent crimes. (*Id.*) According to TIRC, a majority of the traffic stops that resulted in immigration arrests appear to have been conducted by THP. (Doc. No. 11 at 14 & n.39 (citing Doc. Nos. 13-22, 13-23).)

The defendants' Response focuses, as does the plaintiff's Memorandum, on the Davidson County and Robertson County operations to argue that the plaintiff cannot establish a likelihood of success on the merits. The defendants insist that, regardless of comments made by THP troopers about race, ethnicity, and illegal immigration, as evidenced by dash cam recordings filed by the

plaintiffs (*see* Doc. No. 17 (notice of manually filed thumb drive)), "the statements of individual troopers carry little weight unless they can be imputed to those higher up in the chain of command. Even then, it was ultimately up to the federal agents . . . whether a motorist was detained for investigation regarding immigration status." (Doc. No. 30 at 25.)

This argument is misguided, because Fourteenth Amendment protections, as discussed above, are in effect even before a decision to detain a specific individual is made. The plaintiff's point is that THP is directing its troopers to focus operations in neighborhoods with high proportions of immigrants and to pretextually pull over individuals who appear to be Hispanic. The defendants' attempt to attribute the ultimate detention decision to federal officers is simply irrelevant to the plaintiff's Fourteenth Amendment claim that THP, at the institutional level, is directing its officers to target motorists based on ethnicity.

Further, in its Reply, TIRC points out that its theory of recovery on its equal protection claim is not novel, as the Sixth Circuit has denied qualified immunity to an Ohio State Highway Patrol trooper who took selective enforcement actions against Hispanic motorists pursuant to an administrative policy. (Doc. No. 33 at 7 (citing *Farm Lab. Org. Comm. v. Ohio State Highway Patrol*, 308 F.3d 523, 535–36 (6th Cir. 2002)).) And it argues that it has made a "robust showing of both discriminatory effect and purpose through a combination of statistical proof of selective enforcement and direct proof of racial animus." (Doc. No. 33 at 10–11.) TIRC also emphasized during oral argument that THP's actions in Memphis appear to be identical to what happened during Operation Flood the Zone in Nashville. Its position is that the statistics and video pertaining to the Nashville operation in May 2025 are relevant to prove what is currently happening in Memphis.

The court, in short, is not fully persuaded. The Nashville operation, in which THP and ICE alone participated, is different from the multi-agency, far-reaching, presidentially mandated Task Force assembled for "Restoring Law and Order in Memphis." (Doc. No. 13-29 at 1.) The "robust proof" to which TIRC refers is simply not sufficiently connected to the Memphis Task Force to be particularly relevant and, as a result, the plaintiff has made, at best, a weak showing of the likelihood of success on the merits of its claim that the ongoing operations *in Memphis* have a "discriminatory effect" and are "motivated by a discriminatory purpose." *Bey*, 946 F.3d at 319. As set forth above, the proof in the record regarding the Memphis Task Force consists primarily of a handful of articles, such as the ProPublica Article (Doc. No. 13-34), THP arrest records for two nights in Memphis in October 2025 (Doc. Nos. 13-22, 13-23), and several Declarations prepared for use in *Demster v. Blanche*.[12] This evidence, though not robust, is nonetheless sufficient to establish *some* likelihood of success on the merits (as opposed to *no* likelihood of success), so the court must consider the other factors. *PCC Airfoils*, 176 F.4th at 513.

**B. The Other Factors**

The other factors the court must weigh are the risk of irreparable harm to the plaintiff in the absence of an injunction, the risk that an injunction will harm others, and the "broader public interest." *Id.*

"A plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages." *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) (quoting *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535,

[12] The plaintiffs in *Demster* bring First Amendment claims against various officials who have allegedly retaliated against the plaintiffs for attempting to gather information about, and record the activities of, the Memphis Task Force. *See* Complaint, *Demster v. Blanche*, No. 2:26-cv-02546 (W.D. Tenn. May 13, 2026), ECF No. 1.

550 (6th Cir. 2007)). "When constitutional rights are threatened or impaired, irreparable injury is presumed." *Id.* (citing *ACLU v. McCreary Cnty.*, 354 F.3d 438, 445 (6th Cir. 2003)). The presumption in this case, however, is relatively weak, given the same paucity of evidence supporting the plaintiff's likelihood of success on the merits of the claims pertaining to the Memphis Task Force. While the court has found that TIRC has shown that two members have a sufficiently high risk of "imminent" injury to establish *standing*, the question there was whether the members are realistically threatened by the challenged practice in the future; it was not an inquiry into the merits of their claim. For purposes of the preliminary injunction motion, given that the same evidence supporting the likelihood of success on the merits is essentially all that supports the irreparable harm factor, the court cannot find that this factor weighs heavily in favor of an injunction either. Moreover, as the defendants argued at the hearing, the plaintiff's claim that members of the public will be irreparably harmed in the absence of an injunction does not contribute to the analysis. The question is whether the plaintiff (or the plaintiff's members) will suffer irreparable harm.

The third and fourth factors, harm to others and the public interest, "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). And the Sixth Circuit has generally held that, absent compelling evidence of a constitutional violation, "enjoin[ing] a wide swath of police activity" would "dramatically disrupt—rather than preserve—the status quo." *Gale v. O'Donohue*, 751 F. App'x 876, 885 (6th Cir. 2018); *see also Moms for Liberty*, 155 F.4th at 514 ("After all, the purpose of a preliminary injunction is 'simply to preserve the status quo' during the litigation process." (quoting *United States v. Edward Rose & Sons*, 384 F.3d 258, 261 (6th Cir. 2004)).

In sum, on the current record, after weighing all four factors on a sliding scale, the court finds that TIRC, at this juncture, has not made "a clear showing" that it is entitled to a preliminary injunction. *PCC Airfoils*, 176 F.4th at 513.

## VI. CONCLUSION

For the reasons set forth herein, the Motion for Preliminary Injunction will be denied. An appropriate Order is filed herewith.

ALETA A. TRAUGER
United States District Judge