**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**AT NASHVILLE**

| | | |
|---|---|---|
| **TENNESSEE IMMIGRANT AND REFUGEE RIGHTS COALITION, et al.,** | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **No. 3:26-cv-832** **Judge Aleta A. Trauger** |
| **TENNESSEE HIGHWAY PATROL, et al.,** | ) | |
| **Defendants.** | ) | |

---

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO REMAND OR DISMISS**

---

## INTRODUCTION

Plaintiffs, an immigrant advocacy group and several Tennessee taxpayers, brought this action alleging civil rights violations under 42 U.S.C. § 1983 and violations of state law arising from the Tennessee Highway Patrol's ("THP") cooperation with federal law enforcement agents. They allege that THP has "operated in tandem" with the U.S. Immigrations and Customs Enforcement ("ICE") to "detain[ ] motorists to investigate their immigration status." Dkt. 1-1 ¶¶ 1, 2. They claim that THP's actions are *ultra vires*, i.e., beyond its state-law statutory powers, and violate motorists' rights under the Tennessee Constitution, the Fourth Amendment to the U.S. Constitution, and the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution.

Plaintiffs' claims cannot clear the jurisdictional hurdles of Article III standing or the State's sovereign immunity. Thus, all claims must be remanded for lack of subject matter jurisdiction. If the Court finds that it has jurisdiction over any claims, they should be dismissed with prejudice.

## BACKGROUND

The Tennessee Immigrant and Refugee Rights Coalition ("TIRRC") and seven Tennessee taxpayers, Paul Adams, Johanna Keohane, Joni Laney, David Morales, Maria Oceja, Billy Vaughn, and Terry Vo ("taxpayer plaintiffs"), sued THP, the Tennessee Department of Safety and Homeland Security ("the Department"), Commissioner Jeff Long, and Deputy Commissioner Colonel Matt Perry seeking "declaratory and injunctive relief prohibiting the THP from engaging with immigration agents in joint operations whose purpose is the enforcement of civil immigration law." Dkt. 1-1, ¶ 5. Plaintiffs claim that THP "has been operating in tandem" with ICE for the past year by "stop[ping] vehicles for putative traffic violations when they suspect that motorists are noncitizens" so that "ICE agents—who either ride along with the troopers or are on standby nearby—[can] arrest the detained motorists if they develop probable cause of an immigration violation." *Id.* ¶¶ 1, 2.

Plaintiffs claim that THP carried out two of these operations with ICE in May 2025. First, from May 3 to May 10, 2025, Plaintiffs allege that THP troopers, with ICE agents riding along or on standby nearby, conducted numerous traffic stops in "immigrant-dense" neighborhoods of Davidson County solely to detain motorists to investigate their immigration status. *Id.* ¶¶ 44–55. And they claim that during the penultimate night of the Davidson County operation, ICE agents assisted THP troopers with a sobriety checkpoint in Robertson County. *Id.* ¶¶ 56, 57. Although Plaintiffs allege that only one individual, out of 732 vehicles stopped, was seized by ICE agents at the checkpoint, they claim that it "had the hallmarks of an immigration-enforcement subterfuge . . . and was infected by racial profiling." *Id.* ¶¶ 56–58.

Currently, Plaintiffs allege that THP is operating jointly with ICE as part of the Memphis Safe Task Force. *Id.* ¶ 59. That task force, established in September 2025 by President Trump in

response to "tremendous levels of violent crime" in Memphis, includes representatives from thirteen different federal departments and agencies, all of which have been instructed to:

> coordinate and ensure effective integrated action by Federal, State, and local law enforcement authorities to address extensive and pervasive criminal activity and reduce crime in Memphis; enforce Federal immigration law; provide the Memphis Police Department with assistance to facilitate the recruitment, retention, and enhancement of capabilities of its police officers; dramatically increase the Federal, State, and local law enforcement presence and Federal coordination with State and local law enforcement, as appropriate; and coordinate strict enforcement of applicable quality-of-life, nuisance, and public-safety laws, including those laws prohibiting assault, battery, larceny, graffiti and other vandalism, unpermitted disturbances and demonstrations, noise, trespassing, public intoxication, drug possession, sale, vagrancy and use, and traffic violations, to make Memphis safe and secure again.

Memorandum on Restoring Law and Order in Memphis, 2025 Daily Comp. Pres. Doc. 916, §§ 1, 2(d) (Sept. 15, 2025). The U.S. Marshals Service ("USMS") leads the "Joint Operations Command Center" for the task force. Dkt. 1-1 ¶ 59. In October 2025, the USMS reported that "[e]ighty-four (84) multi-agency teams were deployed throughout the Memphis area." *Id.* at 45. The teams were comprised of over 1,500 personnel from 31 different agencies, including the USMS, the Federal Bureau of Investigation, Homeland Security Investigations, the Memphis Police Department, THP, and the Tennessee National Guard. *Id.*

Plaintiffs allege that "[s]ome of these multi-agency teams are just like the teams" in the Davidson County operation, i.e., federal agents ride with THP troopers, drive behind them, or are on standby nearby. *Id.* ¶ 60. And they claim that "the *modus operandi*" is also similar—THP troopers initiate a traffic stop, immigration officers interrogate the occupants of the vehicle, and "[t]hose who cannot provide proper documentation are arrested." *Id.* These operations, according to Plaintiffs, "have the same programmatic purpose" as the Davidson County operation—"to detain motorists to investigate their immigration status." *Id.* ¶ 61. And Plaintiffs contend that the

teams "use racial profiling to determine which motorists to stop" and "have extra aggressively enforced the traffic code against Hispanics." *Id.* ¶¶ 60, 61.

Although Plaintiffs concede that THP troopers only make traffic stops "when there actually is probable cause of a traffic violation" and that ICE only arrests detained motorists "when there is actually probable cause of an immigration violation," *Id.* at 2 n.1, they filed this lawsuit seeking declaratory and injunctive relief based on claims that Defendants are violating state law and the U.S. Constitution "by directing THP troopers to work jointly with [federal immigration] agents with the goal of detaining motorists to investigate their immigration status" and "by directing THP troopers to deliberately and systematically conduct traffic stops for the ulterior purpose of enforcing civil immigration law." *Id.* at 30. Plaintiffs claim that the foregoing actions (1) are *ultra vires*, i.e., Defendants are acting beyond their statutory authority; (2) violate Article I, Section 7 of the Tennessee Constitution and the Fourth Amendment of the U.S. Constitution; and (3) violate Article I, Section 8 and Article XI, Section 8 of the Tennessee Constitution and the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution. *Id.* at 28–30.

As explained herein, each of these claims must be remanded for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) or, in the alternative, dismissed for failure to state a claim upon which relief may be granted under Fed. R. Civ. P. 12(b)(6).

## LEGAL STANDARDS

### I. Subject-Matter Jurisdiction.

A motion under Fed. R. Civ. P. 12(b)(1) challenges the existence of subject-matter jurisdiction. "Subject matter jurisdiction is always a threshold determination." *Am. Telecom Co. v. Republic of Lebanon*, 501 F.3d 534, 537 (6th Cir. 2007). And the "[p]laintiff bears the burden of establishing that subject matter jurisdiction exists." *Cartwright v. Garner*, 751 F.3d 752, 760 (6th

Cir. 2014). Article III standing "is a jurisdictional requirement" and a "threshold question in every federal case." *Coal Operators & Assocs., Inc. v. Babbitt*, 291 F.3d 912, 915 (6th Cir. 2002) (citation omitted). Similarly, sovereign immunity "is a true jurisdictional bar" and, once raised, "must be decided before the merits." *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1046 (6th Cir. 2015). Generally, "[i]f the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3); *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006). However, if the court finds that it lacks subject matter jurisdiction after removal, the case must be remanded. 28 U.S.C. § 1447(c).[1]

**II. Failure to State a Claim.**

Federal Rule of Civil Procedure 12(b)(6) provides for dismissal for failure to state a claim. To survive dismissal, "the complaint must include a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" *Ryan v. Blackwell*, 979 F.3d 519, 524 (6th Cir. 2020) (quoting Fed. R. Civ. P. 8(a)(2)). Courts assessing a Rule 12(b)(6) motion must "construe the [complaint] in the light most favorable to the plaintiff, accept [the plaintiff's] allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh,* 487 F.3d 471, 476 (6th Cir. 2007). A complaint must plead claims that are facially plausible—*i.e.*, supported by "factual content that allows the court to draw the reasonable inference that the defendant is liable." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "While the complaint does not need detailed factual allegations," mere "labels and conclusions" and "formulaic recitation of a cause of action's elements will not do." *Blackwell*, 979 F.3d at 524 (internal quotations omitted) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

[1] "It is both common and objectively reasonable to ask a federal court to resolve the issue of standing following removal," even when that requires remand. *Ladies Mem. Assoc. Inc. v. City of Pensacola, Florida*, 662 F. Supp. 3d 1212, 1219 (N.D. Fla. 2023) (collecting cases).

## ARGUMENT

Plaintiffs fail to meet the "jurisdictional requirement" of Article III standing. *Babbitt*, 291 F.3d at 915. And the State's sovereign immunity bars the state law claims, all claims against THP and the Department, and any claims against Colonel Perry and Commissioner Long arising from the May 2025 operations. Thus, the case should be remanded for lack of jurisdiction. *See* Fed. R. Civ. P. 12(h)(3); 28 U.S.C. § 1447(c). Even if the Court finds that it has jurisdiction, Plaintiffs' Complaint fails to state a claim upon which relief may be granted.

### I. This Court Lacks Subject Matter Jurisdiction Because Plaintiffs Lack Article III Standing.

Article III of the United States Constitution "limits federal courts' jurisdiction to 'cases' and 'controversies.'" *Am. Ass'n of Nurse Anesthesiology v. Kennedy*, 183 F.4th 427, 432 (6th Cir. 2026) (quoting U.S. Const. art. III, § 2). "For there to be a case or controversy under Article III, the plaintiff must have a personal stake in the case—in other words, standing." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (cleaned up). To establish standing, a plaintiff must show "an injury in fact, that was caused by the conduct complained of, and which a favorable decision is likely to redress." *Kareem v. Cuyahoga Cnty. Bd. of Elections*, 95 F.4th 1019, 1022 (6th Cir. 2024) (cleaned up). Standing to seek damages for past harms and standing to seek prospective relief are analytically distinct inquiries. *WCI, Inc. v. Ohio Dep't of Pub. Safety*, 18 F.4th 509, 514 (6th Cir. 2021). To establish standing "for injunctive or declaratory relief, a plaintiff must show that he is under threat of suffering 'injury in fact' that is concrete and particularized, and that threat must be actual and imminent, not conjectural or hypothetical." *Sumpter v. Wayne Cnty.*, 868 F.3d 473, 491 (6th Cir. 2017) (cleaned up). "[P]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *City of Los Angeles v. Lyons*, 461 U.S. 95, 102, (1983) (citation omitted).

### A. Plaintiffs derive no standing from their taxpayer status.

The taxpayer plaintiffs have no personal stake in this case. They each sue in their "individual capacity as a taxpayer." Dkt. 1-1, ¶¶ 10–16. But they fail to allege an actual and imminent threat that they will suffer a concrete and particularized injury. Instead, they simply disagree with how public funds are being used:

> They object to the Defendants' use of their tax payments to fund the THP operations described . . . because they believe that those operations are not statutorily authorized, that they systematically violate the constitutional rights of motorists, and that they divert taxpayer funds away from the THP's statutorily authorized operations in order to engage in these illegitimate operations.

*Id.* at ¶ 9. It is well-established that "a plaintiff raising only a generally available grievance about government . . . does not state an Article III case or controversy." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 573–74 (1992). A plaintiff must do more than allege an injury that "is plainly undifferentiated and common to all members of the public." *Id.* at 575 (cleaned up). Rather, "a state taxpayer must allege direct and palpable injury with sufficient specificity" to establish standing. *Taub v. Com. of Ky.*, 842 F.2d 912, 918 (6th Cir. 1988).[2] Plaintiffs do not obtain standing "by virtue of their status as taxpayers" alone. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 346 (2006).

The taxpayer plaintiffs fail to allege any injury beyond mere disagreement with THP's operational decisions. *See* Dkt. 1-1, ¶¶ 10–16. The only taxpayer plaintiff who has any personal experience with the allegations in this matter is Johanna Keohane, a resident of Robertson County, Tennessee, who was allegedly "subjected to a routine detention in the THP-ICE sobriety roadblock described in [the] Complaint." *Id.* at ¶ 11. But even if that seizure constituted an injury, which

---

[2] The only exception to this general rule is for Establishment Clause cases where Congress has directly contributed funding. *Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587, 609 (2007). That exception is inapplicable here.

Defendants dispute, Ms. Keohane fails to demonstrate that there is "a sufficient likelihood that [she] will again be wronged in a similar way." *Lyons*, 461 U.S. at 111. Put simply, "a federal court may not entertain a claim by any or all citizens who no more than assert that certain practices of law enforcement officers are unconstitutional." *Id*. That is precisely what the taxpayer plaintiffs are attempting to do here. Therefore, they lack Article III standing.

**B. TIRRC lacks associational standing.**

TIRRC purports to bring this lawsuit "on behalf of its members who have experienced previous injury and are subject to imminent future injury due to the defendants' unlawful collaboration with ICE." Dkt. 1-1, ¶ 17. "[A]ssociational standing, which allows an organization to sue on behalf of an injured member," requires three elements: "(1) at least one of the Association's members otherwise has standing in his own right, (2) the suit seeks to protect interests relevant to the Association's purpose, and (3) the claims and relief involved don't require individual members to participate in the lawsuit." *Kennedy*, 183 F.4th at 433.[3] TIRRC cannot make it past the first element.

TIRRC alleges that its "members have suffered a clear, constitutional injury—unlawful stops and seizures resulting from racial profiling—and face an imminent risk of experiencing that injury again at the hands of the defendants." Dkt. 1-1, ¶ 18. But to satisfy the first element of associational standing, TIRRC must "identify a member who has suffered (or is about to suffer) a

[3] Although the Sixth Circuit continues to apply this test, it has recognized that the doctrine of associational standing is in tension with the Supreme Court's modern standing jurisprudence. *Ass'n of Am. Physicians & Surgeons v. United States Food & Drug Admin.*, 13 F.4th 531, 538–42 (6th Cir. 2021). And more recently, Justice Thomas questioned the historical foundations of the associational-standing doctrine, which he stated, "appears to create serious problems, both constitutional and otherwise." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 403 (2024) (Thomas, J., concurring). Because TIRRC lacks standing even under the traditional three-part associational standing test, this Court need not address whether that test can be reconciled with the Supreme Court's recent standing decisions.

concrete and particularized injury from the defendant's conduct" and "show that its requested relief will redress this injury." *Ass'n of Am. Physicians & Surgeons*, 13 F.4th at 543. While TIRRC identifies a member who was stopped by a THP trooper near Memphis, that one member[4] would not have standing in her own right to bring the instant lawsuit.

The TIRRC member, Rosa, was stopped earlier this year for two non-moving traffic violations. Dkt. 1-1, ¶ 18. Rosa allegedly "believed that she had been subjected to a pretextual traffic stop for the purpose of investigating her immigration status" and "[s]he experienced anxiety and a sense of powerlessness for the duration of the stop." *Id*. But even if such a stop constitutes a concrete and particularized injury, which Defendants dispute, "[t]he hypothetical threat of some future harm, even a likely future harm, is not an injury-in-fact," *WCI, Inc.*, 18 F.4th at 515, and TIRRC has failed to show that Rosa is certain to be stopped again, *id.* ("it is not enough that the future injury is reasonably likely to occur—the threatened injury must be certainly impending.) (cleaned up). Simply put, Rosa's fear that she will be stopped again is speculative and conjectural. *Lyons*, 461 U.S. at 108. Indeed, in the absence of Rosa declaring an intent to commit more traffic violations, there is no threat that she will be stopped again by THP.

Based on the foregoing, Plaintiffs lack Article III standing and the case must be remanded on that basis alone. *See* 28 U.S.C. § 1447(c).

---

[4] Defendants make a facial attack on TIRRC's associational standing; in other words, TIRRC must show through its allegations that this Court has jurisdiction over the complaint as pleaded without bolstering through extrinsic evidence. *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994). So TIRRC cannot rely on the declaration about Rosa and Pablo offered in support of their request for a temporary injunction. Dkt. 33-1. Nor can it rely on the "statistical evidence" it used to prop up its injunction request. *See* Dkt. 41, at 12. Even had it pleaded those statistics, "the Supreme Court has rejected probabilistic analysis as a basis for conferring standing." *Ga. Republican Party v. Securities and Exchange Comm'n*, 888 F.3d 1198, 1204 (11th Cir. 2018). It is insufficient even if "there is a statistical probability that some of [TIRRC's] members are threatened with concrete injury." *Summers v. Earth Island Inst.*, 555 U.S. 488, 497 (2009).

## II. Sovereign Immunity Bars the State Law Claims, All Claims Against the State Agency Defendants, and All Claims Against the State Officials Based on Past Conduct.

Plaintiffs face another jurisdictional hurdle—sovereign immunity. Each of their claims are brought against the State. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) ("[A] suit against a state official in his or her official capacity is . . . no different from a suit against the State itself.") (citations omitted); *Thompson v. Tennessee*, No. 3:08-CV-251, 2009 WL 10869407, at *2 (E.D. Tenn. Mar. 31, 2009) ("the Tennessee Highway Patrol and the Tennessee Department of Safety are state agencies, and suits against state agencies are the same as a suit against the state.") (citations omitted). Sovereign immunity "deprives federal courts of subject-matter jurisdiction when a citizen sues his own State unless the State waives its immunity or Congress abrogates that sovereign immunity." *Russell*, 784 F.3d at 1046. But a state's waiver of sovereign immunity, or consent to suit, must be "unequivocally expressed," *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 99 (1984), and the same applies to congressional intent to abrogate, *id.* There is only one more exception: "a suit challenging the constitutionality of a state official's action is not one against the State." *Id.* at 102 (citing *Ex parte Young*, 209 U.S. 123 (1908)).

Tennessee "has not waived sovereign immunity." *Farmer v. Phillips*, No. 20-5730, 2021 WL 6210609, at *2 (6th Cir. Oct. 19, 2021) (citing Tenn. Code Ann. § 20-13-102(a)).[5] And

---

[5] That Defendants removed this case to federal court does not change that conclusion. True, the Supreme Court has held "that the State's action joining the removing of this case to federal court waived its Eleventh Amendment immunity[.]" *Lapides v. Bd. of Reg. of Univ. Sys. of Georgia*, 535 U.S. 613, 624 (2002). But the *Lapides* exception is "limited 'to the context of state-law claims, in respect to which the State has explicitly waived immunity from state-court proceedings.'" *Dantz v. Am. Apple Grp., LLC.*, 123 Fed. App'x 702, 706-07 (6th Cir. 2005) (quoting *Lapides*, 535 U.S. at 617). Unlike in *Lapides*, Tennessee has not waived immunity for Plaintiffs' claims here. In fact, the General Assembly made clear when it repealed Tenn. Code Ann. § 1-3-121, which had been interpreted as a waiver of sovereign immunity, that it "never intended … to waive Tennessee's sovereign immunity" for actions seeking declaratory or injunctive relief regarding the "legality or constitutionality of a government action." *See* 2026 Tenn. Pub. Act, ch. 664 (repealing Tenn. Code Ann. § 1-3-121). As a result, *Lapides* is inapposite.

Congress did not abrogate the sovereign immunity of the states in enacting 42 U.S.C. § 1983. *Will*, 491 U.S. at 70-71. Thus, this suit can proceed only if the *Ex parte Young* exception applies. *Russell*, 784 F.3d at 1046-47. That exception "has been read narrowly," *EMW Women's Surgical Ctr. v. Beshear*, 920 F.3d 421, 445 (6th Cir. 2019), and "allows plaintiffs to bring claims for prospective relief against state officials sued in their official capacity to prevent future federal constitutional or statutory violations." *Boler v. Earley*, 865 F.3d 391, 412 (6th Cir. 2017). The only claims that fall within this exception are the Section 1983 claims against Colonel Perry and Commissioner Long based on THP's prospective involvement in the ongoing Memphis operations. The remaining claims—the state law claims, all claims against THP and the Department, and the Section 1983 claims based on past conduct—must be dismissed for lack of subject matter jurisdiction.

**A. The Court lacks jurisdiction over Plaintiffs' claims that Defendants are violating state law.**

There is no "greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law." *Pennhurst*, 465 U.S. at 106. Yet that is what Plaintiffs ask this court to do. They allege that "Defendants are acting beyond" their "statutory powers" and in violation of the Tennessee Constitution "by directing THP troopers to work jointly with U.S. Department of Homeland Security agents with the goal of detaining motorists to investigate their immigration status." Dkt. 1-1, ¶¶ 66, 70, 76. And they seek declaratory and injunctive relief on that basis. *Id*. at 30. Put another way, Plaintiffs ask this Court to "enjoin … state officials on the basis of … state law." *Pennhurst*, 465 U.S. at 125-26. But because "federal courts lack[] jurisdiction" over those claims, *id*., the state law claims must be dismissed.

### B. The Court lacks jurisdiction over Plaintiffs' claims against state agencies.

It is well-established that *Ex parte Young* "has no application in suits against the States and their agencies, which are barred regardless of the relief sought." *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993). Both THP and the Department are state agencies. *Thompson*, 2009 WL 10869407, at *2. So regardless of the relief sought, claims against them are claims against the State and, consequently, are barred by sovereign immunity. *Puerto Rico Aqueduct & Sewer Auth., Inc.*, 506 U.S. at 146. Thus, all claims against THP and the Department must be dismissed for lack of subject matter jurisdiction.

### C. The Court lacks jurisdiction to decide the constitutionality of past conduct.

"In order to fall within the *Ex parte Young* exception, a claim must seek prospective relief to end a continuing violation of federal law." *Diaz v. Michigan Dep't of Corr.*, 703 F.3d 956, 964 (6th Cir. 2013). Plaintiffs ask this Court to "[d]eclare that the Defendants have violated and continue to violate . . . the Fourth and Fourteenth Amendments of the U.S. Constitution" and "[e]njoin the Defendants from directing THP troopers" to engage in conduct which allegedly violates those constitutional provisions, Dkt. 1-1 at 30, 31. As an initial matter, a declaration that Defendants *have* violated constitutional provisions is not prospective. *Wernert v. Williamson Cnty. Bd. of Educ.*, No. 3:24-CV-01000, 2025 WL 2025166, at *4 (M.D. Tenn. July 18, 2025) ("Even though the plaintiffs seek relief in the form of a declaratory judgment . . . the declaration they seek is retroactive in nature, not prospective, because the plaintiffs ask the court to declare that [the state official's] behavior in the past violated the [ ] plaintiff's constitutional rights."). And the only *continuing* violations alleged by Plaintiffs arise from THP's involvement in the Memphis operations.

The allegedly unlawful joint operation in Davidson County ended on May 10, 2025. Dkt. 1-1, ¶ 44. Likewise, the sobriety checkpoint in Robertson County ended on May 9, 2025. *Id.* ¶ 56.

Because *Ex parte Young* only allows "claims for *prospective* relief against state officials sued in their official capacity to prevent *future* federal constitutional or statutory violations," *Boler*, 865 F.3d at 412 (emphasis added), the claims against Colonel Perry and Commissioner Long based on the May 2025 operations are barred by sovereign immunity and must be dismissed for lack of subject matter jurisdiction.

## III. Plaintiffs Fail to State a Claim Upon Which Relief May Be Granted.

Setting aside those jurisdictional hurdles, Plaintiffs' Complaint fails to state a claim upon which relief may be granted. THP has the authority to stop vehicles for traffic violations. And because Plaintiffs concede that THP only stops motorists based on probable cause of a traffic violation, there is no Fourth Amendment violation. Finally, Plaintiffs' factual allegations cannot support a claim for a violation of the Equal Protection Clause of the Fourteenth Amendment.

### A. THP's alleged activities are authorized by Tennessee law.

Plaintiffs first claim that Defendants are acting *ultra vires*, i.e., beyond their state-law statutory powers. Dkt. 1-1 at 28. "A state officer may be said to act *ultra vires* only when he acts without any authority whatever." *Skatemore, Inc. v. Whitmer*, 40 F.4th 727, 736 (6th Cir. 2022) (cleaned up). This is a "very narrow" doctrine. *Pennhurst*, 465 U.S. at 114 n.25. And the applicable lenient standard merely asks "whether the state official had a colorable basis for the exercise of authority." *Skatemore*, 40 F.4th at 736 (cleaned up). Similarly, under Tennessee law, an action is *ultra vires* only if it is "wholly outside the scope" of the officer's authority or if the action is inconsistent with mandatory provisions. *Allmand v. Pavletic*, 292 S.W.3d 618, 626 (Tenn. 2009).

Here, THP troopers are acting within their statutory authority. Tennessee law requires THP to "[p]atrol the state highways and enforce all laws" regulating traffic on those highways. Tenn. Code Ann. § 4-7-104. And the dispute in this case stems from "THP troopers stop[ping] vehicles for putative traffic violations." Dkt. 1-1, ¶ 2. THP has authority to make those stops. Plaintiffs

allege that when THP's subjective "purpose [for] an operation is the enforcement of civil immigration laws," it is acting *ultra vires*. Dkt. 1-1, ¶ 41. But allegedly ulterior motives do not strip public officials of their statutory authority. *See Skatemore*, 40 F.4th at 736; *Pennhurst*, 465 U.S. at 102 n.11. Because troopers are statutorily authorized to stop vehicles for traffic violations, they have "a colorable basis" for exercising that authority. *Skatemore*, 40 F.4th at 736.

In any event, all law enforcement agencies and officials are required to "communicate with" federal officials "regarding the immigration status of any individual," and "otherwise cooperate with the appropriate federal official in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States." Tenn. Code Ann. § 7-68-105. Although this statute applies specifically to local law enforcement, it demonstrates that law enforcement is authorized, and on some occasions mandated, to cooperate with federal immigration officials.

Given the explicit statutory duties imputed onto THP and THP troopers, Plaintiffs' *ultra vires* allegations fall short of stating a claim upon which relief may be granted.

### B. THP's probable-cause-backed traffic stops do not violate the Fourth Amendment.

Plaintiffs next claim that Defendants are violating the Fourth Amendment "by directing THP troopers to work jointly with U.S. Department of Homeland Security agents with the goal of detaining motorists to investigate their immigration status" and "by directing THP troopers to deliberately and systematically conduct traffic stops for the ulterior purpose of enforcing civil immigration law." Dkt. 1-1 ¶ 70. The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated and no Warrants shall issue, but upon probable cause." U.S. Const. amend. IV. Because "[t]emporary detention of individuals during the stop of an automobile"

constitutes a "seizure" of "persons" within the meaning of the Fourth Amendment, the stop must be reasonable. *Whren*, 517 U.S. at 809-810.

A law enforcement officer may reasonably "stop a car when he [or she] has probable cause to believe that a civil traffic violation has occurred." *United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008) (citation omitted). Probable cause requires a "reasonable ground for belief supported by less than prima facie proof but more than mere suspicion." *Id*. This analysis requires courts to evaluate the "objective fact" of whether officers have probable cause, not to examine the "subjective intent" of what those officers' motivations were. *United States v. Hughes*, 606 F.3d 311, 315 (6th Cir. 2010). Indeed, an officer's "ulterior motivations, if any, are irrelevant." *United States v. Sanford*, 476 F.3d 391, 395 (6th Cir. 2007) (citing *Whren*, 517 U.S. at 813). The upshot is that regardless of intent, "the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren*, 517 U.S. at 810.

Application of this doctrine here is straightforward. Plaintiffs concede that THP "traffic stops are made only when there actually is probable cause of a traffic violation." Dkt. 1-1, ¶ 2 n.1. And they acknowledge that "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." *Whren*, 517 U.S. at 813; *see* Dkt. 1-1, ¶ 40. Although this forecloses their Fourth Amendment claim, Plaintiffs ask this Court to deviate from settled precedent and consider "the real reason for the seizure" because "pretextual seizures of motorists are unreasonable" "when the subterfuge exists on the administrative or planning level." Dkt. 1-1, ¶ 40. But the Supreme Court has "flatly dismissed the idea that an ulterior motive might serve to strip [officers] of their legal justification." *Whren*, 517 U.S. at 812. Put simply, Plaintiffs' "novel theory of incorporating the standard that applies to administrative stops unsupported by probable cause is not grounded in legal precedent." *Tennessee Immigrant and Refugee Rights Coalition v. Tennessee Highway*

*Patrol*, No. 3:26-cv-00832, 2026 WL 2859725, at *8 (M.D. Tenn. Sep. 23, 2026); Dkt. 41 at 18. Because Plaintiffs concede that THP troopers have probable cause for the stops at issue, they fail to state a claim under the Fourth Amendment.

### C. Plaintiffs do not show that Defendants are discriminating on the basis of race in traffic stops.

Finally, Plaintiffs claim that Defendants are violating the Equal Protection Clause of the Fourteenth Amendment "by directing THP troopers to work jointly with U.S. Department of Homeland Security agents with the goal of detaining motorists to investigate their immigration status, because those operations involve troopers choosing to stop motorists based primarily on their perceived race or ethnicity." Dkt. 1-1 ¶ 76. Put differently, they assert that when the real goal is immigration enforcement, it is inevitable that "troopers will deliberately and regularly" stop motorists based on their race or ethnicity. *Id.* ¶ 42. And they allege that THP troopers involved in the Memphis Safe Task Force "have extra aggressively enforced the traffic code against Hispanics" and that those operations "use racial profiling to determine which motorists to stop." *Id.* at ¶¶ 60, 61. But such generalized allegations of racial profiling, unsupported by specific factual allegations demonstrating discriminatory purpose and effect, are insufficient to state a claim under the Equal Protection Clause.

The Equal Protection Clause prohibits any "State [from] . . . deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Relevant here, the Clause "prohibits selective enforcement of the law based on considerations such as race." *Whren*, 517 U.S. at 813. The Sixth Circuit "has established a three-part test" for selective-enforcement claims:

> First, [an official] must single out a person belonging to an identifiable group, such as those of a particular race or religion, or a group exercising constitutional rights, for prosecution even though he has decided not to prosecute persons not belonging to that group in similar situations. Second, [the official] must initiate the

> prosecution with a discriminatory purpose. Finally, the prosecution must have a discriminatory effect on the group which the defendant belongs to.

*Gardenhire v. Schubert*, 205 F.3d 303, 319 (6th Cir. 2000) (citation omitted). The standard for establishing a selective-enforcement claim is a "demanding one." *Stemler v. City of Florence*, 126 F.3d 856, 873 (6th Cir. 1997). "[T]here is a strong presumption that state actors have properly discharged their official duties." *Id*. Only "clear evidence to the contrary" will "overcome that presumption." *Id*.

At minimum, a plaintiff must make "a prima facie showing that similarly situated persons outside her category were not prosecuted." *Id*.; *see Farm Lab. Org. Comm. v. Ohio State Highway Patrol*, 308 F.3d 523, 534 (6th Cir. 2002) ("To establish discriminatory effect in a race case, the claimant must show that similarly situated individuals of a different race were not prosecuted."). A plaintiff "can demonstrate discriminatory effect by naming a similarly situated individual who was not investigated or through the use of statistical or other evidence which addresses the crucial question of whether one class is being treated differently from another class that is otherwise similarly situated." *Id*. (cleaned up). And discriminatory purpose can be "inferred from the totality of the relevant facts, including the fact . . . that the practice bears more heavily on one race than another." *Id*. (cleaned up).

Although Plaintiffs claim that THP troopers in Memphis "have extra aggressively enforced the traffic code against Hispanics," Dkt. 1-1 ¶ 60, they fail to allege any facts demonstrating that similarly situated non-Hispanic motorists are *not* being pulled over. Nor do they show that Hispanic motorists are being treated any differently than non-Hispanic motorists. While Plaintiffs assert that the majority of immigration arrests by the Memphis Safe Task Force started with a traffic stop by a THP trooper, *Id*. ¶ 62, those statistics, even if true, do not support an inference that THP troopers are enforcing the traffic code more aggressively against Hispanic motorists.

Even if the majority of immigration arrests *originated* from a traffic stop, that does not mean that the majority of traffic stops *resulted* in immigration arrests.[6] In sum, the statistic fails to distinguish discriminatory enforcement from ordinary traffic enforcement that sometimes results in the discovery of immigration violations.

At bottom, Plaintiffs simply claim that if THP troopers are focused on immigration enforcement, they must stop motorists based on their race or ethnicity. *Id.* ¶ 42. Such conclusory allegations of racial profiling, without more, are not sufficient to state a selective-enforcement claim. Thus, Plaintiffs' Equal Protection claim should be dismissed.

**CONCLUSION**

Because neither the taxpayer plaintiffs nor TIRRC have standing, this case should be remanded for lack of subject matter jurisdiction. If the Court finds that some, but not all, Plaintiffs have standing, it should dismiss the lacking Plaintiffs' claims without prejudice. Any surviving claims should be dismissed with prejudice for failure to state a claim upon which relief may be granted.

---

[6] The same source that Plaintiffs incorporated in their complaint to support their contention that most immigration arrests started with a traffic stop also reports that only about 15% of the arrests made by the Memphis Safe Task Force were immigration-related. Wendie Thomas et al., *Just 2% of Immigration Arrests by Memphis Safe Task Force Were for Violent Crime, Records Show,* ProPublica, available at https://www.propublica.org/article/memphis-safe-task-force-immigration-arrests-crime-data (cited at Dkt. 1-1, at 27 n. 39-41).

Respectfully submitted,

JONATHAN SKRMETTI
Attorney General and Reporter

*<u>/s/ Andrew D. Denning</u>*
ANDREW D. DENNING, BPR# 042208
Assistant Attorney General
Constitutional Defense Division
Office of the Attorney General
P.O. Box 20207
Nashville, Tennessee 37202-0207
Phone: (615) 253-1103
Andrew.Denning@ag.tn.gov
*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing was filed and served by operation of the Court's electronic filing system on October 27, 2026, upon:

Ian Andrew Mance
NYU School of Law
40 Washington Square S.
New York, NY 10012
ian.mance@nyu.edu

Julio Quiroz Colby
Spring A. Miller
Tennessee Immigrant & Refugee Rights Coalition
3310 Ezell Rd
Nashville, TN 37211
julio@tnimmigrant.org
spring@tnimmigrant.org

Maria R. Santangelo
Rascoe S. Dean
Sherrard Roe Voigt & Harbison, PLC
1600 West End Avenue
Suite 1750
Nashville, TN 37203
msantangelo@srvhlaw.com
rdean@srvhlaw.com

Michael C Holley
The Law Office of Michael C. Holley
922 Main Street
Suite C-161
Nashville, TN 37206
mholley@holleylegal.com

*/s/ Andrew D. Denning*
ANDREW D. DENNING
Assistant Attorney General